**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SUSAN CHAGNON, Derivatively and On Behalf of MATTEL, INC. | ) ) ) | |
| | ) | Civil Action No.: |
| Plaintiff, | ) ) | |
| | ) | |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| YNON KREIZ, MARGARET H. GEORGIADIS, JOSEPH J. EUTENEUER, KEVIN FARR, JOSEPH B. JOHNSON, R. TODD BRADLEY, ADRIANA CISNEROS, MICHAEL J. DOLAN, TREVOR A. EDWARDS, FRANCES D. FERGUSSON, SOREN T. LAURSEN, ANN LEWNES, KATHY W. LOYD, ROGER LYNCH, DOMINIC NG, JUDY D. OLIAN, VASANT M. PRABHU, DEAN A. SCARBOROUGH, CHRISTOPHER A. SINCLAIR, and PRICEWATERHOUSECOOPERS LLP | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| MATTEL, INC. | ) ) | |
| Nominal Defendant. | ) ) ) | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Susan Chagnon ("Plaintiff"), by and through her counsel, derivatively on behalf of Nominal Defendant Mattel, Inc. ("Mattel" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which included, *inter alia*, review and analysis

of: (i) regulatory filings made by Mattel with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Mattel; (iii) a purported class action lawsuit filed in the United Stated District Court for the Central District of California against Mattel, Inc., and Individual Defendants Joseph J. Euteneuer ("Euteneuer"), Margaret H. Georgiadis ("Georgiadis"), Defendant Kevin Farr ("Farr"), and Defendant PricewaterhouseCoopers ("PwC") alleging violations of the anti-fraud provisions of the federal securities laws based on the alleged issuance of false and misleading statements of material fact, and the alleged omission to state material facts necessary to make other statements made not misleading, between August 2, 2017 to August 8, 2019 (the "Relevant Period") with respect to Mattel's accounting and reporting procedures (the "Securities Class Action"); and (iv) other publicly available information, including media and analyst reports, concerning Mattel.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action asserting claims for breach of fiduciary duty, violations of Section 14(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and SEC rule 14a-9 promulgated thereunder, and other violations of law, brought on behalf of nominal defendant Mattel against certain officers and members of the Company's Board of Directors (the "Board").

2.      This derivative action concerns the cover-up of known material misstatements in Mattel's financial results and known severe weaknesses in the Company's internal controls. The cover-up was orchestrated by the Individual Defendants and the Company's auditor, PwC— who were directly responsible for ensuring that Mattel's public statements to investors were accurate and complete.

3.      As detailed below, from the beginning of the Relevant Period, Mattel's tax,

2

accounting, and public reporting irregularities were wide-spread, creating the perfect conditions to enable the Individual Defendants' misconduct. Among other things, Mattel kept the financial information used to generate its financial statements in boxes and binders of loose paper stacked about its offices, with no organization, making it extremely difficult to even find the pertinent back-up information for its financial results. When that information could be found, it often did not "tie out," or reconcile, with the Company's published financial statements. The Individual Defendants also allowed Mattel to lack any formal process for determining and documenting the valuation allowance for its deferred tax assets—which was a critical deficiency because those assets were valued by Mattel at approximately $580 million and had a material impact on Mattel's financial results and balance sheet.

4.      Brett Whitaker ("Whitaker")[1], a senior Mattel tax executive during the Relevant Period reported that the internal control deficiencies at Mattel were severe, open, obvious, and repeatedly discussed with Mattel executives. "If you just walked around the halls, you would know that this place was riddled with issues and alarms were going off everywhere."[2]

5.      In October 2017, as Mattel was closing its books for the third quarter, it was

---

[1] Whitaker earned a Bachelor's degree in Accounting and a Master's degree in Taxation from the University of Washington. He began his career in accounting as an intern with Ernst & Young LLP ("E & Y"), one of the "Big Four" accounting firms, and later joined E & Y's National Tax Accounting and Risk Advisory group, where he worked for seven years until 2012. Whitaker then left E & Y and went on to become the Tax Manager at Zynga from 2012 until 2013. He then managed U.S. GAAP accounting for all foreign subsidiaries of Amazon from 2013 through June 2015. Whitaker left Amazon for Nike, where he served as the Tax Director for Income Tax Accounting before joining Mattel in May 2017, where he remained until March 2018.

[2] The misconduct at issue here led to the filing of the Securities Class Action, and on May 29, 2020, plaintiffs in the Securities Class Action filed a Consolidated Amended Complaint for Violations of the Federal Securities Laws (the "Consolidated Amended Complaint" or "CAC"). The CAC includes the account of a former employee that assists in substantiating Plaintiff's allegations of the misconduct of the Individual Defendants in this action. Any references to former employee(s) in this derivative complaint come from the Consolidated Amended Complaint.

attempting to calculate a potentially very significant allowance for its deferred tax assets. This calculation was highly material. The allowance represented the portion of the assets that no longer had value. The allowance would reduce the value of Mattel's deferred tax assets and be charged against the Company's quarterly income, potentially reducing that income by hundreds of millions of dollars. The process of calculating this critical financial item occurred under the supervision of Mattel's Chief Financial Officer, Defendant Euteneuer, and PwC's former lead audit partner for Mattel, Joshua Abrahams ('Abrahams").

6. The process of calculating this key allowance was chaotic at best. Initially, Mattel determined that it would not record an allowance against the value of its deferred tax assets. Then, with the closing process almost complete, Mattel reversed its decision and determined that it was required to record an allowance against the assets, thus materially reducing their value. Whitaker's team was tasked with calculating a potential half-billion dollar allowance in less than a week. This critical tax and accounting determination would normally take several weeks to make, if not longer, yet Whitaker and his team were forced to do it in days—and do it without reliable documentation that was necessary to back-up the calculation, or any formal process for making and vetting the calculation. Nevertheless, Whitaker and his team worked around the clock and calculated a valuation allowance of approximately $175-200 million, meaning that the assets, and Mattel's net income, would have to be reduced by that amount.

7. Days before Mattel's financial statements were due to be published to investors, PwC informed Whitaker and other Mattel executives that he believed the allowance had been miscalculated. Per PWC, the value of the deferred tax assets had been improperly reduced by several hundred million dollars, which, in turn, had the effect of improperly reducing the valuation allowance amount on those assets by a similar amount.

4

8.      Whitaker and other Mattel executives agreed that errors had been made that incorrectly lowered the allowance by significant amounts. Accordingly, just days before Mattel's financial statements were set to be published to investors, Whitaker and his team were required to fully re-calculate the valuation allowance— again, without adequate time, supporting documentation, or any formal process for doing so. This time, Mattel's calculation yielded a much higher allowance of $562 million, which reduced the value of Mattel's deferred tax assets—and reduced the Company's income—by hundreds of millions of dollars more.

9.      Throughout this entire process, Mattel was internally circulating draft financial statements to its senior executives, including Defendant Euteneuer. Accordingly, the Individual Defendants were privy to the wild downward swings in the Company's third quarter income in the days before they were to be released—first when the Company reversed course and decided to record an allowance of approximately $175-200 million, and then when the Company decided to record an allowance of $562 million.

10.     Unremarkably, Whitaker reported that the Company's numbers were simply unreliable: "We had no confidence in what we were using. Typically, there is a trail of documentation that supports what you are reporting, and that just did not exist."

11.     Nevertheless, on October 26, 2017, Mattel published its 2017 third quarter financial results to investors in a Form 10-Q signed by Defendant Euteneuer, among others. In the Form 10-Q, Mattel reported a loss of $603 million, driven by its $562 million valuation allowance on the deferred tax assets. Defendant Euteneuer certified that these results were accurate and prepared in accordance with accounting rules, and that he had "designed . . . internal control over financial reporting . . . to provide reasonable assurance" that Mattel's financial statements were correct.

12.     These statements were false. Unbeknownst to investors, Mattel's loss was materially understated by an astonishing $109 million—an amount equal to approximately 35% of Mattel's net income for all of 2016—and the Company's internal controls were severely deficient.

13.     In January 2018, as part of the closing process for the Company's 2017 year-end results, Whitaker and Mattel tax executive, Dermot Martin ("Martin") had a meeting to investigate the support for the spreadsheet that was used to substantiate the allowance days before third quarter results were published.  Whitaker described the meeting as "odd": "He [Martin] had us lock ourselves into a conference room, which we never did, and he produced several boxes and binders of loose paper to walk me through.  And I thought he was going to say, 'Here is where the backup is.'  And instead, he said, 'I think the support is somewhere in here. Let's try to find it.'" Whitaker reported, "this is how things were done at Mattel."

14.     After hours of rummaging through boxes and binders of paper, with no success, Whitaker eventually discovered a document that demonstrated that Mattel had materially understated its valuation allowance for the third quarter of 2017 and, in turn, the size of its reported loss.  The document showed that a $311 million intellectual property asset (defined herein as the "HiT IP"), which had been treated as a "finite lived" asset, was actually "indefinite lived." Accordingly, the deferred tax liability that resulted from the HiT IP, which had been used to reduce the valuation allowance for the third quarter of 2017, should not have been used to reduce the allowance. The error amounted to approximately $109 million. When Whitaker explained the error to Martin, Martin remarked, "There goes my ***** job."

15.     On January 15, 2018, Whitaker met with Mattel's Senior Vice President of Accounting, Joe Johnson ("Johnson"), Senior Vice President of Tax and Customs, Clara Wong

("Wong"), and other Accounting and Internal Audit executives, including Mattel's Vice President of Internal Audit. They all agreed that the error had been made and was material. They also all agreed that the Company was suffering from a material weakness in its internal controls. There was "no conflict" on these points, Whitaker reported. Johnson, however, protested that, "We cannot have a material weakness. That would be the kiss of death."

16.     At this time, the Individual Defendants knew that disclosure of misstated financial results and material weaknesses by Mattel would have triggered a particularly severe negative market reaction. Mattel's stock had lost over half of its value in 2017 due to outsized losses, and the Company was executing a strategic rebuild in an attempt to turn around its business. Investors were already questioning Mattel's future, and full disclosure of the truth could have further harmed Mattel's stock price and decimated investor confidence in the Company's ability to weather its troubled times.

17.     Whitaker, Johnson, and Wong met Mattel's legal team, including its head legal officer and its SEC counsel. When asked what the conclusion reached at the meeting was, Whitaker reported that there "was absolutely zero doubt in anyone's mind that we had a material misstatement that would result in a restatement of third quarter earnings." The group decided to inform CFO Euteneuer of their conclusion, and then speak with PwC.

18.     Wong met with Euteneuer and told him of the material error in the third quarter financial statements, and the group's decision to restate those financial statements and admit a material weakness in Mattel's internal controls. Wong reported to Whitaker that Euteneuer accepted the decision.

19.     The subsequent meeting with PwC included, among others, Johnson, Wong, and Abrahams. Wong informed Whitaker that, after the team communicated its conclusions to

7

Abrahams, "Josh Abrahams' immediate response, to everyone's surprise, was that we cannot have a material weakness and we need to figure out a way for that not to be the result." "The mandate" from Abrahams "was for everyone to see what kind of a technical argument we could make" to avoid a restatement and avoid reporting a material weakness.

20.     Within days, PwC had concocted just such a plan. The plan was to change the classification of the HiT IP from an indefinite-lived asset to a finite-lived asset retroactively as of the start of the fourth quarter, on October 1, 2017. This change in classification was an artificial device for Mattel to avoid a required restatement of its third quarter financial statements. This change would match the classification of the HiT IP to the manner in which the Company had (incorrectly) treated it when calculating the third quarter valuation allowance, thus purportedly rendering the valuation allowance "correct" as of the fourth quarter. When Whitaker asked Wong how Mattel could make this retroactive change, Wong's response was that "they would rather have a slap on their wrist from the SEC."

21.     According to Whitaker, Mattel believed that if the SEC discovered that Mattel had retroactively re-classified the HiT IP, it would consider this issue, by itself, far less significant than the existence of a material misstatement of financial results and a material weakness. Accordingly, Mattel believed that the retroactive classification, standing alone, would likely trigger a minimal response from regulators—a "slap on the wrist." So, Mattel and PwC decided to execute this gambit, thereby burying the material misstatement of Mattel's third quarter financial results and hiding the severe deficiencies in Mattel's internal controls.

22.     On February 28, 2018, Mattel published its 2017 Form 10-K to investors reporting its financial results for the fourth quarter and the full year. The Form 10-K, which Euteneuer signed, made no disclosure whatsoever of the fact that Mattel's third quarter results had been

materially misstated; that Mattel had material weaknesses in its internal controls; or that it and PwC had avoided a restatement by improperly and retroactively reclassifying the HiT IP.

23.     Rather than disclose the truth, the Individual Defendants made a series of affirmative materially false and misleading statements in the 2017 Form 10-K, including reporting the materially misstated third quarter results, and representing that the HiT IP had been reclassified for purely legitimate reasons. Defendant Euteneuer certified that "the financial statements, and other financial information included" in the Form 10-K "fairly present in all material respects the financial condition, results of operations and cash flows" of Mattel.  He further certified that he "evaluated the effectiveness of Mattel's internal control over financial reporting," and "concluded that it was "effective as of December 31, 2017." For its part, PwC stated in its audit report that Mattel "maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017," and that the Company's financial results were accurate.

24.     Mattel and PwC succeeded in concealing their misconduct from investors for about a year and a half—until the scheme blew up upon the Company receiving a letter from a whistleblower. On August 8, 2019, Mattel disclosed that it received a whistleblower letter about an accounting error and alleged efforts by executives and Mattel's auditor, PricewaterhouseCoopers, to conceal it. The whistleblower letter also questioned PwC's independence, whom the Board had represented as "Mattel's independent registered public accounting firm" on multiple annual proxy filings, which made those filings materially false, as alleged herein. Mattel also disclosed that it was pulling a debt offering scheduled to close the next day while it investigated the allegations in the letter. The market reacted with surprise and concern. Mattel's stock price immediately plummeted, falling from $13.43 to $11.31, or by

16%, in a single trading day on exceptionally high trading volume.

25. On October 29, 2019, the Individual Defendants finally admitted what they should have long before—that Mattel's financial results for the third and fourth quarters of 2017 had been materially misstated, its internal controls suffered from multiple material weaknesses, and it would restate its financial results to admit and correct these errors. That day, the Company issued a Form 8-K and press release admitting that "Mattel's management identified the third quarter 2017 accounting error associated with its tax valuation allowance during its year-end accounting closing procedures for the quarter ended December 31, 2017. The error was not properly assessed nor were findings and conclusions documented." The Company further admitted that this known error was "not disclosed in the 2017 10-K," and attributed this "failure" to "lapses in judgment by management" as well as the "advice" of "the lead audit engagement partner of Mattel's outside auditor," namely, Abrahams. Mattel further admitted, contrary to its Relevant Period representations, "that there were material weaknesses in its internal control over financial reporting at the time of the preparation of its financial statements for the quarters ending on September 30, 2017 and December 31, 2017."

26. The October 29, 2019 Form 8-K also disclosed that CFO Euteneuer would be departing the Company after a six-month transition period, and that he was "informed of the transition plan on October 23, 2019," less than a week before the Company's announcement. Lastly, the Company concluded that Abrahams "was in violation of the SEC's auditor independence rules," and reported that he, along with "certain other members of [the] audit team," had been replaced. PwC placed Abrahams on administrative leave immediately thereafter.

27. On November 12, 2019, Mattel issued its severely belated restatement of historical

financial results (defined herein as the "Restatement"). In the Restatement, Mattel admitted that, at the time it issued is third quarter 2017 financial results, it had understated its loss by approximately $109 million and materially misstated several other financial metrics. It further admitted that it suffered from multiple material weaknesses in internal controls.

28.     The SEC and the U.S. Attorney's Office for the Southern District of New York have subpoenaed Mattel for documents related to the whistleblower letter and the facts alleged herein. These investigations are ongoing.

29.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Mattel has sustained damages as described below.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

31.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

32.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

33.     Venue is proper in this District because Mattel is incorporated in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## THE PARTIES

34.     Plaintiff is a stockholder of Mattel, was a stockholder of Mattel at the time of the wrongdoing alleged herein, and has been a stockholder of Mattel continuously since that time.

35.     Nominal Defendant Mattel, Inc. (defined above as "Mattel" or "the Company") is a global toy-manufacturing conglomerate.  Mattel is a Delaware corporation with its headquarters located in El Segundo, California. Mattel common stock trades on the NASDAQ under the ticker symbol MAT.

36.     Defendant Ynon Kreiz ("Kreiz") has served as the Company's Chairman and Chief Executive Officer ("CEO") since April 26, 2018, and as a Company director since June 13, 2017. He also serves as the sole member of the Company's Equity Grant Allocation Committee.

37.     Defendant Euteneuer was appointed Chief Financial Officer ("CFO") of Mattel with an effective date of September 25, 2017. Prior to his official appointment, he completed a transition period that, on information and belief, lasted multiple weeks. On October 29, 2019, as a result of the Audit Committee's investigation into the whistleblower letter concerning the materially false and misleading misstatements alleged herein, Mattel announced that Euteneuer would be stepping down from his position after a six-month transition period. In light of the disruption to the global economy due to Covid-19, however, Euteneuer's tenure with Mattel was extended through August 3, 2020.

38.     Defendant Georgiadis was the CEO of Mattel from February 8, 2017 until April 19, 2018.

39.     Defendant Farr was Mattel's CFO from February 2000 until September 29, 2017. Prior to becoming CFO, Farr served in various leadership roles at Mattel since 1991. Before joining Mattel, Farr spent 10 years at PwC.

40.     Defendant Joseph B. Johnson ("Johnson") served as the Company's Senior Vice President and Corporate Controller from May 2015 until he retired on August 10, 2018.

41.     Defendant R. Todd Bradley ("Bradley") has served as a Company director since May 17, 2018. He also serves as a member of the Audit Committee and Compensation Committee.

42.     Defendant Adriana Cisneros ("Cisneros") has served as a Company director since August 13, 2018. She also serves as a member of the Governance and Social Responsibility Committee.

43.     Defendant Michael J. Dolan ("Dolan") has served as the Board's Independent Lead Director since January 2015 and as a Company director since 2004. He also serves as Chair of the Compensation Committee, Chair of the Executive Committee, and as a member of the Governance and Social Responsibility Committee.

44.      Defendant Trevor A. Edwards ("Edwards") served as a Company director from 2012 until he retired on May 17, 2018.

45.     Defendant Frances D. Fergusson ("Fergusson") served as a Company director from 2006 until she retired on May 17, 2018.

46.     Defendant Soren T. Laursen ("Laursen") has served as a Company director since May 17, 2018, and as the Company's interim Executive Director since October 2018. He also serves as a member of the Governance and Social Responsibility Committee and the Compensation Committee.

47.     Defendant Ann Lewnes ("Lewnes") has served as a Company director since 2015. She also serves as Chair of the Governance and Social Responsibility Committee, and as a member of the Executive Committee.

48.     Defendant Kathy White Loyd ("White Loyd") served as a Company director from

2001 until she retired on May 17, 2018.

49.     Defendant Roger Lynch ("Lynch") has served as a Company director since August 13, 2018. He also serves as a member of the Audit Committee and the Finance Committee.

50.     Defendant Dominic Ng ("Ng") has served as a Company director since 2006. He also serves as the Chair of the Finance Committee, and as a member of the Audit Committee and the Executive Committee.

51.     Defendant Judy D. Olian ("Olian") has served as a Company director since September 13, 2018. She also serves as a member of the Compensation Committee and the Governance and Social Responsibility Committee.

52.     Defendant Vasant M. Prabhu ("Prabhu") served as a Company director from 2007 until June 10, 2020. He also served as Chair of the Audit Committee, and as a member of the Executive Committee and the Finance Committee.

53.     Defendant Dean A. Scarborough ("Scarborough") served as a Company director from 2007 until he retired on May 17, 2018.

54.     Defendant Christopher A. Sinclair ("Sinclair") served as the Executive Chairman of the Board from February 2017 until May 2018. He previously served as a Company director from 1996. He also formerly served as the Company's CEO from April 2015 to February 2017, at which point he "resigned" from his position and took on the role of Executive Chairman of the Board.

55.     Defendant PwC has served as Mattel's registered outside auditing firm since 1974 and was responsible for auditing the Company's financial statements and internal controls over financial reporting. PwC issued unqualified audit reports on the Company's financial statements and internal controls for fiscal years 2017 and 2018 and stated that it conducted its

audits in accordance with controlling auditing standards.  PwC consented to the incorporation by reference of its unqualified audit reports on the Company's financial statements and on management's assessment of internal controls in Mattel's Relevant Period Forms 10-K.

56.     The defendants referenced above in ¶¶ 36-54 are referred to herein as the "Individual Defendants."

57.     The Individual Defendants and PwC t ogether are sometimes collectively referred to herein as the "Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

58.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

59.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

60.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and

controls of the Company. By virtue of such duties, the officers and directors of Mattel were required to, among other things:

   a)  ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

   b)  conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

   c)  properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

   d)  remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

   e)  ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

61.    Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith and candor in the management and

administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

62.    In addition, the Company has also adopted a Code of Conduct (the "Code"). Pursuant to the Code, all employees are expected to comply with the Code, Company policies, and laws that govern the Company's activities. Additionally, certain of the provisions of the Code apply to members of the Board.

63.    The Code of Conduct provides in pertinent part:

A conflict of interest arises any time our personal interests might affect our judgment as to what is in the best interest of Mattel, or make it difficult to perform our work for Mattel objectively and effectively. Employees and Directors must act in the best interests of Mattel, without considering personal interests or the potential for personal benefit.

It is the responsibility of each Covered Employee to promptly bring to the attention of the Company's Disclosure Committee any material information of which the executive may become aware that affects the disclosures made by the Company in its public filings or otherwise, and otherwise to assist the Disclosure Committee in fulfilling its responsibilities. In addition, each Covered Employee shall promptly bring to the attention of the Disclosure Committee and the Internal Audit function, any information the employee may have concerning (a) deficiencies or weaknesses in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial information or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

* * *

All employees and Directors share in the responsibility to protect Mattel's assets (including physical assets, financial assets, intellectual property and confidential information) from theft, loss, damage, misuse or waste. Employees who use company property, such as vehicles and laptop computers, should take appropriate measures to ensure their proper security and use. Company assets should not be used for illegal purposes, or for personal

benefit (except as may be allowed in company approved compensation arrangements). Incidental personal use of company assets, such as telephones, personal computers and photocopying machines, is permitted as long as such use does not interfere with the employee's duties, is not done for monetary gain, does not conflict with Mattel's business and does not violate any Mattel Policy or applicable law.

* * *

Mattel is committed to provide full, fair, complete, accurate, timely and understandable disclosure of information, including financial information, in reports filed with the Securities and Exchange Commission and in other public communications, in accordance with applicable laws, rules and regulations.

Financial books, records and accounts must be maintained in reasonable detail, accurately reflect transactions and events, and conform to applicable legal and accounting requirements and to Mattel's system of internal controls. In order to fulfill our responsibility for sound decision-making, we require honest and accurate recording and reporting of business information and transactions, including quality, safety and personnel data records, as well as financial transactions and records.

Falsification of any record or financial report, such as quality and safety data, time reports or expense reports, will result in immediate disciplinary action.

See the "How to Get Help and Raise Concerns" section for information about procedures for raising concerns about accounting and auditing matters.

* * *

Employees and Directors must comply with the laws, rules and regulations wherever Mattel does business.

Every employee has a responsibility to understand the law and the Code as it applies to his or her job. Any employee who has a question or concern about the legality of an action should contact the Law Department for advice.

Which Law Applies?

Mattel, Inc. is incorporated in the United States. The laws of the United States often extend to Mattel's operations throughout the world, and to the business activities of Mattel's employees wherever we live and work.

As a global company, Mattel's operations may be regulated by many different laws at the same time. There may be a conflict between the applicable laws of two or more countries. Any employee who thinks there may be a conflict should ask the Law Department for advice.

The Code of Conduct is intended to promote compliance with the laws and regulations that apply to Mattel's business. However, if we find that compliance with the Code of Conduct might cause us to violate the law, we must obey the law and ask the Law Department for advice as soon as possible. On the other hand, if following any local business custom or practice would cause us to violate the Code of Conduct, we must comply with the Code of Conduct and notify our supervisors of the conflict.

\* \* \*

Taking action to correct problems is part of the Mattel culture.

Mattel provides a number of resources that employees can use to raise ethical concerns or report potential violations. If you observe conduct that you believe may be unethical, illegal or in violation of the Code of Conduct or Company Policies, you should report your concerns to your supervisor, the Human Resources Department, the Law Department, the Internal Audit Department, the Global Security Department or the confidential EthicsLine.

All reported concerns will be handled promptly, fairly and discreetly. Employees must cooperate fully with any investigation that Mattel undertakes and must answer truthfully any questions that are asked as part of the investigation.

\* \* \*

Any employee may submit a good faith concern or complaint regarding accounting, internal accounting controls or auditing matters to Mattel, without fear of retaliation of any kind, in any of the following ways (these are general complaint procedures and may vary from country to country due to local laws and regulations):

Contact an Officer: Employees with complaints regarding accounting, internal accounting controls or auditing matters may report their complaints to the General Counsel or Vice President – Audit, in writing, by phone or via e-mail.
Employee complaints submitted in writing or by telephone may be made on a confidential and anonymous basis. Due to technical constraints, e-mail submissions may not be made anonymously.

Call the EthicsLine: Mattel's EthicsLine permits employees to report complaints regarding accounting, internal accounting controls or auditing matters and other matters confidentially and anonymously.

## SUBSTANTIVE ALLEGATIONS

### A.    BACKGROUND

64.    Mattel is an American multinational toy manufacturing company founded in 1945

with headquarters in El Segundo, California. The products and brands it produces include Fisher-

Price, Barbie, Monster High, Ever After High, Polly Pocket, Enchantimals, Hot Wheels, Matchbox, Masters of the Universe, American Girl, and Thomas & Friends.

65. The Company operates through three business segments: North America, international, and American Girl. It is the world's second largest toy maker in terms of revenue, after The Lego Group.

**B. MATTEL FALTERS FINANCIALLY**

66. The time leading up to (and indeed continuing through) the Relevant Period was a difficult one for Mattel. The internet age has been challenging for toy manufacturers as children have moved away from traditional toys in favor of electronics, leaving toy manufacturers facing declining demand. Mattel, traditionally the largest toy manufacturer in the world, found itself on rocky financial footing by 2017. Mattel's struggles were so significant that investors became concerned over whether it could continue as an independent Company. In response, Mattel announced a major restructuring plan to assure investors that it could successfully navigate its substantial challenges.

67. With Mattel in a vulnerable financial position, rumors that Hasbro might acquire the Company began to circulate shortly before the Relevant Period. *Business Insider* reported on March 15, 2017 that one of the reasons a combination of the two companies "[made] sense" was because "Mattel has been struggling lately as children are becoming less interested in Barbie/American Girl dolls and more interested in electronics and brands like Star Wars. The company's stock has struggled after a rough holiday season, and investors are pricing in a dividend cut."

68. On April 20, 2017, Mattel announced first quarter financial results that were widely described as disappointing by market analysts. Mattel reported that sales were down 15% and it

had suffered an operating loss of $127 million.  Barclays reported on April 20, 2019 that "Mattel's 1Q17 results were surprisingly bad.  [W]e view these results as a set-back to already low investor sentiment on the stock. We really look forward to commentary by new CEO, Margaret Georgiadis, who will hopefully provide a roadmap for investors that outlines prospects for better results ahead."

69.     On  April 21, 2017, Barclays reported that "it is tough to make the bull case at this point in time.  For us to view that glass as half full, Mattel needs to deliver upon its guidance flawlessly for the remainder of this year, demonstrate to investors that cultural improvements and operational changes not only have traction but are sustainable and that LT financial goals are tangible."

70.     The faltering state of Mattel's business prompted the Company to make significant changes to its strategic operations and long-term business plan.  On June 14, 2017 Mattel management announced a new strategic plan meant to achieve growth and focus on certain products that it believed would enable long-term profitability. The Company announced that its new growth strategy would focus on "building its Power Brands (American Girl, Barbie, Fisher-Price, Hot Wheels, and Thomas & Friends) into 360 degree connected systems of play and experiences; accelerating growth in emerging markets; and transforming its innovation pipeline." The Company announced that this "strategic repositioning" required it to "reshap[e] operations." In connection with this overhaul, Georgiadis explained that Mattel needed to "shift our business aggressively in a new strategic direction and transform how we operate[.]"

71.     On July 27, 2017, however, the Company announced second quarter 2017 financial results, which continued to be disappointing, as Mattel missed revenue, gross margin, and earnings expectations.

72.     Then, in early September 2017, rumors began circulating that Toys "R" Us would be filing for bankruptcy, which it ultimately did on September 18, 2017. Toys "R" Us was Mattel's largest customer and largest vendor of Mattel's products, and its bankruptcy put substantial additional pressure on the Company. Barclays reported on September 20, 2017 that "[g]iven the potential for lost cash flow, we believe the Toys "R" Us bankruptcy could be particularly negative for MAT. . . . As we wait to see how this situation unfolds, we can draw one major conclusion: the Toys "R" Us bankruptcy underscores the vulnerability of Mattel's balance sheet and cash flows."

73.     Mattel also cut its dividends of $0.38 per share to holders in the first and second quarters of 2017 and cut dividends to $0.15 per share in the third quarter of 2017.

74.     On October 26, 2017, Mattel announced that it was suspending its quarterly dividend entirely beginning in the fourth quarter of 2017 "in order to increase financial flexibility, strengthen balance sheet and facilitate strategic investments." Mattel also announced a plan to cut $650 million in costs.

75.     By late 2017, Mattel's position had weakened so significantly that it was exposed to a hostile takeover bid by rival Hasbro. BMO analysts reported on October 30, 2017 that "[w]e think investors can also start looking at Mattel from a sale of the company perspective, or breakup value. We believe its brands and manufacturing footprint could be worth more than $10 billion in their current state. Thus, the company could have value to a financial, industry, or entertainment conglomerate buyer."

76.     Then, on November 11, 2017, the *Wall Street Journal* reported that Hasbro had made a takeover offer for Mattel after the latter had "tak[en] a beating [that] year" with a market value "at about 5 billion, or less than half as much as Hasbro's, which is currently more than

11 billion."

77.     Aside from its financial struggles, Mattel was also an extremely debt-heavy company— and remained so throughout the Relevant Period. Mattel held between $2.6 and $3 billion of debt between the second quarter of 2017 and the third quarter of 2019. On December 9, 2017, Mattel disclosed that it was seeking to issue an additional $1 billion in unsecured notes so that it could pay its maturing debt. Unfortunately for Mattel, as its worsening financial state made its bonds increasingly risky, it was getting much more expensive for the Company to borrow. All the major credit rating agencies, including Moody's, S&P, and Fitch Ratings, had by then downgraded Mattel to "subprime" or "junk-bond" status.

78.     All told, Mattel's stock cratered during 2017. Mattel's stock was trading at $27.67 on January 3, 2017. After Mattel disclosed its third quarter results on October 26, 2017, its stock price had fallen to $12.90, or a decrease of almost 53% from the start of the year.

**C.     MATTEL'S INTERNAL CONTROL DEFICIENCIES ALLOW THE INDIVIDUAL DEFENDANTS TO MATERIALLY MISSTATE THE COMPANY'S FINANCIAL RESULTS AND COVER UP THE MISSTATEMENT WITH PWC**

79.     By the beginning of the Relevant Period, Mattel was plagued with severe deficiencies in its internal controls. These deficiencies contributed to a material misstatement of Mattel's financial results, and then enabled the Individual Defendants to conspire with PwC to cover up those material errors rather than disclose them to investors.

80.     As detailed further below, the report of Whitaker, who served as Mattel's Director of Tax during the Relevant Period, demonstrates that Mattel's control deficiencies were widespread and severe—including key financial documents being stashed in boxes piled around Mattel's headquarters, a lack of reconciliation between important ledgers providing support for Mattel's reported financials, senior executives not understanding what they had signed off on, and the lack

of a process for setting and confirming the tax valuation allowance at issue in this case, which was unquestionably material to Mattel's financial performance.

### 1)   The Need for Internal Controls

81.     The securities laws and SEC regulations require that public companies maintain robust controls over their disclosures and financial reporting. These "internal controls" are internal processes and standards that ensure that the information about a public company's business operations and financial results in its public filings are complete and accurate.

82.     Internal controls are critical to public companies and their investors because they provide reasonable assurance that a company's publicly-reported financial results are materially accurate, and provide a way to detect any material fraud or misstatements.

83.     Public companies like Mattel are required to design and implement two kinds of internal controls to ensure that their financial and non-financial representations to investors are accurate: "disclosure controls and procedures" and "internal controls over financial reporting."

84.     "Disclosure controls and procedures" ensure that information required to be disclosed by a company under the Exchange Act is communicated to company management and its board sufficiently in advance of the company's filing dates, to allow them ample time to consider the information and make proper disclosures to the company's investors.

85.     Similarly, "internal controls over financial reporting" are designed by or under the supervision of a company's CEO and CFO to provide reasonable assurances that a company's financial statements are accurate, reliable and prepared in accordance with Generally Accepted Accounting Principles ("GAAP") before they are disclosed to investors. Company management is required to review and evaluate these controls quarterly to determine their effectiveness at preventing or detecting material misstatements of financial statements in a

timely manner.

86.     Internal controls, while always important, take on enhanced importance when a company is facing challenging times and bad news has become the norm.  As analysts noted, to return the Company to profitability and keep it viable as an independent entity, Mattel needed to execute "flawlessly." Investors were paying close attention to whether Mattel's strategic rebuild would work, and whether the rebuild would ultimately rejuvenate the Company's financial results. Significant internal control weaknesses would cause investors to lose faith in the Company's ability to turn its business around, and to lose trust in its management and publicly- reported financial results and allow the Individual Defendants to manipulate the information being provided to the investing public.

87.     As explained in further detail below, the Individual Defendants and PwC represented throughout the Relevant Period that Mattel maintained effective controls. These representations assured investors that they could rely on the information, both financial and non-financial, reported in Mattel's SEC filings to make informed investment decisions, which, again, was particularly important given the fragile and uncertain state of Mattel's business.

88.     Those representations were false when made and the Individual Defendants and PwC have now admitted as much. As reported by Whitaker—and as the Individual Defendants and PwC have now acknowledged—Mattel's controls suffered from multiple, undisclosed material weaknesses in violation of a number of statutes, SEC regulations, and governing standards.

       **2)    Mattel's Internal Controls Were Severely Deficient**

89.     Before taking control of tax reporting for Mattel, Whitaker familiarized himself with the Company's processes. When Whitaker joined the Company in May 2017, Mattel was approximately a month away from the close of its second quarter 2017, so Whitaker

"shadowed" Clara Wong (Mattel's Vice President of Tax) throughout the closing process, including attending meetings with Wong. Whitaker took control and was responsible for leading the tax team through the third quarter closing process.

90.     Upon arriving at Mattel in May 2017, Whitaker observed a number of red flags and critical deficiencies within Mattel's system of internal controls related to the tax and accounting departments. In describing the environment at Mattel, he said: "If you just walked around the halls, you would know that this place was riddled with issues and alarms were going off everywhere."

91.     There were boxes of loose paper everywhere containing important financial documentation that was used to support and substantiate the financial statements, and this was the modus operandi for the accounting and tax departments. The support for Mattel's financials was kept in these boxes and binders of loose paper, there was no organization, and important information was not backed up electronically. To understand Mattel's financial statements and the support for what was reported in the Company's SEC filings, Whitaker had to "literally scrummage through boxes and boxes of loose paper to try and gain understanding." Whitaker reported that "we just couldn't find anything. It was like I was back in the 1980's and I don't mean that as a joke. I had never seen anything like it in my entire life. That was the biggest red flag. We just couldn't find anything." Given the severe deficiencies in how Mattel documented the support for its financial statements, when Whitaker had questions about Mattel's financials or where to find support for a specific entry, the people who had signed off on the entries did not have answers. Whitaker said further that it was "impossible not to be aware of [the Company's reliance on disorganized piles of paper] because when you walked around the office it was everywhere. It was kind of a running joke between departments, including Internal Audit."

92.     Even when Whitaker was able to gain access to backup materials, the numbers often did not "tie out." In other words, the numbers did not reconcile. "We literally couldn't figure out how the numbers reconciled," Whitaker reported. Whitaker recalled attending meetings with senior Mattel employees who had signed off on the Company's reported financials who themselves could not figure out how to reconcile the numbers. Per Whitaker, "[i]t was almost as if they didn't know what they had signed off on. They admittedly in some cases were not even sure what they had signed off on."

93.     This was also true with respect to PwC, Mattel's long-time outside auditor. According to Whitaker, when he arrived at Mattel, he had a series of meetings with the primary PwC partners on the Mattel audit team—Joshua Abrahams, John Brierley ("Brierley"), and Chip Lightfoot ("Lightfoot"). During these meetings, even the PwC partners were unable to explain how past quarters' numbers were reconciled, and despite this they had been signing off on Mattel's financial statements for years.

94.     Third, there was extremely ineffective communication between the Tax department and the Financial Planning & Analysis ("FP&A") department. This was a critical breakdown because Mattel's tax provisioning was based in part on the Company's forecast and budget, for which FP&A was responsible. Whitaker explained that normally, at a company with adequate controls, the FP&A and Tax departments would work in tandem—they were "tied at the hip"— because many determinations as to tax liabilities relied on FP&A analysis. However, at Mattel, the two departments "could not have been in more different worlds." As a result, "[t]here was a lot of confusion about what was being booked as a tax provision."

95.     Additionally, the Company lacked an internal control or formal process for determining, documenting and confirming its tax valuation allowance. This was a fundamental

failure.  Companies must have key controls that mitigate the risk that financial statements, including deferred tax assets and income tax expense, are materially misstated. Since the Company's deferred tax asset was material prior to and during the Relevant Period (it was $580 million as of June 30, 2017, for example), Mattel should have had controls in place to ensure that the Company's deferred tax asset balance was recorded in accordance with GAAP. This would include a formal process for determining whether the deferred tax asset required a valuation allowance at any point, and an established process for calculating, documenting, and confirming the accuracy of the allowance.

96.    Mattel's process of applying its internal controls in the Tax department was also deficient and superficial, as was the purported testing of such internal controls that was performed by Mattel's Internal Audit department.  The internal control process consisted principally of having the individual who was responsible for implementing the control sign a document stating that the control had been followed and send the document to the Internal Audit department. Whitaker reported that Mattel's Tax department employees simply "checked the box" sometimes days or weeks after the control was purportedly performed, instead of substantively performing the steps described by each specific internal control. Whitaker also stated that Mattel's Internal Audit employees responsible for testing the effectiveness of various tax internal controls did not have any experience or knowledge in tax, and would simply review the signed document, but did not perform any actual testing of the controls to understand whether they were actually designed and implemented effectively by Mattel's Tax department. If the Internal Audit department requested back-up documentation for the tax calculation, they lacked the knowledge to adequately test its accuracy.  "I can tell you first hand from an internal audit standpoint, these people knew nothing about tax," Whitaker reported. "It was really just a

check the box exercise. Hey, did you sign this? The review was really just initialing a document. That would satisfy it. To say they would test it, that would be a stretch. And they didn't even know what they were testing. That was the environment we were operating in." Whitaker added that the Internal Audit department itself was open about its lack of tax knowledge and the fact that it was not qualified to manage the internal controls process for tax. "They were very vocal about the fact that they knew nothing about tax."

97.     Relatedly, Whitaker reported that PwC, which was supposed to be evaluating Mattel's internal controls, performed a similar "check the box exercise," rather than perform an actual test and evaluation of the controls. Whitaker explained that "an effective control is something you are actually doing while you are actually at task. Going back after the fact and signing a piece of paper does not actually mean that you are doing the internal control. PwC did the same thing in their testing—check the box."

98.     Per Whitaker, these internal control issues were well-known throughout the Company during the Relevant Period, including when Whitaker arrived at Mattel in May of 2017. Whitaker's supervisor, Wong—who reported directly to CFO Euteneuer—maintained an open dialogue with Whitaker during his time at Mattel. "She was very open and honest with me," Whitaker reported. Wong stated to Whitaker that she knew supporting documentation for the Company's financials was lackluster and that there was inherent risk in the way the Company had been compiling its financials.

99.     Part of what Wong had brought Whitaker in to do in his new role was to fix these issues. "She brought me in to fix this because this was my background," Whitaker reported. However, "quite contrary to that, once I got there, although aware of [the problems] and willing to discuss it, she abstained from taking any steps to improve it. We spoke daily, and I was very

vocal about my concerns. Her reactions would flip-flop."

100.    In addition, after the close of Mattel's second quarter 2017 financial statements, in approximately July 2017, Shirley Wang, Manager of Internal Audit at Mattel, scheduled a meeting with Whitaker to discuss the Tax department's internal controls. She explained that the Internal Audit department was testing the Tax department's controls for compliance with the Sarbanes-Oxley Act of 2002 and that, in its review, Internal Audit had found that the controls were either non-existent or extremely dated and agreed that the problem needed to be addressed.

101.    It was clear to Whitaker that, in order to lead the third quarter close for the tax department, he was going to need support and manpower to sort through all of the paper information since Mattel did not have a sufficient system of documentation. Thus, immediately after Mattel published its second quarter 2017 results on August 2, 2017, Whitaker hired Katie Danzig ("Danzig") as Mattel's Senior Manager of Tax. Danzig reported directly to Whitaker during the Relevant Period.

**D.    MATTEL MATERIALLY UNDERSTATED ITS LOSSES FOR THE THIRD QUARTER 2017**

### 1)    The Individual Defendants and PwC Initially Decide Not to Record A Reserve Against Mattel's Deferred Tax Assets

102.    As the third quarter of 2017 was coming to an end on September 30, 2017, Mattel faced a key decision with material financial consequences: whether to record a "valuation allowance" against its deferred tax assets. This was a significant decision because any allowance would represent a reduction in the value of one of Mattel's largest assets and would impact some of the Company's most critical financial metrics, such as its net income. As of June 30, 2017, Mattel carried $580 million in deferred tax assets on its balance sheet. Any valuation allowance would have to be deducted from Mattel's income, thus reducing any profit or enlarging any losses—meaning that this decision would have a material impact on Mattel's financial

performance.

103. A deferred tax asset is an asset that a company can use to reduce or eliminate a future tax liability. This includes deductible "carryforwards"—*i.e.*, deductions or credits that cannot be utilized on the tax return during the current year (because the company has suffered a loss, for example) but may instead be carried forward to reduce taxable income or taxes payable in a future year. ASC 740-10-25-2; ASC 740-10-20. In this sense, deferred tax assets are comparable to prepaid assets or credits. Thus, deferred tax assets have real value, and are recorded as "assets" under GAAP because they can be used in the future to reduce a company's tax payments by offsetting future taxable income.

104. The value of deferred tax assets depends on whether the company will, in fact, generate taxable income in the future. If it likely will generate income in the future, then the asset has value because it can be used to offset future tax liability on that income. Conversely, if the company likely will not generate income, then the asset has less or no value because it will not be able to be used to offset a future tax liability, as there likely will be no future tax liability.

105. As with any other asset, companies are required to value deferred tax assets on a quarterly basis and determine the probability that the company will be able to use the deferred tax assets. This evaluation necessarily requires determining whether the company is likely to have future taxable income against which it could ultimately use the deferred tax assets.

106. GAAP requires that if a company determines it likely will not be able to use all or some of its deferred tax assets because the company is unlikely to have a sufficient amount of future taxable income, the company must record a "valuation allowance" against the deferred tax assets. ASC 740-10-30-5. A valuation allowance reduces the value of the asset, as it is "[t]he portion of a deferred tax asset for which it is more likely than not that a tax benefit will not be

realized . . . . The valuation allowance shall be sufficient to reduce the deferred tax asset to the amount that is more likely than not to be realized." ASC 740-10-30-24. As noted above, the recognition of a valuation allowance (or a change in the valuation allowance from one period to another) is charged, or in the case of a reduction, credited, to the company's income for that reporting period.

107. As Mattel was preparing its third quarter 2017 financial statements during the first few weeks of October, Mattel had approximately $600 million of deferred tax assets on its books, and any material reduction in value of those assets was of great consequence for Mattel, especially given the landscape of Mattel's business at this time.

108. As noted above, recording a valuation allowance against Mattel's deferred tax assets would have negatively impacted Mattel's earnings for the quarter and the year, and threatened to devastate the Company's financial performance. Importantly, recording the valuation allowance would also have communicated to investors that the Company would likely not make money in the near term. According to Whitaker, this kind of action "tells investors that you do not see the ship turning around any time soon. It is very indicative of the future state of things, and you want to avoid that at all costs." Sending such a message would have completely contradicted the message the Individual Defendants were putting out to the markets.

109. Given the significance of this determination, Whitaker and his team were meeting multiple times a week with PwC leading up to the close of the third quarter to determine whether to record a valuation allowance. Whitaker's team included Clara Wong and Dermot Martin, Senior Director of Tax at Mattel and Whitaker's counterpart. The PwC team consisted of lead partner Joshua Abrahams, and partners Chip Lightfoot and John Brierley.

110. Senior Mattel executives and these PwC partners regularly discussed with

32

Defendant Euteneuer whether Mattel would record a valuation allowance. Whitaker reported that Wong met frequently with Euteneuer about the valuation allowance issue and regularly updated Whitaker following those discussions. "She did that very regularly," Whitaker reported, noting that he and Wong spoke daily. PwC partners Abrahams and Lightfoot were also having regular meetings with Euteneuer, Whitaker reported, and were very focused on the issue of whether to take the allowance, as it could have been as high as approximately half a billion dollars. They often similarly updated Whitaker after their meetings with Euteneuer. Whitaker reported that "Abrahams was very open about his conversations with the CFO as well."

111.    Despite the importance of this determination, Whitaker reported that as this decision was being made, Mattel did not have internal controls in place to assess the value of the Company's deferred tax assets or the need for a valuation allowance on a quarterly basis. "That's how not conscious of this we were as a company," he said.

112.    According to Whitaker, the discussions about whether to record a valuation allowance continued up to and past the end of the third quarter, September 30, 2017. In approximately the last week of September or the first week in October, Mattel and the PwC team decided not to record a valuation allowance against Mattel's deferred tax assets for the third quarter of 2017, even though the poor state of the business raised questions about the likelihood of future income against which to use these deferred tax assets.

113.    Whitaker explained that this decision was questionable because Mattel's business was performing poorly and "things were drastically falling fast." Still, Mattel and PwC believed there was enough uncertainty about the future of the business and whether it would generate taxable income to avoid taking a valuation allowance in the third quarter. According to Whitaker, in deciding not to record a valuation allowance against Mattel's deferred tax asset, Mattel was

being unreasonably optimistic about its forecast. Despite this decision, they nonetheless recognized internally that even if they did not record a valuation allowance in the third quarter, they would likely have to record it in the next quarter. According to Whitaker, "the forecast at the time was looking pretty grim. We probably should have been considering at least a partial allowance if not a full allowance on the domestic deferred tax assets."

### 2) The Individual Defendants and PwC Abruptly Change Course Just Before Mattel Publicly Issued Its Third Quarter 2017 Financial Results

114.   As Mattel's third quarter reporting period came to an end on September 30, 2017, the Company began its formal closing process, which typically takes approximately two weeks to complete. About a week into the process, Whitaker and his team started to book the appropriate tax journal entries based on the decision by senior Mattel management and the PwC audit team that there would be no valuation allowance taken against Mattel's domestic deferred tax assets.

115.   However, with approximately one week left in the closing process, the Company and PwC suddenly reversed their decision, and decided that Mattel was required to record a valuation allowance. The abrupt about-face was based on a decision to write-off approximately $100 million in receivables from Toys "R" Us in the coming quarters, including a large portion of that amount in the third quarter.

116.   As noted above, the Company had learned that Toys "R" Us filed for bankruptcy on September 18, 2017. This news put extreme pressure on Mattel because Toys "R" Us was Mattel's biggest customer and retailer. Toys "R" Us had purchased a lot of Mattel toy inventory, the payment obligation for which was reflected by Mattel on its balance sheet as "accounts receivable" that Toys "R" Us would now be unable to sell and would ultimately return to Mattel. Mattel might have to write-off those accounts receivable, resulting in a loss—depending on where it stood in the hierarchy of creditors—which could significantly impact Mattel's financial

performance. Mattel, including Defendants Georgiadis and Euteneuer, acknowledged the significance of the Toys "R" Us bankruptcy and discussed it frequently during conference calls with investors, particularly because the Toys "R" Us bankruptcy was likely to have a significant adverse impact on Mattel and its near- term results. Given the fragile state of the Company and that 15% of its receivables were left exposed by the bankruptcy, Mattel risked losing important cash flow and being forced to record a significant loss on amounts deemed uncollectible, which would also have a material negative impact on the Company's earnings.

117.    Mattel desperately needed the Toys "R" Us receivables to be paid given the state of its business and was, according to Whitaker, "waiting on pins and needles" to learn where in the line of creditors it stood, and thus, whether and how much of the account receivables it would have to write-off. Whitaker explained that the Company was "desperately needing the cash at the time, and that was going to determine whether we were going to write off the full accounts receivable balance." If the Company did need to write off the full Toys "R" Us accounts receivable balance—meaning that this was not cash or income the Company would receive — it would no longer be able to justify its decision to not take a valuation allowance against its deferred tax assets. This was because the write-off would put Mattel in a cumulative net operating loss position in the United States over the three-year period ending  September 30, 2017, which was a critical consideration  in  determining whether to record a valuation allowance.

118.    With approximately one week left in the closing process, and after Whitaker's team had already been calculating journal entries based on the decision to  not  take  a  valuation allowance, Whitaker was approached by Abrahams and Lightfoot as he sat in his office one evening. They informed Whitaker that Mattel would have to write off approximately $100 million of accounts receivable, including a material write-off in the third quarter of 2017.  This

meant that they needed to reverse the decision not to take a valuation allowance against Mattel's deferred tax assets and had to scramble to calculate the correct valuation allowance.

119.    Whitaker was shocked and upset because it would typically take several weeks of work to accurately calculate a valuation allowance, and he was now being asked to do that in approximately a week, as the books were about to be closed.

120.    Whitaker, Lightfoot, and Abrahams immediately went to speak with Christine Lew ("Lew"), Mattel's Vice President of Accounting.  Lew confirmed that the new plan was to record a valuation allowance against Mattel's domestic deferred tax assets, and that Whitaker's team had to do so in approximately the one week left before the Company was to close its books and then publish its third quarter financial results. Wong, too, confirmed that this was the new plan. Whitaker expressed his concern about the lack of supporting documentation and his team's ability to reverse course and perform a multi-week analysis in such a short period of time, but the directive did not change.

121.    Whitaker and his team, including Danzig, worked nonstop for days to create the tax valuation allowance entry. This would have been an extremely difficult undertaking under any circumstances but was particularly risky because Mattel did not have the proper internal controls or supporting documentation in place to ensure the accuracy of the process.

122.    After working quickly to meet their deadline without access to the backup materials they needed, Whitaker's team calculated a valuation allowance of approximately $175 million to $200 million against Mattel's deferred tax assets. "We had so little confidence in what we were reporting because we didn't have the back-up to tie it out," he said. "Typically, there is a trail of documentation that supports what you are reporting, and that just did not exist." Whitaker reported that this issue of the absence of "back-up" to support Mattel's financials came up regularly in

meetings with Martin and Wong. Whitaker said that Danzig had frequent meetings with Martin to "understand the labyrinth that was Mattel," and that these discussions "were regular and often heated."

123.    The analysis prepared by Whitaker and his team reflecting a valuation allowance of approximately $175 million to $200 million was immediately signed off on internally and given to PwC to review. While Mattel was preparing its financial disclosures, PwC had only days to review the new tax entry before Mattel was to publish its financial statements.

124.    The valuation allowance that Whitaker's team created was included in draft financial statements that were being circulated to all senior executives, including to CFO Euteneuer. Further, Abrahams and Lightfoot, who were extremely focused on the valuation allowance issue particularly given the Toys "R" Us bankruptcy, spoke openly about the fact that they were having regular meetings with CFO Euteneuer on these issues. In fact, Mattel's third quarter 2017 Form 10-Q issued on October 26, 2017 mentions the valuation allowance recorded during the quarter in numerous sections. According to Whitaker, "the idea that a potential half billion-dollar allowance is something [CFO Euteneuer] would not have known about would be implausible. It seems outlandish."

3)    **Mattel's Faulty Internal Controls Strike, Leading to PwC Finding a Critical Error in the Valuation Allowance Calculation "Days Before" Financials Are Published**

125.    Days before Mattel was to report third quarter earnings on October 26, 2017, PwC discovered a material error in the way the valuation allowance was calculated that required Whitaker and his team to quickly and haphazardly redo the entire tax entry, yet again.

126.    Specifically, days before Mattel's financial results were due to be released, Whitaker and Danzig received a call from Brierley at PwC. Brierley told Whitaker and

Danzig that Mattel had improperly reduced its total deferred tax assets by several hundred million dollars, which had the effect of improperly reducing the valuation allowance amount on those assets (as well as improperly reducing Mattel's reported net loss for the quarter) by a similar amount. In other words, the valuation allowance, and Mattel's net loss, needed to be substantially higher than they were.

127.   The error stemmed from the fact that Mattel had improperly offset its deferred tax assets by netting out the value of deferred tax liabilities emanating from certain intellectual property assets. As explained in detail below, companies are permitted to do this type of netting when the property has a "finite life," *i.e.,* when its value can be depreciated over a fixed time, such as a machine that depreciates over 15 years. But GAAP generally prohibits companies from doing this type of netting when the property has an "indefinite life," like certain kinds of intellectual property, which was the case here.

128.   When Whitaker was informed of this error, he was floored. As noted above, the error had the effect of increasing Mattel's valuation allowance—and, in turn, its quarterly loss— by hundreds of millions of dollars. Whitaker and Martin called Wong immediately. The support for PwC's conclusion was a spreadsheet that Martin showed to Whitaker's team, which Whitaker and Danzig had never seen before. This spreadsheet was the sole support substantiating the massive error precisely because Mattel lacked controls to assess the value of its deferred tax assets and calculate any required allowance.

129.   At the direction of Abrahams, Whitaker and his team, without additional supporting documentation other than Martin's single spreadsheet, redid the tax entry just days before Mattel was to publish third quarter results. The result of the recalculation was to increase the valuation allowance recorded against Mattel's deferred tax assets as of September 30, 2017

from the previously- determined $175-$200 million to $562 million.

130.   At this time, as in earlier during the closing process, draft financial statements were regularly shared with senior Mattel executives, including CFO Euteneuer, for their review. Given the material error in the way the first valuation allowance was calculated, the Company's draft financial results—including its net income—varied significantly by hundreds of millions of dollars. According to Whitaker, the wild swings in the valuation allowance and Mattel's financial results "were something that could not be ignored" because they were so material, and even more so because the Company was intensely focused on how the Toys "R" Us bankruptcy would impact its results.

131.   As was the case earlier in the closing process, given the critical period of time that the Company was in and the urgency of its decisions, Abrahams was in regular contact with CFO Euteneuer about the Toys "R" Us receivables, Mattel's valuation allowance, and the impact on the Company's financial results. Whitaker, too, was in ongoing contact with Abrahams because the valuation allowance issue was so important, and Abrahams shared with Whitaker that he spoke frequently with Euteneuer throughout this time.

132.   According to Whitaker, Mattel's failure to discover this error in its own valuation allowance calculation was yet another illustration of the material weaknesses in Mattel's internal controls. Mattel simply had no internal controls in place to detect this sort of error and no intelligence as to its own assets. Whitaker called this state of affairs "the perfect example of a material weakness."

133.   Given the severity of this problem, Whitaker expected that PwC would require Mattel to disclose material deficiencies in its accounting and disclosure controls, particularly given that PwC discovered the error. According to Whitaker, PwC requiring the disclosure of material

weaknesses would ultimately have been positive for the Company because it would have forced the Company to invest in fixing these issues. Whitaker had almost daily meetings with Wong and Brierley, and they repeatedly told him that Mattel needed to change its internal control processes and policies. However, PwC did not require the disclosure of any material weakness, and nothing was done to repair the Company's internal controls.

134.    As Whitaker reported, "[t]hat was a bone of contention between me and John Brierley. I wanted to have the best department that I could. I was very upset that there was no internal control deficiency recognized [in the Company's SEC filings]. That might have been the thing that finally encouraged leadership to give us the resources and the budget to start fixing things. I remember being very upset about that."

135.    On October 26, 2017, Mattel publicly reported its third quarter results, including the valuation allowance of $562 million and a loss of $603 million. Significantly, the Company made no mention of the existence of a material weakness in its internal controls over financial reporting in its announcement or in its third quarter 2017 Form 10-Q filed with the SEC on October 26, 2017. Instead, in violation of SEC reporting regulations, in Mattel's third quarter 2017 Form 10-Q, Defendants Euteneuer and Georgiadis reported that they had "evaluated the effectiveness of [Mattel's] disclosure controls and procedures," and that Mattel's internal controls were effective as of September 30, 2017.

136.    In truth, unbeknownst to investors, Mattel's internal controls were severely deficient, and its third quarter financial results had been materially misstated—specifically, Mattel's reported loss for the third quarter of 2017 was understated by approximately $109 million, or by 18%.

   4)    **Things go from Bad to Worse as Another Material Error is Discovered Requiring a Restatement**

137.    As a result of the third quarter of 2017 chaos, PwC recommended that Mattel develop a new internal control concerning its deferred tax asset valuation allowance analysis by the end of the year. Whitaker described the absence of this control during the period in which the Company had calculated a large valuation allowance as "quite alarming," noting that, "the idea that we didn't have an internal control around that already is absurd."

138.    Whitaker was given responsibility for developing the new control. As part of that process, he wanted to understand the support for the spreadsheet that Martin had produced showing the netting error days before third quarter financials were published, given that there was no time to vet this data prior to publishing third quarter results. In approximately the beginning of January 2018 (at some point before January 12), Whitaker and Martin set up a meeting to review all existing documentation relating to the netting issue and the classification of Mattel's intangible assets.

139.    Whitaker described his meeting as follows: "It was an odd meeting. He [Martin] had us lock ourselves into a conference room, which we never did, and he produced several boxes and binders of loose paper to walk me through. And I thought he was going to say, 'Here is where the backup is.' And instead, he said, 'I think the support is somewhere in here. Let's try to find it.'" It was concerning to Whitaker that Mattel had just published its third quarter 2017 financials and relied on a solitary spreadsheet to calculate a $562 million entry for which Martin did not even know where the supporting documentation was. However, Whitaker noted, "this is how things were done at Mattel."

140.    Whitaker and Martin spent hours in the conference room going through boxes of paper trying to find the support for Mattel's valuation allowance. Whitaker eventually came across a single loose piece of paper with numbers and values listed on it that referenced the intellectual

property assets and values that were set forth on the spreadsheet that Martin had supplied to support the recalculation of the third quarter valuation allowance. Whitaker was hopeful that this document would "tie everything out" and provide support for the numbers listed on the spreadsheet they had used when calculating the valuation allowance.

141.    Whitaker noticed that one of the intellectual property assets listed on the paper was related to Mattel's 2011 acquisition of HIT Entertainment Ltd., which included Thomas & Friends, Barney & Friends, and Bob the Builder ("HiT IP"). In the third quarter, Mattel had treated this asset as having a finite life (*i.e.,* amortizing over a fixed period) and had therefore netted the deferred tax liability resulting from the HiT IP against Mattel's deferred tax assets, thereby reducing its valuation allowance. Because this asset was valued at $311 million, and the deferred tax liability related to the asset was valued at approximately $109 million, this netting had a material impact in lowering the allowance reported by Mattel as of the end of the third quarter of 2017.

142.    Whitaker noticed that the HiT IP was listed on the piece of paper as having no amortization—in other words, it was listed as an indefinite-lived asset. As explained in further detail below, this meant that the deferred tax liability related to this asset should not have been used to reduce/net against Mattel's deferred tax assets or the Company's allowance in the third quarter. When Whitaker realized this, his "heart started racing and alarm bells started going off because we had just reported in our third quarter 2017 Form 10-Q that the HiT IP was being amortized. If this [the indication that the HiT IP was indefinite-lived] was true, it meant we had completely mistreated this" in the Company's third quarter financial statements.

143.    Had the HiT IP been classified properly, the valuation allowance that Mattel recorded in the third quarter would have been approximately $109 million higher, and its

reported loss would have been approximately $109 million larger. This was precisely the same type of error that PwC identified days before Mattel's third quarter results were published.

144.    When Whitaker explained the mistake to Martin, Martin said, "there goes my f***ing job." Referring to the Company's severely deficient internal controls and the errors those deficiencies had enabled, Whitaker said that he "had never seen anything like it in my entire life."

E.    **AFTER MATTEL CONCLUDES THAT A RESTATEMENT IS REQUIRED, THE INDIVIDUAL DEFENDANTS AND PwC CONSPIRE TO COVER UP THE MATERIAL MISSTATEMENT OF MATTEL'S FINANCIAL RESULTS AND MATTEL'S SEVERE INTERNAL CONTROL DEFICIENCIES**

145.    As explained below, rather than report a material weakness and restate Mattel's recently-issued third quarter 2017 financial statements, PwC and the Individual Defendants conspired to change the accounting treatment of the HiT IP and retroactively reclassify it to match the way Mattel had improperly treated it (as a finite asset). The purpose of this maneuver was to avoid the restatement of Mattel's third quarter results and avoid an admission of the material weaknesses in internal controls.

146.    After discovering the error, Whitaker confirmed with Mattel's accounting team that the HiT IP was not being amortized for accounting purposes, contrary to how it was treated for purposes of Mattel's SEC filings. Whitaker and Greg Dunlap ("Dunlap")—a Deloitte tax partner who had been filling in for Wong, who was on sick leave—immediately called Wong to walk her through the error.

147.    Whitaker assessed the impact of the error as approximately $109 million.

148.    The following Monday morning, January 15, 2018, Whitaker scheduled a meeting at Wong's request with Mattel's SVP of Accounting, Joe Johnson; VP of Accounting, Lew; VP of Internal Audit, Beverly Lively; Director of Internal Audit, Vladimir Marinescu; Assistant

43

Controller, Nathan Yoo; Wong; Whitaker; and Martin.

149.    During the January 15 meeting, all attendees agreed that this was a serious error in Mattel's financial statements.  Per Whitaker, "[e]verybody understood it. There was no conflict or confusion on that."

150.    There was discussion about whether and to what extent it constituted an internal control deficiency. Lively and Marinescu believed that this constituted a material weakness because it was so significant, and it was the second time in one quarter that an issue like this had arisen.

151.    Whitaker reported that by the end of the meeting, "there was no conflict that this was a material weakness.  One, this was so material.  Two, this was not the first time we had this error."

152.    Despite this conclusion, Johnson, Mattel's SVP of Accounting who reported directly to CFO Euteneuer, protested that, "We cannot have a material weakness.  That would be the kiss of death."

153.    Whitaker understood Johnson's remark to mean that the market would react poorly to Mattel admitting that its financial statements were materially misstated and that it had a material weakness in its internal controls, particularly given the many challenges the Company was already facing. "Our company [was] tanking. To then go out and say we have no sufficient controls, as an investor, you would read that and say, what else don't you have control over?"

154.    In addition, the Company was a defendant in a securities class action suit at the time, and Martin expressed the view that these types of admission would "add fuel to the fire." Also, Mattel had just secured new debt on December 20, 2017. Given the material error in the valuation allowance, there was concern over the fact that the financial information Mattel had provided to secure that debt was incorrect. "Those kinds of things were at the tops of peoples'

minds at the meeting," Whitaker reported.

155.    The agreement leaving that meeting was, "this was a clear-cut material weakness," Whitaker said, but the team was holding out a thin sliver of hope that perhaps Mattel might be able to find a way to characterize it differently.

156.    Lew then researched ways to avoid restating financial results and admitting a material weakness. On the afternoon of January 15, 2018, she sent an email to Whitaker, Johnson, Wong, Martin, and others containing Ernst & Young's interpretation of certain guidance suggesting that, in certain circumstances, a company might be able to assess the materiality of an error against its annual results, rather than by reference to the impact on its quarterly results (which was not true). Indeed, the same guidance from Ernst & Young provided that even when a company deems an error material for specific prior quarters but not for the full year cumulatively, the company would still have to separately disclose the error.  It stated further that "if the error being corrected materially affected a prior quarter of the current fiscal year, the SEC staff would expect the registrant to file an Item 4.02 Form 8-K with respect to those interim financial statements."  Nevertheless, Lew wrote, "We may have a tiny, miniscule sliver of hope."

157.    Per Whitaker, the Mattel team wondered whether they could perhaps "get away with" a "Little r" restatement rather than a "Big R" restatement. A "Big R" restatement is when the correction of an error in a company's financial statements, whether due to a mistake or fraud, is significant enough to require that the company file a Form 8-K with the SEC evincing a material event, withdrawal of prior period filings and the auditor's opinion on those filings, and revision of the prior period financial information before refiling with the SEC. By  contrast, so-called "Little r" restatements occur when no prior periods are materially misstated, but the accumulation of misstatements in prior periods taken together becomes material.  In such

"Little r" restatements, companies typically disclose the correction of the error (likely in a footnote) in their current financial statements but would not amend or restate their prior period SEC filings.

158.    Notably, the entire concept of "Little r" restatements is dubious to begin with, as they are not mentioned or otherwise contemplated in ASC 250, the GAAP provision governing restatements for correction of an error and what a company is required to do when it discovers an error in previously issued financial statements.

159.    A follow-up meeting with the individuals noted above, including Whitaker, Johnson, Lew, Wong, Marinescu and Lively, then occurred on January 16, 2018 at 9:30 am. Whitaker reported that the collective view at this meeting was still that the error required a "Big R" restatement, meaning that Mattel's third quarter financials would have to be restated, and Mattel would have to disclose a material weakness. Before that decision was formally made, however, Johnson requested a meeting with Mattel's legal team.

160.    The meeting with Mattel's legal team occurred in Johnson's office soon thereafter, and included Whitaker, Wong, Johnson, and Mattel's head legal officer.[3] The Company's SEC counsel was also on the phone.  The conclusion of this meeting was that everyone agreed with the determination that Mattel's financial statements had been materially misstated, the Company had a serious material weakness in its internal controls, and Mattel was required to issue a ("Big R") restatement of its third quarter 2017 results. "There was absolutely zero doubt in anyone's mind that we had a material misstatement that would result in a restatement of third quarter earnings," Whitaker reported of this meeting.

---

[3] Mattel's SEC filings from this time period indicate that the Company's Chief Legal Officer and Secretary was Robert Normile.

161.   The meeting participants decided to communicate this conclusion to CFO Euteneuer, and then set up a meeting with PwC to communicate the findings to them.

162.   Wong, Johnson, and Lew met with Euteneuer on either January 16 or 17, 2018 to share the group's conclusion regarding the need for a restatement of third quarter results and the admission of a material weakness. Right after Wong's meeting with Euteneuer, Wong came to Whitaker's office to tell him they had just met with Euteneuer and update him on how the meeting went. Wong reported to Whitaker that Euteneuer accepted the decision to restate third quarter earnings, and "was very aware of it." Euteneuer requested that Wong set up a meeting to discuss that conclusion with PwC.

163.   Whitaker expected to attend the meeting with PwC, but before the meeting started, Wong told Whitaker that only VPs and above would attend, which meant Whitaker would not participate. "I remember being kind of shocked by it," Whitaker reported. Wong, Johnson and Lew attended for Mattel. Whitaker believes that Abrahams, Brierley, and Lightfoot attended this meeting from PwC.

164.   Immediately following the meeting with PwC, Whitaker received a call from Martin to come to his office and meet with him, Wong, and Dunlap for a debrief of the meeting with PwC. After closing the door, Wong told Whitaker that during the meeting with PwC, "Josh Abrahams' immediate response, to everyone's surprise, was that we cannot have a material weakness and we need to figure out a way for that not to be the result."  "The mandate" from Abrahams "was for everyone to see what kind of a technical argument we could make" to avoid a restatement and avoid reporting a material weakness.

165.   After the meeting, Brierley came to Whitaker's office and shut the door. Brierley reiterated that they needed to find a way to not have the material weakness and to avoid a

restatement. Brierley told Whitaker that his "team was now scavenging the earth to try to find a technical argument that could be made to say there was no material weakness."

166.    A couple of days later, Wong came to Whitaker and communicated to Whitaker that PwC had manufactured a plan to avoid a restatement.  PwC's plan was to change the classification of the HiT IP asset from an indefinite-lived asset to a finite-lived asset retroactively as of the start of the fourth quarter, October 1, 2017, thereby matching its classification to the manner in which the Company had treated it in the third quarter, and purportedly rendering the valuation allowance "correct" as of the fourth quarter. When Whitaker questioned how they could make this retroactive change, Wong's response was that "they would rather have a slap on their wrist from the SEC."

167.    According to Whitaker, Mattel believed that retroactively reclassifying the HiT IP asset exposed Mattel to minimal penalties from regulators. That is, if the SEC investigated the reclassification issue and discovered that the HiT IP had been retroactively reclassified, this fact, by itself, would trigger a far less significant response than the existence of a material misstatement of financial results and a material weakness. Accordingly, Mattel and PwC decided to change the accounting treatment of the HiT IP asset, make that change retroactive to October 1, 2017, and bury the known error and avoid the disclosure of material weaknesses in Mattel's internal controls.

168.    This reclassification was done as a maneuver to enable Mattel to avoid a required restatement of third quarter results and the disclosure of material weaknesses in Mattel's internal controls. Whitaker reported that "it was never our intent" in October 2017 (or during the fourth quarter more generally) to reclassify the HiT IP. Whitaker also explained, as discussed above, that while the Company was assessing the impact of the Toys "R" Us bankruptcy and considering whether to record a valuation allowance, Whitaker and his team had regular meetings with the

FP&A group about Mattel's budget and forecast. One of the items discussed during these meetings was a spreadsheet that detailed the variables that might have an impact on Mattel's earnings. Had there been any prior discussion about reclassifying the HiT IP as a finite-lived asset, which would have impacted earnings, this would have been one of the main items on the spreadsheet and would have been discussed. Instead, the first time Whitaker ever heard of the idea to change the life of the HiT IP asset was after the error was discovered and financials were already published, and PwC and Mattel were searching for a "technical argument" to avoid a restatement.

169.   Soon after Wong shared PwC's plan with Whitaker, Brierley came to speak with Whitaker. Whitaker asked Brierley to speak candidly with him as if "we were just two guys in a bar talking," and then asked Brierley how this retroactive treatment of the HiT IP could possibly "be right." Whitaker reported that Brierley "just shook his head, because he knew it was bull****." "I said, 'I want no part of this,' and I asked him to leave," Whitaker reported.

170.   Before Mattel's 2017 Form 10-K was due to be filed in February 2018, Mattel and PwC conducted a final review of Mattel's financial statements.

171.   During the review, Martin discovered a third error again related to the accounting for Mattel's intellectual property. The third error was of a similar nature to the first two, as Mattel improperly netted certain deferred tax liabilities related to indefinite-lived assets, a violation of GAAP, when it was attempting to determine its valuation allowance as of December 31, 2017. The error was valued at approximately $20 million, which was just above PwC's materiality threshold. Whitaker recalled that "there was this 'oh sh**' moment because we just got through this storm, they somehow concluded, albeit fraudulently—in my opinion—that we didn't have a material weakness, and there was this feeling in the office that 'we can't get through another one.'"

172.    After the error was communicated to PwC, PwC spent an entire day at Mattel's offices figuring out if they could net other, immaterial errors against this one to take it below the materiality threshold and avoid having to report it. PwC successfully carried out this exercise to reduce the effect of the third error and decided that it did not have to be reported. This,  along with the cover-up, meant that Mattel would not have to report any weaknesses or errors in its 2017 Form 10-K.

173.    When the issue was resolved and the audit was completed, Lightfoot walked through the halls of Mattel high-fiving people to celebrate the fact that there would be no restatement and the 2017 audit was finally signed off on. Lightfoot also sent a congratulatory email stating that the issue was resolved, and PwC's audit was completed satisfactorily.

174.    During this time period, Dunlap ran to Whitaker's office, closed the door, and said to Whitaker, "Brett, tell Chip [Lightfoot] to take me off these emails because I don't want to be subpoenaed when the SEC looks at this." Whitaker said that "this was the moment when I knew that this was beyond my understanding."

175.    On February 27, 2018, Mattel filed its 2017 fourth quarter and annual results with the SEC on Form 10-K, which was signed by Defendants Georgiadis, Euteneuer, Johnson, Sinclair, Dolan, Edwards, Fergusson, Kreiz, Lewnes, Ng, Prabhu, Scarborough, and White Loyd. In its 2017 Form 10-K, Mattel made no disclosure to investors of the truth. Mattel said nothing about the fact that its 2017 third quarter results were materially misstated. It made no mention of the material weaknesses in internal controls from which it suffered. It certainly made no disclosure about the fact that, along with PwC, it had concocted a plan to avoid restating its third quarter results as summarized above.

176.    Instead, the Individual Defendants made numerous false statements in the 2017

50

Form 10-K. For instance, Mattel reported, and Defendant Euteneuer certified, that Mattel's "internal control over financial reporting was effective as of December 31, 2017." The Form 10-K also included false representations, described in detail below, asserting that Mattel reclassified the HiT IP during the fourth quarter for purely legitimate reasons. In truth, this reclassification was an instrument to avoid a restatement. Similarly, in violation of PCAOB accounting standards, PwC issued an unqualified audit opinion incorporated into Mattel's 2017 Form 10-K stating that Mattel's internal controls over financial reporting were effective as of December 31, 2017 and that Mattel's financial statements were accurate and prepared in accordance with GAAP.

177. After Mattel's 2017 10-K was published, Whitaker expressed his concerns to Patricia Bojorquez in Human Resources ("HR") at Mattel. Bojorquez instructed him to call Mattel's ethics hotline but stated that his grievance would go to the Head of Internal Audit, who would obviously know Whitaker's identity, although the hotline was supposed to be anonymous. Accordingly, Bojorquez advised Whitaker to set up a meeting with Lively and express his concerns to her. HR ultimately told Whitaker that there was nothing they could do.

178. HR told Whitaker that he could leave the Company but would have to pay back the stipend the Company gave him to move his family to Los Angeles for the job. Whitaker resigned from Mattel in March 2018.

**F.    THE INDIVIDUAL DEFENDANTS AND PwC ARE FORCED TO DISCLOSE THEIR WRONGDOING AFTER RECEIVING A WHISTLEBLOWER LETTER**

179. The Individual Defendants and PwC concealed their wrongdoing from investors for nearly two years. Then, after the market closed on August 8, 2019, Mattel filed a Form 8-K with the SEC disclosing that the Company "was made aware of an anonymous whistleblower letter" and, as a result, would initiate an investigation related to the "matters set forth in the letter."

180.    The Form 8-K further disclosed that "[t]o provide the Company with an opportunity to investigate the matters set forth in the letter, the offering of the Company's 6.00% Senior Notes due 2027 that was scheduled to close on August 8, 2019 has been terminated. The Company intends to refinance its 4.350% Senior Notes due October 2020 prior to maturity."

181.    The market reacted with surprise and concern in response to this news. On August 9, 2019, the Associated Press published an article titled "Mattel shares sink on whistleblower letter" reporting that Mattel shares "tumbled more than 10% in morning trading after the toymaker pulled a debt offering upon learning of a letter from an anonymous whistleblower." *Bloomberg* reported the same day that Mattel shares were "down 11%, most in six months . . . more than any full-day loss since Feb. 15[.]"

182.    Another *Bloomberg* article dated August 9, 2019 reported that "Mattel Inc. fell the most in almost 6 months on Friday after the company said it would pull a bond sale as it looks into 'an anonymous whistleblower letter.'" The toymaker became aware of the letter on Aug. 6, according to a filing late yesterday. Mattel said it is terminating the sale of senior notes due in 2027 'to provide the company with an opportunity to investigate the matters set forth in the letter.'"

183.    The same *Bloomberg* article quoted Jefferies analyst Stephanie Wissink as commenting that the allegations in the whistleblower letter are likely "'material enough to prevent' the bond deal rather than just delay it." A CNBC article from the same day titled "Mattel stock craters after pulling bond sale over anonymous whistleblower letter" similarly reported that the bond sale, "which was worth an estimated $250 million, had initially [been] scheduled to close on Thursday. Mattel said it intends to refinance bonds that are due in October 2020 prior to maturity."

184.    An August 9, 2019 *Fox Business* article titled "Barbie doll-maker Mattel has a whistle blower" reported that "Burt Flickinger, managing director at Strategic Resource Group,

52

told FOX Business the whistleblower letter comes at a time when the four cornerstones of Mattel's business are crumbling. Its core brands and categories have been in a secular state [of] decline for decades[.]'"

185.   The *L.A. Business Journal* also reported on August 9, 2019 that "Mattel's stocks tumbled Friday after [Mattel] announced it terminated the sale of senior notes so it could investigate an anonymous whistleblower letter. . . . Mattel intended to refinance its 4.35% senior notes due October 2020 before they matured. . . . Shares of Mattel fell more than 15% on intraday trading."

186.   As news outlets reporting on Mattel's disclosure recognized, it is extremely rare for an issuer to pull an offering after the bonds have priced. According to an August 9, 2019 article in the *International Financing Review*, "[c]ancelling a deal in between pricing and settlement . . . has only happened three times before[.] . . . Pulling a deal after pricing is extremely rare and suggests the company and banks were wary of any potential legal risks that could arise if the deal went ahead."  The article quoted an investor as acknowledging that "'[t]he banks are all about printing paper, but if this does lead to a loss for investors they could be accused of not performing due diligence[.]'"  Mattel's decision to pull its bond offering after pricing and one day before it was scheduled to close therefore indicated the seriousness of the issues raised in the whistleblower letter.

187.   In response to Mattel's disclosure, Mattel's stock price declined 16% in a single day.  Mattel's stock price fell from $13.43 on August 8, 2019, to a closing price of $11.31 on August 9, 2019, on exceptionally high volume of over 15 million shares traded.

### THE TRUTH IS REVEALED

188.   Following that August 8, 2019 disclosure, the Individual Defendants made a series

53

of admissions that corroborated the whistleblower letter and the facts alleged herein, as set forth below.

A.   **THE INDIVIDUAL DEFENDANTS ADMIT THAT THE COMPANY'S THIRD AND FOURTH QUARTER 2017 FINANCIAL RESULTS WERE MATERIALLY FALSE WHEN ISSUED, AND ANNOUNCE THAT MATTEL WILL ISSUE A RESTATEMENT**

189.   On October 29, 2019, Mattel released positive financial results for the third quarter of 2019. These results included net sales up 3% versus the prior year, a 23% increase in operating income, a 3% increase in revenue, and adjusted earnings per share of $0.26 compared to adjusted EPS of $0.18 in the prior year quarter. Mattel beat street expectations for EPS and revenue and raised its 2019 guidance.

190.   Analysts were pleased with the Company's results. For example, on October 29, 2019, BMO Capital Markets reported that Mattel "posted 3Q results that beat the Street and were much better than investors feared, especially after Hasbro's big miss last week. [Mattel] also shrugged off tariff impacts and raised its 2019 full year guidance." On October 30, 2019, Wells Fargo Securities issued an analyst report providing that the third quarter "was another solid quarter with sales/EBITDA upside and cost savings again tracking better than expected. . . . Fundamentals, lower than anticipated inflating and tight working capital management are driving a positive 2019 Oper CF outlook. …. [W]e believe [Mattel] will see strong upside follow-through vs. possible incremental near-term [Hasbro] weakness." Buoyed by these results, Mattel's stock price closed up on October 29, 2019.

191.   Also on October 29, 2019, at the same time it disclosed these positive financial results, Mattel filed a Form 8-K with the SEC addressing the findings from the whistleblower investigation. Mattel announced that the Company would be restating its quarterly financial

data for the three and nine months ended September 30, 2017 as reported in Mattel's third quarter 2017 Form 10-Q and the three months ended December 31, 2017 as reported in Mattel's 2017 Form 10-K, and that those financial statements "should no longer be relied upon due to material misstatements." The decision to restate financial results is an admission that Mattel's financial statements in its third quarter 2017 Form 10-Q and 2017 Form 10-K were materially false when issued.

192.    Specifically, Mattel's October 29, 2019 Form 8-K disclosed that Mattel's

previously issued unaudited consolidated financial statements for the three and nine months ended September 30, 2017, which are included in the Company's Quarterly Report on Form 10-Q for the three months ended September 30, 2017, and the unaudited consolidated financial information for the three months ended December 31, 2017, which is included in the Company's Annual Report on Form 10-K for the year ended December 31, 2017, should no longer be relied upon due to material misstatements.

Mattel added that "related press releases, earnings releases, and investor communications describing Mattel's financial statements for these periods should no longer be relied upon." As a result, the Company planned to amend its 2018 Form 10-K to restate "the unaudited quarterly financial data for the three month periods ended September 30, 2017 and ended December 31, 2017 set forth in Note 17 - Quarterly Financial Information (Unaudited) (including restatement of related information for the nine months ended September 30, 2017)," as well as "Management's Report on Internal Control over Financial Reporting included under Item 8 and correspondingly, to restate the Evaluation of Disclosure Controls and Procedures included under Item 9A."

193.    The Form 8-K further reported that "the Company has reassessed its conclusions regarding the effectiveness of its internal control over financial reporting as of December 31, 2018" and "has determined that certain material weaknesses existed as of December 31, 2018 and subsequently, and therefore the Company has concluded that its internal control over financial

reporting as of December 31, 2018 was not effective and that Management's Report on Internal Control on Financial Reporting as of December 31, 2018 should also no longer be relied upon."

194.    In a press release filed as an exhibit to Mattel's October 29, 2019 Form 8-K, the Company provided further detail on the accounting misstatements that would be corrected in the forthcoming restatement. In addition to reporting the positive financial results as described above, the press release stated that the Company's "investigation determined that income tax expense was understated by $109 million in the third quarter of 2017, and overstated by $109 million in the fourth quarter of 2017[.]" It went on to state that the "Audit Committee's investigation found errors in publicly-filed Mattel financial statements for the last two quarters of 2017, failures to properly consider and disclose such errors to the then-Chief Executive Officer ('CEO'), Margaret Georgiadis, and the Audit Committee once they became known, and violations of auditor independence rules."

195.    The press release contained a section entitled "Mattel's 10-Q for the Quarter Ended September 30, 2017 ("Q3 2017 10-Q") and 10-K for the Year Ended December 31, 2017 ("2017 10-K") Contain Errors" further describing the accounting errors creating the need for the Restatement. Specifically:

> Mattel's previously reported net loss of $603.3 million for the third quarter ended September 30, 2017 was understated by $109 million due to an error in calculating its tax valuation allowance. The correct reported net loss for the quarter ended September 30, 2017 should have been a net loss of $712.3 million.

> A change in accounting for an intangible asset in the fourth quarter of 2017 resulted in an effective correction of the error for the 2017 annual results. However, the tax expense remained uncorrected in the Q3 2017 10-Q and was therefore overstated in the quarter ended December 31, 2017. As a result, Mattel's previously reported loss of $281.3 million for the quarter ended December 31, 2017 should have been reported as a net loss of $172.3 million.

196.    In light of these findings, the Company admitted "that there were material weaknesses in its internal control over financial reporting at the time of the preparation of its financial statements for the quarters ending on September 30, 2017 and December 31, 2017."

197.    The October 29, 2019 Form 8-K also disclosed that CFO Euteneuer would be departing the Company after a six-month transition period and that he was "informed of the transition plan on October 23, 2019," less than a week before the release of the October 29, 2019 Form 8-K and press release.

198.    News outlets immediately tied Defendant Euteneuer's departure to the discovery of these accounting errors. For example, *Forbes* reported on October 30, 2019 that "Euteneuer's exit . . . is one of four steps Mattel announced late Tuesday in response to the probe that found errors in publicly filed financial statements for the last two quarters of 2017 and failures of the company's reporting procedures, among other conclusions."

199.    Lastly, regarding Joshua Abrahams, PwC's lead audit partner for Mattel, the press release stated:

> Audit Committee's investigation and a separate investigation by Mattel's outside auditor concluded that certain actions in specific HR- related activities by the lead audit partner of Mattel's outside auditor, namely providing recommendations on candidates for Mattel's senior finance positions, was in violation of the SEC's auditor independence rules. He also provided feedback on senior finance employees.

It went on to state that "Mattel's outside auditor has replaced its lead audit engagement  partner and certain other members of its audit team for its audit engagement with Mattel. The Audit Committee and Mattel's management support this decision."

200.    Following Mattel's issuance of its Audit Committee's findings in October 2019, Whitaker saw that neither the Company nor PwC was fully accepting responsibility for what had occurred, but instead were attempting to minimize the issues. He called the Wall Street Journal.

201.    On November 6, 2019, the *Wall Street Journal* published an article titled "Mattel, PwC Obscured Accounting Issues, Former Executive Says" detailing Whitaker's account of the internal control deficiencies at Mattel and PwC's cover-up of the valuation allowance misstatement that led to the need for a restatement.

202.    The November 6, 2019 *Wall Street Journal* article also reported that Abrahams, who led the Mattel audit team, had been put on administrative leave, and that he was expected to leave PwC entirely as a result of his conduct during PwC's investigation into the whistleblower allegations. Thereafter, a November 14, 2019 *Bloomberg* article reported that, according to a written statement from PwC, "[t]he lead partner overseeing the Mattel audit is no longer with the firm[.] We will continue to take the appropriate actions in response to any allegations of misconduct."

203.    Thereafter, a February 26, 2020 *ProMarke*t article—the publication of the Stigler Center at the University of Chicago Booth School of Business— confirmed that Abrahams had left PwC as a result of his involvement in the scandal at Mattel. The article reported specifically that "Abrahams has now left PwC after the Wall Street Journal quoted a second whistleblower, Brett Whitaker, saying PwC and Abrahams were complicit in Mattel's attempt to cover-up errors in reporting its deferred tax balances."

**B.    MATTEL FILES THE RESTATEMENT**

204.    On November 12, 2019, Mattel filed with the SEC its amended 2018 Form 10-K/A with restated financials (the "Restatement"). The purpose of the Restatement was to restate  Mattel's previously issued financial statements as of and for the three and nine-month periods ended September 30, 2017, and the Company's previously reported consolidated financial information for the three months ended December 31, 2017, to correct for material

misstatements. The Restatement also restated Management's Report on Internal Control over Financial Reporting included under Item 8 and the Evaluation of Disclosure Controls and Procedures included under Item 9A in the Form 10-K/A based on material weaknesses in Mattel's internal controls over financial reporting.

205.   In the Restatement, Mattel again confirmed that, contrary to its statements during the Relevant Period, its accounting suffered from multiple material weaknesses. The Restatement defines a material weakness specifically as "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis."

206.   Mattel admitted in the Restatement that its internal controls were "ineffective" at the time of the preparation of its financial statements for the quarters ended September 30, 2017 and December 31, 2017 (and subsequent reporting periods) because the internal controls suffered from two material weaknesses. First, Mattel admitted that it had a material weakness that existed as of September 30, 2017 in management's control over the Company's review of its income tax valuation allowance. According to the Restatement, this material weakness was remediated during the three months ended December 31, 2018. Second, Mattel admitted that it had a material weakness in its monitoring control activities, and specifically that the Company failed to properly design and operate controls to assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action. As discussed below, this material weakness also resulted in the restatement of Mattel's consolidated financial statements as of and for the three and nine-month periods ended September 30, 2017 and financial information for the three months ended December 31, 2017.

207.    The Restatement included "Management's Report on Internal Control Over

Financial Reporting (As Restated)," which provided:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)). Mattel's management, including Ynon Kreiz, its principal executive officer, and Joseph J. Euteneuer, its principal financial officer, evaluated the effectiveness of Mattel's internal control over financial reporting using the framework in *Internal Control-Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO framework). In connection with the Original Filing, Mattel included Management's Report on Internal Control Over Financial Reporting therein, which expressed management's conclusion that Mattel's internal control over financial reporting was effective as of December 31, 2018. ***In connection with filing this Form 10-K/A for the year ended December 31, 2018, management, including Mattel's principal executive officer and principal financial officer, reassessed the effectiveness of Mattel's internal control over financial reporting as of December 31, 2018 based on the COSO framework. Based on that reassessment, management determined that Mattel did not maintain effective internal control over financial reporting as of December 31, 2018 due to the existence of the material weakness described below….***
>
> ***We failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action***, including the chief executive officer and the board of directors, as appropriate. Mattel has determined that this control deficiency constitutes a material weakness. The material weakness resulted in the restatement of Mattel's consolidated financial statements as of and for the three and nine month periods ended September 30, 2017 and financial information for the three months ended December 31, 2017, related to an accounting misstatement associated with the tax valuation allowance. Additionally, this material weakness could result in a misstatement of Mattel's consolidated financial statements or disclosures that could result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected.

(Emphasis added).

208.    PwC concurred in the Restatement and similarly restated its audit report in its

"Report of Independent Registered Public Accounting Firm." Specifically, PwC's restated report

provided that contrary to its previous conclusion, Mattel did not maintain effective control over

financial reporting as of December 31, 2018 because of the continuing material weaknesses in

its internal control over financial reporting.  The report stated:

> [I]n our opinion, ***the Company did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control-Integrated Framework (2013) issued by the COSO because a material weakness in internal control over financial reporting existed as of that date as the Company did not properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action,*** including  the chief executive officer and the board of directors, as appropriate.

> A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. The material weakness referred to above is described in the accompanying Management's Report on Internal Control  Over Financial Reporting. ….

> ***Restatement  of Management's Conclusion Regarding Internal Control over Financial Reporting***

> Management and we previously concluded that the Company maintained  effective internal control over financial reporting as of December 31, 2018. However, management has subsequently determined that a material weakness in internal control over financial reporting related to the failure to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action, including  the chief executive officer and the board of directors, as appropriate, existed as of that date. ***Accordingly, management's report has been restated and our present opinion on internal control over financial reporting, as presented herein, is different from that expressed in our previous report***.

(Emphasis added).

209.    In the Restatement, Mattel also admitted that because of its improper consideration of an indefinite-lived intangible asset and resultant deferred tax liability in Mattel's tax valuation allowance calculation for the three months ended September 30, 2017, the Company was forced to restate its financial results for the third and fourth quarters of 2017. The result of the error caused Mattel's provision for income taxes to be understated by $109 million for the third quarter of

2017, which impacted other key metrics in the third quarter. Mattel understated its net loss by approximately $109 million, effectively overstating earnings by $0.32 per share.

210.    According to the Restatement, if Mattel had properly reported an accurate valuation allowance in the third quarter, it would have reported an allowance of $670.9 million. Then, when the Company later reclassified the HiT IP in the fourth quarter, it should have also consequently reduced its valuation allowance by $109 million because of the reclassification. This reduction would have resulted in a credit to fourth quarter income of approximately $109 million, which would have reduced the fourth quarter loss that Mattel originally reported. Mattel never recorded this credit to income in its originally-issued fourth quarter results, of course, because the reclassification was done simply to bury the known error by making the treatment of the HiT IP correspond to the misstated valuation allowance that the Company had improperly reported in the third quarter. Indeed, the fact that Mattel did not record this credit to income at the time of the reclassification is further confirmation that the reclassification was done as a device to avoid the required restatement and the admission of material weaknesses in Mattel's internal controls.

211.    The Restatement explained:

On August 6, 2019, Mattel was made aware of an anonymous whistleblower letter. An independent investigation was initiated in August 2019 on matters discussed in that letter. The investigation concluded there were material tax related misstatements in the previously issued unaudited consolidated financial statements as of and for the three and nine month periods ended September 30, 2017 and previously reported unaudited consolidated financial information for the three months ended December 31, 2017 and failures to properly consider and communicate such misstatements to Mattel's then Chief Executive Officer and Audit Committee. The investigation did not find that management engaged in fraud. As it relates to the accounting misstatement, it was concluded that Mattel had failed to properly consider an indefinite-lived intangible asset in its tax valuation allowance calculation for the three months ended September 30, 2017, which caused the provision for income taxes to be understated by $109.0 million. **In the fourth quarter of 2017, Mattel determined that the intangible asset was no longer indefinite-lived. This change resulted in an effective correction of the tax misstatement for the 2017 annual results.**

**However, the provision for income taxes remained uncorrected for the three months ended September 30, 2017, which resulted in an overstatement of the tax expense for the three months ended December 31, 2017**.

212.    The Individual Defendants again reiterated the disclosures made in the Restatement during a November 15, 2019 conference call with investors. For instance, Mattel's Senior Vice President and Corporate Controller Yoon Hugh reiterated that:

> in light of the investigation's conclusions, ***management determined that there were material weaknesses that existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017.*** One of those material weaknesses related to the control over the review of income tax valuation allowance analysis. This material weakness was remediated during the 3 months ended December 31, 2018, after enhancements in the design of the control were made and were operating effectively for a sufficient period of time as of December 31, 2018. The second material weakness related to a deficiency in monitoring control activities. Management determined this material weakness still existed as of December 31, 2018.

213.    *Bloomberg* reported on November 15, 2019 that "Mattel plans to formalize its policy spelling out how it evaluates, documents, and discloses accounting errors and build in stronger procedures by the end of the year," further demonstrating that the Company lacked these essential internal controls during the Relevant Period.

## C.    THE SEC AND SDNY SUBPOENA MATTEL

214.    In its Form 10-K for the year ended December 31, 2019, Mattel disclosed that it received a subpoena from the SEC in December 2019 "seeking documents related to the whistleblower letter and subsequent investigation[.]"

215.    Then, in its Form 10-Q for the first quarter of 2020, Mattel disclosed that it also received a subpoena from the U.S. Attorney's Office for the Southern District of New York. The Company disclosed that it was "responding to requests from the United States Attorney's Office for the Southern District of New York ('SDNY') related to this matter. Mattel cannot

predict the eventual scope, duration or outcome of potential legal action by the SEC or SDNY, if any, or whether any such action could have a material impact on Mattel's financial condition, results of operations or cash flows."

## MATTEL VIOLATED STATUTES, REGULATIONS, AND STANDARDS REQUIRING IT TO ESTABLISH EFFECTIVE INTERNAL CONTROLS, AND CERTIFY THEIR EFFECTIVENESS TO INVESTORS

### A.    LAWS AND REGULATIONS GOVERNING INTERNAL CONTROLS

216.    Public companies like Mattel are required to design and implement two kinds  of internal controls to ensure that their representations to investors—both financial and non-financial—are accurate: "disclosure controls and procedures" and "internal controls over financial reporting."

217.    As noted above, "disclosure controls and procedures" mandate that information required to be disclosed by a company under the Exchange Act is communicated to company management, including its CEO and CFO, sufficiently in advance of the company's filing dates, to allow senior management ample time to consider it and disclose it to investors. Disclosure controls and procedures include, for example, components meant to provide reasonable assurances that allowances are recorded properly to permit preparation of financial statements in accordance with Generally Accepted Accounting Principles ("GAAP"), the common set of accounting principles, standards, and procedures that United States companies use to compile their financial statements.

218.    Likewise, "internal controls over financial reporting" are designed by or under the supervision of a company's CEO and CFO to provide reasonable assurances that a company's financial statements are accurate, reliable and prepared in accordance with GAAP before they are disclosed to investors. Management is required to review and evaluate these controls quarterly to

determine their effectiveness with respect to preventing or detecting material misstatements of financial statements in a timely manner.

219. Several statutes and regulations require the Individual Defendants to maintain adequate internal controls and disclosure controls and procedures—and to either publicly certify to investors that the controls they had in place were adequate or disclose any material weaknesses.

220. First, federal law requires that the CEO and CFO of public companies certify the company's quarterly and annual reports filed with the SEC and the procedures established by the company to prepare the company's financial statements and its disclosures generally.

221. Section 302 of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241 ("SOX")—meant to ensure that a public company's CEO and CFO take a proactive role in their company's public disclosures and to give investors confidence in the accuracy, quality, and reliability of a company's periodic SEC reports—requires that a CEO and CFO of a public company address in their quarterly and annual SEC filings (Forms 10-Q and 10-K, respectively: (1) the material accuracy and fair presentation of the report's disclosures; (2) establishment and maintenance of "disclosure controls and procedures"; and (3) deficiencies in, and material changes to, internal control over financial reporting. The CEO and CFO must certify that: (1) they have reviewed the periodic report; (2) it does not contain any untrue statement of material fact or omit to state a material fact necessary to make any statements made not misleading; (3) based on their knowledge, the financial statements and other financial information fairly present the financial condition and operations of the company; (4) they have maintained disclosure controls and internal controls and have designed such controls to ensure that all material information is made known to them and to provide reasonable assurance regarding the reliability of financial information; and (5) they have disclosed to the audit committee and auditors all significant deficiencies and material weaknesses in the

design or operation of internal controls. These certifications communicate to investors that all material information required to be disclosed is contained in the report.

222.    Section 404 of SOX, 15 U.S.C. § 7262, requires that management of a public company and its outside auditor annually evaluate the effectiveness of the company's internal controls over financial reporting and disclose the conclusion, including any material weaknesses, to investors. Specifically, Section 404 reiterates the need for public company management to establish and maintain a system of internal controls relating to, among other things, financial reporting, and to document, test, and maintain those controls and procedures to ensure their effectiveness, as well as to assess and report on the design and operating effectiveness of internal controls over financial reporting on an annual basis. Section 404 of SOX was "intended to bring information about material weaknesses in [internal controls] into public view." SEC Release 33-8810.

223.    Under the Public Company Accounting Oversight Board's ("PCAOB") Accounting Standards, a "material weakness" in internal controls over financial reporting is a control deficiency that gives rise to a reasonable possibility that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis. A "significant deficiency," by contrast, is a deficiency in internal control over financial reporting that is less severe than a material weakness, but important enough to merit attention by those responsible for oversight of a company's financial reporting.

224.    Second, Section 404 of SOX requires management at public companies to select an internal control framework and then assess and report on the design and operating effectiveness of those internal controls on an annual basis. Most companies, including Mattel, adopt a framework published by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO")

to report on their internal controls in compliance with SOX.

225.    The COSO Framework states: "[i]nternal control is a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives" relating to (i) effectiveness and efficiency of operations; (ii) reliability of financial reporting; and (iii) compliance with applicable laws and regulations.

226.    COSO identifies interrelated components of internal control: control environment, risk assessment, control activities, information and communication, and monitoring activities. At minimum, Mattel's system of internal controls lacked the "control activities," "information and communication," and "monitoring" components.

227.    The "information and communication" component requires that an "organization obtains or generates and uses relevant, quality information to support the functioning of internal control"; internally communicates information, including objectives and responsibilities for internal control, necessary to support the functioning of internal control"; and "communicates with external parties regarding matters affecting the functioning of internal control." The COSO Executive Summary explains that

> [i]nformation is necessary for the entity to carry out internal control responsibilities to support the achievement of its objectives. Management obtains or generates and uses relevant and quality information from both internal and external sources to support the functioning of other components of internal control. Communication is the continual, iterative process of providing, sharing, and obtaining necessary information.

228.    The "control activities" component requires that an "organization selects and develops control activities that contribute to the mitigation of risks to the achievement of objectives to acceptable levels"; "selects and develops general control activities over technology to support the achievement of objectives"; and "deploys control activities through

policies that establish what is expected and procedures that put policies into action." The COSO Executive Summary further explains that "[c]ontrol activities are the actions established through policies and procedures that help ensure that management's directives to mitigate risks to the achievement of objectives are carried out. [] They may be preventive or detective in nature and may encompass a range of manual and automated activities[.]"

229.    The "monitoring activities" component requires that an "organization selects, develops, and performs ongoing and/or separate evaluations to ascertain whether the components of internal control are present and functioning," and "evaluates and communicates internal control deficiencies in a timely manner to those parties responsible for taking corrective action, including senior management and the board of directors, as appropriate."

230.    Third, SEC regulations required that Mattel maintain an adequate system of controls and disclose any weaknesses in those controls. Item 307 of SEC Regulation S-K, 17 CFR § 229.307, requires that a company disclose the conclusions of its CEO and CFO regarding the effectiveness of the company's disclosure controls and procedures as of the end of the period covered by the periodic report.

231.    Item 308 of Regulation S-K, 17 CFR § 229.308(a)(3), similarly requires that a company provide annual reports on the state of its internal controls over financial reporting containing a statement of management's responsibility for maintaining adequate internal controls, identifying the framework used by management to evaluate the effectiveness of the internal controls, and the assessment of the effectiveness of the internal controls. Under Item 308 "[m]anagement is not permitted to conclude that the registrant's internal control over financial reporting is effective if there are one or more material weaknesses in the registrant's internal control over financial reporting." A statement that internal controls over financial reporting are

effective is, therefore, an assertion by management that there are no material weaknesses in such internal controls.

232.    In addition to management's annual report on internal controls over financial reporting, SEC Regulation § 240.13a-15(d) requires that companies such as Mattel evaluate any change in its internal controls over financial reporting that occur during each of its fiscal quarters. After such evaluation, Item 308 requires that a company disclose any change to its internal controls over financial reporting during its last fiscal quarter.

**B.    THE INDIVIDUAL DEFENDANTS VIOLATED STATUTES AND REGULATIONS GOVERNING INTERNAL CONTROLS AT MATTEL**

233.    In Mattel's Relevant Period quarterly and annual SEC filings, the Individual Defendants certified the effectiveness of Mattel's internal and disclosure controls, represented that there were no material weaknesses in those controls, and thus, that all material information was disclosed to investors and the Company's financial statements were accurate.

234.    For example, Defendants Georgiadis and Euteneuer certified in the Company's Relevant Period SEC filings that they had "[e]valuated the effectiveness of the registrant's disclosure controls and procedures" as required by SOX, certifying that these and other controls would prevent the Company's financial statements from being misstated and would ensure that its other disclosures were not misleading. Mattel also stated in its quarterly SEC filings that the Company "made no changes to its internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting."

235.    These statements were false. As described above, Mattel's internal and disclosure controls suffered from material weaknesses rendering them inadequate and ineffective throughout the Relevant Period. Specifically, due in part to these deficiencies (and also due to Mattel's senior management and Mattel's auditor exploiting these deficiencies), the Individual Defendants

materially misstated the Company's third quarter 2017 financial statements, and the Individual Defendants and PwC successfully engaged in a cover-up of those material misstatements.

236. As Defendants have now admitted, Mattel's internal and disclosure controls were ineffective at least as of September 30, 2017 because of two material weaknesses: first, Mattel lacked a control for assessing the need for and calculating a valuation allowance against its deferred tax assets, and second, Mattel failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies.

237. As alleged above, Defendants either knew of or recklessly disregarded these material weaknesses in Mattel's internal controls and failed to report them in violation of Sections 302 and 404 of SOX, and Items 307 and 308 of Regulation S-K.

238. Throughout the Relevant Period, Mattel also represented that it adhered to the COSO Framework for its internal controls. In truth, Mattel's deficient internal controls were not in compliance with the COSO Framework.

239. Before and throughout the Relevant Period, the support for Mattel's financial statements resided in a collection of unorganized boxes filled with loose papers. Further, when relevant information could be found, it often did not reconcile with the financial statements. These facts strongly indicate that management was not obtaining the appropriate quality information it needed to properly execute on its internal control objectives and to prepare its financial statements in accordance with GAAP. This was in violation of the information and communication component of the COSO framework, which required that Mattel "obtain[] or generate[] and use[] relevant, quality information to support the functioning of internal control."

240. Further, that Mattel lacked a key control surrounding an analysis that should have

been done every quarter to evaluate whether Mattel's deferred tax asset was fully recoverable or needed a valuation allowance, similarly violated COSO. Whitaker stated that such a control was typical in tax departments at other companies he worked for but did not exist in Mattel's internal control framework. This was in violation of the control activities component of the COSO framework, which required that Mattel "select[] and develop[] control activities that contribute to the mitigation of risks to the achievement of objectives to acceptable levels."

### MATTEL VIOLATED GAAP

241.   Compliance with GAAP is a fundamental obligation of publicly traded companies such as Mattel. GAAP is the official standard for accounting accepted by the SEC and is primarily promulgated by the Financial Accounting Standards Board ("FASB") and American Institute of Certified Public Accountants ("AICPA"), which standards are referenced as "Accounting Standards Codification" ("ASC"). GAAP is recognized by the accounting profession as conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. In addition, the FASB has issued guidance in the form of FASB Concept Statements ("FASCON"), which set the objectives, qualitative characteristics, and other concepts used in the development of GAAP and which reflect the underlying basis and framework for the promulgation of accounting standards.

242.   At all times throughout the Relevant Period, Mattel asserted in its SEC filings that the Company's financial statements complied with GAAP. Contrary to these statements, the Restatement was an admission that Mattel's historical financial statements violated GAAP. SEC Regulation S-X provides that Mattel's annual and interim financial statements filed with the SEC

"which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a).

243.    As discussed further below, Mattel's financial statements included in its Relevant Period SEC filings were not prepared in accordance with GAAP. By misclassifying certain of Mattel's intellectual property for tax purposes, Mattel understated its income tax valuation allowance against its deferred tax assets, thereby understating its losses in the third quarter of 2017, and misstated several other financial metrics. The financial metrics that Mattel misstated in its financial statements for the relevant reporting periods during the Relevant Period as set forth above. Mattel's failure to disclose these errors and restate its financial statements also violated basic GAAP principles governing Mattel's responsibility to timely disclose material errors.

A.    **GAAP ACCOUNTING FOR DEFERRED TAX ASSETS**

244.    GAAP required that Mattel account for the Company's deferred tax assets in accordance with ASC 740, *Accounting for Income Taxes* ("ASC 740"). ASC 740 "addresses financial accounting and reporting standards for the effects of income taxes that result from an enterprise's activities for financial accounting and reporting for income taxes." ASC-740-10-05-1.

245.    In Mattel's Forms 10-K, Mattel described certain accounting policies that "Mattel considers most critical in preparing its consolidated financial statements. Management has discussed the development and selection of these critical accounting policies and estimates with the Audit Committee of its Board of Directors[.]" One of these critical accounting policies is "Income Taxes," which Mattel represented it accounted for in accordance with ASC 740. Mattel provided further that accounting for income taxes was a "critical accounting estimate []" because it "could materially affect Mattel's consolidated financial statements."

246.     ASC 740-10-30-3 provides that the total income tax expense (or benefit) for a period is the sum of deferred tax expense (or benefit) and income taxes currently payable or refundable. ASC 740 further provides that a deferred tax expense (or benefit) is the change during a period in an entity's deferred tax liabilities and assets. ASC 750-10-30-4.

247.     Under GAAP, deferred tax assets are the consequences attributable to deductible "temporary differences" and "carryforwards." A "temporary difference" is "[a] difference between the tax basis of an asset or liability computed pursuant to the requirements in [ASC] 740-10 for tax positions, and its reported amount in the financial statements that will result in taxable or deductible amounts in future years when the reported amount of the asset or liability is recovered or settled, respectively." ASC-740-10-20. "Carryforwards" include "deductions or credits that cannot be utilized on the tax return during a year that may be carried forward to reduce taxable income or taxes payable in a future year." ASC-740-10-20. Deferred tax liabilities are the consequences attributable to taxable "temporary differences."

248.     In other words, if the difference between the tax laws (used to measure what the company will pay currently in tax as reflected in its income tax return) and accounting standards (used to define what the company reports in tax expense for financial statement purposes) result in a company paying more tax than it reflects in its financial statements as tax expense, a deferred tax asset is created representing the difference. Alternatively, if the difference between the tax laws and accounting standards results in a company paying less tax than it reflects in its financial statements, a deferred tax liability is created.

249.     If a company determines that it may not be able to realize in its financial statements the benefits of a previously recorded deferred tax asset (in essence "a prepaid tax asset"), the asset must be eliminated or have its net carrying value reduced by a valuation allowance. ASC 740-10-

30-2; ASC 740-10-30-4. A company is required to recognize a full or partial valuation allowance for deferred tax assets "if, based on the weight of available evidence, it is more likely than not (a likelihood of more than 50 percent) that some portion or all of the deferred tax assets will not be realized. The valuation allowance shall be sufficient to reduce the deferred tax asset to the amount that is more likely than not to be realized." ASC 740-10-30-5. When a company records a valuation allowance reducing its deferred tax assets, it concurrently records an income tax expense for the same amount as the other side of the accounting entry.

250.    As Mattel explained in its 2017 Form 10-K:

Certain income and expense items are accounted for differently for financial reporting and income tax purposes. As a result, the income tax expense reflected in Mattel's consolidated statements of operations is different than that reported in Mattel's tax returns filed with the taxing authorities. Some of these differences are permanent, such as expenses that are not deductible in Mattel's tax return, and some differences reverse over time, such as depreciation expense. These timing differences create deferred income tax assets and liabilities. Deferred income tax assets generally represent items that can be used as a tax deduction or credit in Mattel's tax returns in future years for which Mattel has already recorded a tax benefit in its consolidated statements of operations. Mattel records a valuation allowance to reduce its deferred income tax assets if, based on the weight of available evidence, management believes expected future taxable income is not likely to support the use of a deduction or credit in that jurisdiction. Management evaluates the level of Mattel's valuation allowances at least annually, and more frequently if actual operating results differ significantly from forecasted results.

251.    GAAP requires that when a company assesses whether it needs to record a valuation allowance against its deferred tax assets, it must consider certain sources of taxable income, one of which is the existence of deferred tax liabilities. ASC 740-10-30-18. GAAP normally requires that when calculating a valuation allowance, a company first net its deferred tax liabilities against its gross deferred tax assets and then determine the portion of the residual deferred tax assets (i.e., after the offset of the deferred tax liabilities) which may be realized in the future. Any remainder should be reduced by a valuation allowance.

252.    However, when the source of a deferred tax liability is an asset—such as intellectual property (an intangible asset)—with an indefinite useful life, the deferred tax liability cannot be netted against deferred tax assets under GAAP. This is because there is no measurable likelihood that the asset's utility (intangible asset in this case) giving rise to the deferred tax liability, will expire before the deferred tax assets expire. Specifically, under ASC 350, Intangibles—Goodwill and Other ("ASC 350"), for public companies such as Mattel, recovery of the book values of indefinite-lived intangible assets (or land) generally do not occur through periodic diminution represented by depreciation or amortization, but through impairment or disposal. ASC 350-30-35-6.

253.    The key point is that GAAP ASC 740 mandates that most deferred tax liabilities that arise from indefinite-lived assets cannot be used to offset (or net against) gross deferred tax assets for the purposes of determining a valuation allowance required against the deferred tax asset.

## B.    GAAP REQUIRES THE CORRECTION OF MATERIAL ERRORS IN PREVIOUSLY ISSUED FINANCIAL STATEMENTS

254.    Importantly, GAAP requires prompt correction, by way of restatement, of previously issued materially misstated financial statements.

255.    ASC 250, *Accounting Changes and Error Corrections* ("ASC 250") defines an error in previously issued financial statements as an "error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of [GAAP], or oversight or misuse of facts that existed at the time the financial statements were prepared." ASC 250-10-20.

256.    Under GAAP, where an error in financial statements discovered after such statements are issued is deemed to be material, GAAP requires that such errors be disclosed.

Specifically, ASC 250 requires that such error "be reported as an error correction, by restating the prior-period financial statements." ASC 250-10-45-23. ASC 250 further defines a "[r]estatement" as "[t]he process of revising previously issued financial statements to reflect the correction of an error in those financial statements." ASC 250-10-20.

## C.   MATTEL VIOLATED GAAP BY FAILING TO ISSUE A RESTATEMENT OF A MATERIAL MISSTATEMENT IN ITS FINANCIAL RESULTS

257.   Mattel had recorded noncurrent deferred tax assets of $580 million and $96 million in noncurrent deferred tax liabilities on its balance sheet as of June 30, 2017. These balances were not disclosed as standalone line items in Mattel's balance sheet but constituted a portion of the line items "Other noncurrent assets" and "Other noncurrent liabilities," respectively, and were disclosed more specifically in the notes to the financial statements.

258.   As alleged above, during the closing process for the third quarter financial statements, Mattel and PwC decided that Mattel needed to record a valuation allowance against its domestic deferred tax assets. Just before Mattel's third quarter 2017 financial statements were filed, PwC identified material errors in the way Mattel calculated its valuation allowance. Specifically, PwC discovered that Mattel improperly netted deferred tax liabilities that arose from intangible assets with indefinite useful lives, as prohibited by ASC 740. The netting of these deferred tax liabilities had the impact of improperly reducing the gross deferred tax assets and, in turn, the required valuation allowance.

259.   After haphazardly rushing to correct this calculation prior to filing its financial statements, Mattel ultimately recorded a $562 million valuation allowance against its domestic deferred tax assets as of September 30, 2017. Primarily as a result of this valuation allowance, Mattel's deferred tax assets decreased to $76 million as of September 30, 2017.

260.   While this $562 million valuation allowance increased Mattel's loss for the quarter

ended September 30, 2017, this allowance (and, similarly, the net loss reported by Mattel for the quarter in its third quarter 2017 Form 10-Q) was nonetheless materially understated because of a material error. As alleged above, in January 2018, before Mattel published its 2017 Form 10-K, Whitaker and Martin discovered another error in the way Mattel's valuation allowance for deferred tax assets was calculated in the Company's third quarter 2017 Form 10-Q. Specifically, a deferred tax liability arising from the HiT IP—an indefinite lived intangible asset—was improperly used to net against the gross deferred tax assets when determining Mattel's valuation allowance. The HiT IP was deemed by Mattel to have an indefinite life as of September 30, 2017, and therefore the deferred tax liability related to such asset could not be netted against deferred tax assets for purposes of determining the amount of the valuation allowance.

261.    The impact of this error was that Mattel incorrectly reduced the valuation allowance on its domestic deferred tax assets by $109 million in the third quarter of 2017 by improperly netting deferred tax liabilities related to an indefinite-lived intangible asset associated with the Company's Thomas & Friends brand (part of the HiT IP) in its calculation of the valuation allowance. As discussed above, in most cases, GAAP does not allow companies to use deferred tax liabilities arising from indefinite-lived assets to offset deferred tax assets for the purposes of determining a valuation allowance, but this didn't stop the Defendants.

262.    Although Defendants were aware by no later than January 2018 that Mattel's third quarter 2017 Form 10-Q therefore contained material misstatements, Defendants failed to immediately investigate the errors and promptly restate Mattel's results reflected in the Company's third quarter Form 10-Q. Instead, the Individual Defendants and PwC conspired to cover-up the error, as described above, in violation of ASC 250 and PCAOB standards (discussed further below).

263.   This error was the reason that the loss disclosed by Mattel for the three months ended September 2017 in its third quarter 2017 Form 10- Q was $603 million, instead of the restated $713 million, as well as the reason why its income tax expense was materially understated. When Mattel subsequently reclassified the economic life of the HiT IP asset as of October 1, 2017 but did not record any corresponding credit to income in connection with this reclassification, this maneuver had the impact of overstating the net loss reported for the fourth quarter of 2017 in Mattel 2017 Form 10-K by approximately the same $109 million.

264.   In accordance with GAAP, once the Defendants identified an error in the Company's previously issued financial statements concerning its valuation allowance for deferred tax assets, and determined that such financial statements were materially misstated, Mattel was required by GAAP to inform the public that such statements were not to be relied upon and also to promptly restate them. ASC 250-10-45-23.

265.   Instead, when the Defendants discovered this error in January of 2018, rather than restate Mattel's results for the third quarter 2017, which had been issued in October of 2017, the Individual Defendants and PwC conspired to cover-up the error in violation of ASC 250 and PCAOB standards. Mattel did not perform a proper assessment of this error at the time it was identified nor did it document any findings and conclusions. This cover-up resulted in additional misstatements in Mattel's 2017 Form 10-K. Specifically, instead of restating the Company's third quarter 2017 Form 10-Q as GAAP required, the Individual Defendants and PwC reclassified the HiT IP to no longer be an indefinite-lived asset, to effectively match the manner in which Mattel had incorrectly calculated and reported its valuation allowance. In its November 2019 Restatement, Mattel thus reported that while "[t]his change resulted in an effective correction of the tax misstatement for the 2017 annual results . . . the provision for income taxes remained

uncorrected for the three months ended September 30, 2017, which resulted in an overstatement of the tax expense for the three months ended December 31, 2017."

## PWC FALSELY CERTIFIED THAT IT HAD AUDITED MATTEL'S FINANCIAL STATEMENTS AND INTERNAL CONTROLS FOR 2017 AND 2018 IN ACCORDANCE WITH CONTROLLING AUDITING STANDARDS

266. PwC's liability in this action arises from its own Relevant Period statements certifying that it had audited Mattel's financial statements and internal controls for the calendar years ended December 31, 2017 and December 31, 2018 in accordance with the controlling auditing standards of the PCAOB, which PwC knew were false and misleading when made. Among other things, PwC's statements misrepresented that it had (1) conducted its audits in compliance with PCAOB auditing standards, when that was not the case; (2) a reasonable basis for its opinions that the Company's internal controls were effective and contained no material weaknesses, when that also was not true; and (3) that Mattel's financial statements complied with GAAP, when they did not. Had PwC complied with controlling PCAOB auditing standards, the only reasonable conclusions PwC could have drawn would have been that Mattel's financial statements were not prepared in accordance with GAAP, and the Company's internal controls were not effective due to the existence of material weaknesses.

267. As set forth above, Mattel's financial statements did not comply with GAAP because the Company improperly used deferred tax liabilities arising from intangible indefinite-lived intellectual property to calculate and net against the amount of income tax valuation allowance required for the third quarter of 2017. PwC knew of this error no later than January 2018, prior to the issuance of Mattel's 2017 Form 10-K. PwC also knew that Mattel's internal controls were not effective when Mattel issued its SEC filings during the Relevant Period.

## A.    PCAOB AUDITING STANDARDS

268. PCAOB's auditing standards are referenced by the acronym AS, which stands for "Auditing Standards." PCAOB auditing standards represent the rules and guidelines by which an audit of public companies must be planned, performed, and reported on, and are, therefore, a measure of audit quality and the objectives to be achieved in an audit. Auditors have a responsibility to their profession to comply with the standards accepted by their fellow practitioners. AS 1001, Responsibilities and Functions of the Independent Auditor ("AS 1001").

269. AS 1001.01 provides that the "objective of the ordinary audit of financial statements by the independent auditor is the expression of an opinion on the fairness with which they present, in all material respects, financial position, results of operations, and its cash flows in conformity with generally accepted accounting principles." The auditor's report is the medium through which the auditor expresses his conclusions or, if circumstances require, disclaims them. AS 1001.01. In either case, the auditor is required to state whether the audit has been made in accordance with the standards of the PCAOB. These standards require the auditor to state whether the financial statements are presented in conformity with generally accepted accounting principles (GAAP) and to identify those circumstances in which such principles have not been consistently observed in the preparation of the company's financial statements.

270. To this end, an audit represents the highest level of assurance an external auditor can provide to the benefit of potential investors with respect to the reliability of financial statements when making an informed investment decision. For this reason, the independence of external auditors is important so that the auditor's opinion is impartial, unbiased, and free from any undue influence or conflict of interest to override the professional judgment of the auditor. Accordingly, PCAOB auditing standards, AS 1005, Independence ("AS 1005") require that auditors must maintain "an independence in mental attitude" in all matters related to an audit. AS

1005.01. The PCAOB states further that "[i]ndependent auditors should not only be independent in fact; they should avoid situations that may lead outsiders to doubt their independence." AS 1005.03.

271. Pursuant to AS 3101, the Auditor's report on an audit of financial statements, when the auditor expresses an unqualified opinion ("AS 3101"), an auditor should only issue an "unqualified opinion" when the auditor has "conducted an audit in accordance with the standards of the [PCAOB] and concludes that the financial statements, taken as a whole, are presented fairly, in all material respects, in conformity with the applicable financial reporting framework." AS 3101.02. Thus, an auditor may express an unqualified audit opinion only when the auditor has formed such an opinion on the basis of an audit performed in accordance with generally accepted auditing standards. Accordingly, when an auditor has failed to conduct its audit in accordance with the standards established by the PCAOB, it is limited to only expressing a qualified or adverse opinion, disclaiming its opinion, or issuing no opinion at all. AS 3101.

272. In addition to auditing financial statements, external auditors may also be engaged to perform audits on—and express their conclusions on—the effectiveness of a company's internal controls over financial reporting. Where an auditor conducts an audit of a company's internal controls over financial reporting in conjunction with its audit of the company's financial statements, the auditor reports its conclusions on both components in the auditor's report. This "integrated report" is incorporated into the company's Form 10-K. AS 2201.01, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements* ("AS 2201").

273. PCAOB auditing standards state that "[i]f one or more material weaknesses exist, the company's internal control over financial reporting cannot be considered effective." AS

2201.03. A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

274.    Additionally, PCAOB auditing standards state that if a company's internal controls have "one or more material weaknesses, the auditor must express an adverse opinion on the company's internal control over financial reporting." AS 2201.90.

275.    Importantly, auditors are also required to express an adverse opinion on a company's internal controls over financial reporting if material weaknesses are identified "subsequent to the date as of which internal control over financial reporting is being audited but before the date of the auditor's report." AS 2201.93, .96.

## B.    PwC VIOLATES THE PCAOB AUDITING STANDARDS

276.    In its auditor reports that are incorporated into each of Mattel's originally issued 2017 and 2018 Forms 10-K, PwC stated that Mattel's internal controls over financial reporting were effective as of the end of each calendar year. As described below, PwC violated several PCAOB standards by issuing false and misleading unqualified audit reports in Mattel's 2017 and 2018 Forms 10-K by failing to report material weaknesses discovered during PwC's annual audits and quarterly reviews of Mattel's financial results, and by failing to require Mattel to restate its financial statements to correct known material errors.

277.    Additionally, as explained below, once PwC became aware that Mattel's system of internal controls was deficient and contained material weaknesses—issues which persisted throughout the Relevant Period—PwC had a duty to inform Mattel's management that Mattel's quarterly and annual filings should disclose such weaknesses. PwC's failure to do so time and

82

again throughout the Relevant Period also violated PCAOB auditing standards.

**1)    PwC Violated PCAOB Auditing Standards in Failing to Report Material Weaknesses Beginning in the Second Quarter 2017**

278.    As alleged above, PwC has served as Mattel's auditor for over 45 years. PwC was thus intimately familiar with the way Mattel's accounting and tax departments functioned, including its system of internal controls over financial reporting, and the way the Company prepared its quarterly and annual SEC filings.

279.    Speaking to the familiarity of an outside auditor with a company based on the longevity of the auditor's relationship with that company, AS 4105, Reviews of Interim Financial Information ("AS 4105") provides that an "accountant who has audited the entity's financial statements for one or more annual periods would have acquired sufficient knowledge of an entity's internal control as it relates to the preparation of annual financial information and may have acquired such knowledge with respect to interim financial information." AS 4105.13.

280.    Given the longevity of PwC's relationship with Mattel, at a bare minimum, PwC was aware as of the beginning of the Relevant Period, when Mattel published its second quarter 2017 financial statements on August 2, 2017, that Mattel was lacking key controls regarding the evaluation of whether its deferred tax asset was impaired and the calculation of a valuation allowance. As Mattel's deferred tax asset was material as of the beginning of the Relevant Period (nearly $600 million), the lack of these key internal controls constituted a material deficiency of which PwC was aware. Indeed, Mattel purportedly regularly assessed the need to record a valuation allowance, and PwC was involved in that process, giving it direct knowledge of the lack of internal controls governing that process.

281.    Despite this knowledge, at no time during the Relevant Period did PwC require that Mattel disclose material weaknesses in its internal controls.

282.    Moreover, as Mattel and PwC were finalizing Mattel's third quarter 2017 financial statements in October 2017, PwC discovered a significant error that impacted Mattel's calculation of its income tax valuation allowance. After PwC informed Whitaker of the error, Whitaker and his team corrected the mistake days before the results were published. This sequence of events further demonstrated to PwC that Mattel lacked controls for the calculation of its valuation allowance.

283.    These issues and fundamental failures were exacerbated by Mattel's other material control deficiencies, as described above—Mattel's lack of sufficient supporting documentation for its reported financials, and its deficient procedure for reporting known errors to the Audit Committee. Rather than alerting the Audit Committee that Mattel's controls suffered from this material weakness that should be disclosed, PwC exploited this very weakness to cover up the known material misstatement in Mattel's financial statements.

284.    In Mattel's second and third quarter 2017 Forms 10-Q, PwC did not require that Mattel report material weaknesses in its internal controls despite the fact that, as of June 30, 2017 and September 30, 2017, it understood that Mattel lacked controls governing the Company's calculation of its valuation allowance and lacked a system for reliably documenting the support for its financial statements, among other deficiencies.

285.    Although PwC was only required to publish audit reports in Mattel's annual reports on Form 10-K, PCAOB auditing standards nonetheless required that PwC communicate issues that were discovered during its review of Mattel's interim financial reporting—such as material weaknesses in the Company's internal controls—to Mattel executives and the Audit Committee. Specifically, AS 4105.29, *Reviews of Interim Financial Information* ("AS 4105") provides that:

[a]s a result of conducting a review of interim financial information, the accountant may become aware of matters that cause him or her to believe that . . . *modification to the disclosures about changes in internal control over financial reporting is necessary* for the certifications to be accurate and to comply with the requirements of Section 302 of [SOX] and Securities Exchange Act Rule 13a-14(a) or 15d-14(a), whichever applies . . . *the accountant should communicate the matter(s) to the appropriate level of management as soon as practicable.*

286.    AS 4105.33 further provides:

When conducting a review of interim financial information, the accountant may become aware of matters relating to internal control that may be of interest to the audit committee. Matters that should be reported to the audit committee are referred to as significant deficiencies. A significant deficiency is a deficiency, or a combination of deficiencies, in internal control over financial reporting, that is less severe than a material weakness yet important enough to merit attention by those responsible for oversight of the company's financial reporting. *The accountant should communicate significant deficiencies or material weaknesses of which the accountant has become aware to the audit committee or those responsible for oversight of the company's financial reporting in a timely manner and prior to the registrant filing its periodic report with the SEC.*

(Emphasis added).

287.    Although PwC did not opine on the effectiveness of Mattel's internal controls in the Company's Forms 10-Q, its failure to require Mattel to disclose the existence of material weaknesses in Mattel's Relevant Period Forms 10-Q was a violation of PCAOB auditing standards.  AS 4105.46; AS 2905.

### 2)    PwC Knowingly Made Materially False and Misleading Statements in Mattel's 2017 and 2018 Forms 10-K

288.    PCAOB auditing standards provide that if a company's system of internal controls contains a material weakness, such system of controls cannot be considered effective, and, accordingly, the auditor must express an adverse opinion regarding the effectiveness of the company's system of internal controls. AS 2201.90. In violation of this standard, in its audit reports that are incorporated into each of Mattel's originally issued 2017 and 2018 Forms 10-K, PwC stated that Mattel's internal controls over financial reporting were effective as of the end of

each year.

289.    However, PwC was aware that Mattel's internal controls were not designed and operating effectively when it issued these audit reports. Therefore, PwC's unqualified audit opinions regarding Mattel's internal controls as of December 31, 2017, and December 31, 2018, incorporated into Mattel's 2017 and 2018 Forms 10-K, respectively, were materially false and misleading and violated AS 2201 and AS 3101.02.

290.    Further, in January 2018 while Mattel was preparing its 2017 year-end financial statements, Whitaker discovered that the Company had understated its income tax valuation allowance and, by extension, Mattel's net losses, by approximately $109 million in its third quarter 2017 Form 10-Q. As Whitaker described, Mattel's accounting and finance executives concluded that Mattel needed to restate its previously issued third-quarter 2017 financial results and disclose the existence of the material weaknesses in Mattel's internal controls that contributed to these errors.

291.    When Mattel reported this material misstatement to PwC—including Abrahams and Brierley—the PwC audit team manufactured a cover-up at Abrahams' direction so that Mattel could surreptitiously avoid both restating its financial statements and disclosing material weaknesses in its internal controls. PwC assisted the Individual Defendants in devising a scheme by which Mattel would retroactively, as of the beginning of the fourth quarter 2017, reclassify the HiT IP to match its improper accounting treatment reflected in the third quarter valuation allowance. Once PwC and the Individual Defendants executed the cover-up, PwC issued an unqualified audit opinion as to the effectiveness of Mattel's internal controls over financial reporting incorporated into Mattel's 2017 Form 10-K despite knowing that the 2017 Form 10-K contained material misstatements relating to the Company's third quarter results and the existence

of material weaknesses in internal controls.

292.     Finally, once PwC became aware in January 2018 that Mattel's results of operations in its recently issued third quarter 2017 Form 10-Q were materially misstated due to an understated deferred tax asset valuation allowance, it had a duty to advise Mattel to restate the results for the third quarter of 2017. Instead, PwC did the opposite and advised Mattel not to revise its third quarter 2017 financial statements and instead determined a method to conceal the error, another violation of PCAOB standards. PwC's unqualified audit opinion in Mattel's 2017 Form 10- K was additionally materially false and misleading for these reasons and violated AS 2201 and 3101.02.

293.     Because these material weaknesses persisted throughout the Relevant Period but were not reported by Mattel or mentioned by PwC in its integrated audit report, nor did PwC advise Mattel's management to report such material weaknesses in its interim Forms 10-Q filed during the Relevant Period, PwC's audits and interim reviews of Mattel's 2018 Form 10-K and Relevant Period Forms 10-Q similarly violated PCAOB auditing standards.

294.     In addition to its materially false and misleading statements concerning the adequacy of Mattel's internal controls, PwC's statement in Mattel's 2017 Form 10-K that the Company's "consolidated financial statements . . . present fairly, in all material respects, the financial position of the Company as of December 31, 2017" was also materially misleading. PwC was aware that Mattel's "Quarterly Financial Information" contained in Note 16 of the Company's 2017 Form 10-K, which included financial data from the third and fourth quarters of 2017, was materially misstated, as described above. PwC was complicit in covering up this misstated financial data. Specifically, despite the representation that the quarterly financials were "unaudited," PwC was aware of the misstatements in the Note 16 regarding Mattel's third quarter results since it was aware of the $109 million error in the third quarter, and therefore knew that

Note 16 was misleading. PwC was further aware that the fourth quarter 2017 results disclosed in Note 16 were also misstated by approximately $109 million, because of the effort to conceal the error in the third quarter financial statements.

295.    The same misleading "Quarterly Financial Information" including financial data from the third and fourth quarters of 2017 was contained in Note 17 of Mattel's 2018 Form 10-K filed with the SEC on February 22, 2019.  Thus, PwC's statement in Mattel's 2018 Form 10-K that the Company's "consolidated financial statements . . . present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017" was also materially misleading.

### 3)    PwC Violated PCAOB Auditing Standards When It Did Not Require Mattel to Restate its Third Quarter 2017 Form 10-Q

296.    After PwC learned no later than January 2018 that Mattel's third quarter 2017 Form 10-Q contained a material misstatement,  PCAOB auditing standards mandated that PwC require Mattel to restate those financial statements. Specifically, AS 4105.46 provides:

> Subsequent to the date of the accountant's review report or the completion of the interim review procedures, if a report is not issued, the accountant may become aware that facts existed at the date of the review report (or the completion of the review procedures) that might have affected the accountant's report (or conclusion, if a report is not issued) had he or she then been aware of those matters. Because of the variety of conditions that might be encountered, the specific actions to be taken by the accountant in a particular case may vary with the circumstances. In any event, the accountant should consider the guidance in AS 2905, *Subsequent Discovery of Facts Existing at the Date of the Auditor's Report*.

297.    AS 2905, *Subsequent Discovery of Facts Existing at the Date of the Auditor's Report* ("AS 2905") addresses the actions an auditor is required to take once it identifies facts that may have impacted its previous conclusions had those facts been known then. AS 2905.04-.07. AS 2905.04 instructs that once such facts are discovered, the auditor should first determine whether such facts are reliable and existed as of the time the previous financials were issued. AS

2905.05 provides that if the facts were reliable and existed as of the time the previous financial statements were issued, the auditor should evaluate whether (a) those facts would have impacted the auditor's conclusion and (b) the auditor believes persons are relying on the previously issued financial statements. AS 2905.06-07 states that auditors should then advise the company to make appropriate disclosure of such facts and restate the company's previously issued financial statements, and that the auditor should take the steps deemed necessary to satisfy himself that the client has made the requisite disclosures. AS 2905.06 also requires auditors to revise their audit reports in these circumstances.

298.    Under these standards, once PwC was informed of the $109 million material misstatement in Mattel's third quarter 2017 Form 10-Q, PwC was required to advise Mattel to restate its results of operations for the third quarter of 2017. Instead, PwC did the opposite and advised Mattel not to revise (*i.e.,* restate) the results of operations for the third quarter of 2017 and instead created a method to conceal the error, which was accomplished by reclassifying the economic life of the HiT IP intangible asset as of October 1, 2017 to match its improper treatment in the calculation of the allowance, and not reporting the $109 million error.

## C.    MATTEL'S RELATIONSHIP WITH PWC VIOLATED AUDITOR INDEPENDENCE REQUIREMENTS

299.    PwC's relationship with Mattel also ran afoul of widely accepted auditor independence requirements.

300.    The objective of the audit of financial statements by an independent auditor is the expression of a conclusion on the fairness with which they present, in all material respects, the financial position, results of operations, and a company's cash flows in conformity with GAAP. The independence of outside auditors is important to ensure that the auditor's conclusion is impartial, unbiased, and free from any undue influence or conflict of interest to override the

professional judgment of the auditor. To this end, the PCAOB auditing standards require that auditors maintain "an independence in mental attitude" in all matters related to its audit. AS 1005.01.

301. PwC's checkered history with independence issues hardly began with Mattel. PwC has been the subject of consistent scrutiny in recent years for its failure to adhere to these requirements. For example, on September 23, 2019, the SEC charged PwC with improper professional conduct in connection with 19 different engagements on behalf of 15 separate issuers and violating auditor independence rules in connection with engagements for one issuer where PwC performed prohibited non-audit services. Specifically, the SEC found that PwC violated PCAOB Rule 3525, Audit Committee Pre-approval of Non-Audit Services Related to Internal Control Over Financial Reporting, which requires an auditor to describe in writing to the audit committee the scope of work, discuss with the audit committee the potential effects of the work on independence, and document the substance of the independence discussion. PwC's actions deprived numerous issuers' audit committees of the information necessary to assess PwC's independence. PwC paid over $7.9 million in monetary relief to settle the charges.

302. Then, in January 2020, PwC was battling conflict of interest allegations concerning its work for Sonangol, the government-owned oil group that underpins Angola's economy. PwC's work for Sonangol raised conflict of interest concerns because PwC was also retained to audit the company's accounts while at the same time collecting fees to advise on a major restructure. During the time PwC was retained to perform audit work among other various services for Sonangol, Sonangol's chairwoman was involved in an elaborate criminal scheme to embezzle money from the Angolan government. As a result of these conflict-of-interest claims, PwC's contract with Sonangol was terminated early and the head of PwC's tax advisory team for Angola and Portugal

stepped down.

303.    Not only does PwC have a recent history rife with independence violations, but recent data also shows that PwC clients are more likely to revise their financial statements than clients of any of the other "Big Four" audit firms—PwC, Ernst & Young LLP, Deloitte Consulting, and KPMG LLP.

304.    A December 17, 2019, a *Wall Street Journal* article reported that PwC has had a streak of accounting problems surface recently at U.S. companies it audits, including an uptick in high-profile restatements. Its clients account for three of the five biggest restatements so far this year, measured by cumulative impact on net income[.] . . . Companies audited by PwC have been more prone over the last couple of years than clients of the other Big Four firms to do the most serious type of restatement[.]

305.    According to the article, PwC clients issued more restatements in 2018 than the remaining 3 "Big Four" audit firms combined: "Since the start of 2018, PwC clients have done 15 of these 'Big R' restatements, more than the combined total of 11 for companies audited by Deloitte LLP, Ernst & Young LLP and KPMG LLP[.]"

306.    PwC's work for Mattel was similarly plagued by these issues. Mattel's internal investigation found that PwC's lead audit partner for Mattel—Abrahams—"was in violation of the SEC's auditor independence rules" by "providing recommendations on candidates for Mattel's senior finance positions." These recommendations resulted in a new controller at Mattel, as well as a senior vice president for tax, during the 2017-2018 timeframe. This ran directly afoul of both PCAOB and SEC independence rules providing that auditors cannot advise their clients on hiring specific candidates for specific jobs, based on the principle that auditors are not supposed to audit their own work. AS 1005.03; 17 C.F.R. § 210.2-01.

307.     Further, PwC provided both audit services and consulting services to Mattel, which calls into question the ability of PwC to be independent in its audits given the significant amount of revenue PwC generated from consulting services provided to Mattel. Mattel paid PwC more than nearly $10 million in fees for tax and audit services in 2018 alone, including $1.2 million for tax services. These sorts of fees are nothing new for Mattel and PwC—in 2016, Mattel paid PwC $8.6 million; $9.4 million in 2017; and nearly $11 million in 2019.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

308.     Throughout the Relevant Period, Defendants made numerous materially false and misleading statements and omissions concerning several subjects, including: (i) the effectiveness of Mattel's internal controls and procedures; (ii) the accuracy of Mattel's financial statements, including its reported tax valuation allowance, net income/loss and earnings per share; (iii) the reclassification of the HiT IP asset in the fourth quarter of 2017; (iv) Mattel's compliance with GAAP; and PwC's auditing of Mattel's financial statements and its audit reports. These materially false and misleading statements and omissions are set forth below.

### A.     MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS CONCERNING THE SECOND QUARTER 2017

309.     On August 2, 2017, Mattel filed its Form 10-Q for the second quarter of 2017 (the "Q2 2017 Form 10-Q"), which was signed by Defendants Georgiadis and Farr. Defendants Georgiadis and Farr certified in Exhibits 31.0 and 31.1 in the 2Q 2017 10-Q, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that they had: (1) designed internal controls over financial reporting to provide reasonable assurance that Mattel's financial statements were accurate and complied with GAAP; (2) evaluated the effectiveness of Mattel's disclosure controls and procedures and presented the conclusions regarding that effectiveness in the Q2 2017 Form 10-Q;

and (3) designed disclosure controls and procedures to ensure that material information about

Mattel was made known to them. Specifically, they certified that:

1. I have reviewed this quarterly report on Form 10-Q of Mattel, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;***

b. ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;***

c. ***Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and***

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to

materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Emphasis added).

310.    The statements above were materially false and misleading when made. First, contrary to the statement in paragraph 4(b) of the certification, as of June 30, 2017, Mattel's internal controls over financial reporting were severely deficient, and did not provide reasonable assurance regarding the reliability of the Company's financial statements and its compliance with GAAP. Specifically, (1) Mattel stored vital financial information necessary for accurate financial reporting, including the back-up for Mattel's financial statements, in disorganized boxes and binders of paper, which made it extremely difficult to even locate the support for its published financial statements; (2) even when that support could be located, Mattel's financial back-up information often did not reconcile or "tie-out" with the financial statements, and senior Mattel executives would sign-off on the financial statements without adequately reconciling the financial statements with the supporting information; (3) Mattel lacked coordination between the accounting and tax departments; and (4) Mattel lacked an internal control for determining and confirming its valuation allowance on its deferred tax assets, which was a critical failure in light of the materiality of those assets. Notably, the Defendants have admitted that the Company's

internal controls were deficient as of September 30, 2017. These deficiencies did not suddenly arise as of that date. In fact, as quoted below, the Company stated that there had been no material changes to its internal controls over financial reporting as of June 30, 2017 and September 30, 2017, demonstrating that the deficiencies existed as of the second quarter of 2017 as well.

311.    Second, contrary to the statement in section 4(c) of the certification, Defendants Georgiadis and Farr had not truly evaluated the effectiveness of Mattel's disclosure controls as of June 30, 2017. Specifically, as set forth above in greater detail, Mattel executives conducted no substantive evaluation of whether disclosure controls were effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

312.    Third, contrary to the statement in section 4(a) of the certification, as of June 30, 2017, Mattel's disclosure controls were severely deficient, and did not provide assurance that the information required to be disclosed by Mattel in its SEC filings was in fact properly collected, communicated and reported in Mattel's SEC filings. As Defendants would later admit, at the time Mattel prepared its financial statements for the third and fourth quarters of 2017, it "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action. . . ." As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because Defendants did not ensure that the material errors in the Company's third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were "disclosed in the 2017 10-K." These material deficiencies in disclosure controls and procedures that Defendants exploited did not suddenly arise in September 30, 2017, but rather, existed as of

June 30, 2017. At no point in 2017 did the Company state that it had changed its disclosure controls and procedures to remove controls that had existed before.

313.    Further, in Item 4. "Controls and Procedures," the Q2 2017 Form 10-Q stated:

*Evaluation of Disclosure Controls and Procedures*

**As of June 30, 2017, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective** in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. **Based on this evaluation, Margaret H. Georgiadis, Mattel's principal executive officer, and Kevin M. Farr, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of June 30, 2017.**

*Changes in Internal Control Over Financial Reporting*

During the quarter ended June 30, 2017, Mattel made no changes to its internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting.

(Emphasis added).

314.    The statements set forth above were materially false and misleading when made. First, contrary to these statements, Defendants Georgiadis and Farr had not truly "evaluated" the effectiveness of Mattel's disclosure controls and procedures as of June 30, 2017. Specifically, as set forth above in greater detail, Mattel executives conducted no substantive evaluation of whether disclosure controls were actually effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

315.    Second, as of June 30, 2017, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel

in its SEC filings was in fact properly collected, communicated and reported in Mattel's SEC filings. On November 15, 2019, during a conference call with investors, Mattel's Senior Vice President and Corporate Controller Yoon Hugh reiterated that Mattel suffered from a "material weakness related to a deficiency in monitoring control activities" at the time it prepared its financial statements for the third and fourth quarters of 2017. As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because Defendants did not ensure that the material errors in Mattel's third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were "disclosed in the 2017 10-K." The material deficiencies in disclosure controls and procedures that Defendants exploited did not suddenly arise in September 30, but rather existed as of June 30, 2017. At no point in 2017 did the Company state that it had changed its disclosure controls and procedures to remove controls that had existed before.

### B. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS CONCERNING THE THIRD QUARTER 2017

316.    On October 26, 2017, Mattel filed its Form 10-Q with the SEC setting forth the Company's financial and operating results for the quarter ended September 30, 2017 (the "Q3 2017 Form 10-Q"). The Q3 2017 Form 10-Q was signed by Defendants Georgiadis and Euteneuer. The Q3 2017 Form 10-Q provided a number of statements concerning Mattel's valuation allowance for its deferred tax assets, its tax provision, its net loss, and its loss per share. For example, the Q3 2017 Form 10-Q stated:

> Mattel regularly assesses the need for a valuation allowance against its deferred tax assets. In making that assessment, Mattel considers both positive and negative evidence related to the likelihood of realization of the deferred tax assets to determine, based on the weight of available evidence, whether it is more-likely-than-not that some or all of the deferred tax assets will not be realized. In evaluating the need for a valuation allowance, Mattel considered its recent operating results which resulted in a cumulative net operating loss in the U.S. for

the 36- month period ending September 30, 2017. The 36-month cumulative U.S. loss from operations is considered strong negative evidence and outweighs other positive subjective evidence, such as projections of future income. *As a result, in the third quarter Mattel established a valuation allowance on its U.S. federal and state deferred tax assets. This results in a discrete non-cash charge to the quarter of $561.9 million for the balance of these net deferred tax assets as of December 31, 2016.*

(Emphasis added).

317.    The Q3 2017 Form 10-Q further stated: "Net loss for the third quarter of 2017 was $603.2 million. . . . [It] was negatively impacted by discrete non-cash tax expense of $561.9 million related to the establishment of a valuation allowance on deferred tax assets that will likely not be realized and lower gross profit."

318.    The financial statements included in the 3Q 2017 Form 10-Q reiterated Mattel's net loss of $603.2 million and reported a net loss on a per share basis of $1.75, as well as a provision for income taxes of $664.5 million.

319.    Defendants have now admitted that the statements set forth above were materially false when made. Mattel admitted in the Restatement that its net loss, net loss per share, valuation allowance, and income tax provision reported in the Q3 2017 Form 10-Q were all materially understated when issued. The misstatements of these financial metrics are set forth in the chart below:

| Mattel's Materially Misstated Financial Metrics for the 2017 Third Quarter | | | | |
|---|---|---|---|---|
| FinancialMetric | As Previously Reported | Corrections | As Restated | Percent Understatement |
| Net Loss | $603 million | $110 million | $713 million | 18% |
| Net Loss Per Common Share | $1.75 | $0.32 | $2.07 | 16% |

| Valuation Allowance | $562 million | $109 million | $671 million | 19% |
| Provision for Income Tax | $664 million | $113 million | $777 million | 17% |

320.    Mattel also included similar financial data for the nine months ended September 30, 2017. Specifically, for the nine months ended September 30, 2017, Mattel reported a net loss of $772.6 million, a net loss per share of $2.25, a valuation allowance of $561.9 million, and a provision for income tax of $614.4 million. Mattel admitted in the Restatement that its net loss, net loss per share, valuation allowance, and income tax provision for the nine-month period ended September 30, 2017, reported in the Q3 2017 Form 10-Q, were all materially understated when issued. The misstatements of these financial metrics are set forth in the chart below:

| Mattel's Materially Misstated Financial Metrics For The Nine MonthsEnded September 30, 2017 | | | | |
|---|---|---|---|---|
| Financial Metric | As Previously Reported | Corrections | As Restated | Percent Understatement |
| Net Loss | $772 million | $107 million | $879 million | 14% |
| Net Loss Per CommonShare | $2.25 | $0.31 | $2.56 | 14% |
| Valuation Allowance | $562 million | $109 million | $671 million | 19% |
| Provision for Income Tax | $614 million | $114 million | $729 million | 19% |

321.    Defendants Georgiadis and Euteneuer also certified in Exhibits 31.0 and 31.1 in the 3Q 2017 10-Q, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that:

1.  I have reviewed this quarterly report on Form 10-Q of Mattel, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. *Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;*

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;*

b. *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;*

c. *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;* and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on

our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Emphasis added).

322.   First, contrary to the statement in paragraph 4(b) of the certification, as of September 30, 2017, Mattel's internal controls over financial reporting were severely deficient, and did not provide reasonable assurance regarding the reliability of the Company's financial statements and its compliance with GAAP. As Defendants would later admit, "there were material weaknesses in [Mattel's] internal control over financial reporting at the time of the preparation of its financial statements for the quarters ending on September 30, 2017 and December 31, 2017[,]" concerning, among other things, "the control over the review of income tax valuation allowance analysis." Specifically, (1) Mattel stored vital financial information necessary for accurate financial reporting, including the back-up for Mattel's financial statements, in disorganized boxes and binders of paper, which made it extremely difficult to even locate the support for its published financial statements; (2) even when that support could be located, Mattel's financial back-up information often did not reconcile or "tie-out" with the financial statements, and senior Mattel executives would sign-off on the financial statements without adequately reconciling the financial statements with the supporting information; (3) Mattel lacked coordination between the accounting and tax departments; and (4) Mattel lacked an internal control for determining and confirming its valuation allowance on its deferred tax assets, which

was a critical failure in light of the materiality of those assets.

323.    Second, contrary to the statement in section 4(c) of the certification, Defendants Georgiadis and Euteneuer had not truly evaluated the effectiveness of Mattel's disclosure controls as of September 30, 2017. Specifically, as set forth above in greater detail, Mattel executives conducted no substantive evaluation of whether disclosure controls were actually effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

324.    Third, contrary to the statement in section 4(a) of the certification, as of September 30, 2017, Mattel's disclosure controls and procedures were severely deficient as of September 30, 2017 and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was in fact properly collected, communicated, and reported in Mattel's SEC filings. As Mattel would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action." As Mattel would further admit, these "material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017." As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because Defendants did not ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were "disclosed in the 2017 10-K."

325.    Fourth, contrary to the statement in paragraph 3 of the certification, Mattel's financial results for the third quarter 2017 did not "fairly present in all material respects the financial condition," and "results of operation." As noted above, Mattel's financial results for the

three and nine months ended September 30, 2017 were materially misstated in numerous respects. Senior Mattel executives, including Defendant Euteneuer, had personally witnessed Mattel's inability to accurately report its financial results in the days before they were reported, as he witnessed Mattel's financial results wildly fluctuate in draft financial statements that were circulated internally.

326.    Further, in Item 4. "Controls and Procedures," the Q3 2017 Form 10-Q stated:

*Evaluation of Disclosure Controls and Procedures*

***As of September 30, 2017, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective*** in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. ***Based on this evaluation, Margaret H. Georgiadis, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of September 30, 2017.***

*Changes in Internal Control Over Financial Reporting*

During the quarter ended September 30, 2017, Mattel made no changes to its internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting.

(Emphasis added).

327.    The statements set forth above were materially false and misleading when made. Contrary to the statement that Defendants Georgiadis and Euteneuer "evaluated" Mattel's disclosure controls and procedures, Defendants Georgiadis and Euteneuer had not truly "evaluated" the effectiveness of Mattel's disclosure controls and procedures as of September 30, 2017. Specifically, as set forth above in greater detail, Mattel executives conducted no substantive

evaluation of whether internal controls were actually effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

328.    Second, contrary to Defendants' statements, Mattel's disclosure controls and procedures were severely deficient as of September 30, 2017 and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was in fact properly collected, communicated, and reported in Mattel's SEC filings. As Mattel would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action." As Mattel would further admit, these "material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017." As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because Defendants did not ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were "disclosed in the 2017 10-K."

329.    Finally, the 3Q 2017 Form 10-Q, as well as each of Mattel's SEC disclosures during the Relevant Period, stated that the financial statements contained therein had been prepared in accordance with GAAP: "The accompanying unaudited consolidated financial statements and related disclosures have been prepared in accordance with accounting principles generally accepted in the United States of America ('GAAP') applicable to interim financial information and with the instructions to Form 10-Q and Rule 10-01 of Regulation S-X."

330.    These statements were false and misleading when made. Defendants have admitted

that Mattel's financial statements for the third quarter of 2017 were materially misstated in violation of GAAP.

331.    On October 26, 2017, Mattel issued an earnings release, which it also filed with the SEC on Form 8-K, as well as an investor presentation for its conference call. Each of these documents reported the same false financial results for the third quarter of 2017, including Mattel's reported net loss, net loss per share, valuation allowance and provision for income taxes. These documents also reported the same false financial results for the nine-month period ended September 30, 2017, including net loss, net loss per share, valuation allowance, and provision for income taxes. Defendants have now admitted that this financial information in the earnings release, Form 8-K, and investor presentation was materially misstated when issued, as set forth in the charts above.

## C.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS CONCERNING THE FOURTH QUARTER AND FULL YEAR 2017

332.    On February 1, 2018, Mattel held a conference call with investors and analysts to discuss its financial results for the fourth quarter and full year 2017 (the "4Q 2017 Earnings Call"). On the 4Q 2017 Earnings Call, Defendant Euteneuer discussed the Company's tax position, and reiterated the false third quarter tax valuation allowance, stating "As I mentioned on our third quarter earnings call, we booked a onetime noncash charge of $561.9 million to record a valuation allowance for a significant portion of our deferred tax assets."

333.    This statement was materially false when made. At the time he made this statement, Defendant Euteneuer knew that Mattel's valuation allowance for the third quarter of 2017 had been materially understated by approximately $109 million, and that the Company had reclassified the HiT asset as a definite-lived asset to avoid the GAAP-required restatement.

334.    Mattel also issued a series of documents setting forth its financial results for the

fourth quarter and full year 2017, many of which reiterated the false financial information Mattel had issued in the third quarter and contained additional false and misleading statements concerning the fourth quarter and year-end 2017. All of these documents also completely omitted numerous highly material facts that were known to the Defendants.

335. For example, on February 1, 2018, Mattel issued an earnings release, which it filed with the SEC on Form 8-K, setting forth its results for the fourth quarter and year-end 2017. That same day, Mattel issued an investor presentation concerning its results for the fourth quarter and year-end 2017, which listed Defendants Georgiadis and Euteneuer on the cover page. On February 27, 2018, Mattel filed an annual report on Form 10-K with the SEC setting forth the Company's financial and operating results for the year ended December 31, 2017 (the "2017 Form 10-K") and for interim periods, including as of September 30, 2017. The 2017 Form 10-K was signed by Defendants Georgiadis, Euteneuer, Johnson, Sinclair, Dolan, Edwards, Fergusson, Kreiz, Lewnes, Ng, Prabhu, Scarborough, and White Loyd.

336. Nowhere in the 2017 Form 10-K, the February 1, 2018 earnings release, or the February 1, 2018 investor presentation, did Defendants disclose any of the following highly material facts: (1) Mattel's internal controls over financial reporting and disclosure controls and procedures were severely deficient; (2) Mattel's senior management had determined that the Company's financial statements for the third quarter of 2017 were materially misstated, including that its loss for the third quarter was understated by approximately $110 million; (3) Mattel's senior management had conspired with PwC to retroactively reclassify the HiT asset as a definite-lived asset to avoid the GAAP-required restatement, and to avoid admitting to material weaknesses in internal controls; and (4) the prior understatement, coupled with the subsequent reclassification of the HiT IP, resulted in the misstatement of Mattel's fourth quarter financial statements, including

a $106 million net loss overstatement for the fourth quarter. The 2017 Form 10-K, the February 1, 2018 earnings release, and the February 1, 2018 investor presentation were materially false and misleading for the failure to disclose this information.

337.    Moreover, these documents set forth several statements that were affirmatively false and misleading. For example, Note 16 of the 2017 Form 10-K reiterates Mattel's third quarter 2017 financial results, including a net loss of $603.2 million, a net loss per common share of $1.75, and a net discrete tax expense of $561.9 million. These figures were materially misstated by the amounts set forth above in the chart above.

338.    The 2017 Form 10-K also stated that the "[n]et loss in the third quarter of 2017 included net discrete tax expense of $561.9 million, primarily related to the establishment of a valuation allowance." This statement was also materially false and misleading when made. As Defendants have admitted, Mattel's reported third quarter tax expense was materially understated by approximately $109 million.

339.    The 2017 Form 10-K also reported false and misleading financial results for the fourth quarter of 2017. Specifically, the 2017 Form 10-K reported a net loss for the fourth quarter of $281.3 million and a net loss per share of $0.82.

340.    These financial metrics were materially false and misleading when issued. As a consequence of the scheme Defendants employed to conceal the third quarter misstatement of financial results, and as Defendants admitted in the Restatement, Mattel's net loss and net loss per share reported in the 2017 Form 10-K were materially overstated, as set forth in the chart below:

| **Mattel's Materially Misstated Financial Metrics for the 2017 FourthQuarter** |
| --- |

| Financial Metric | As Previously Reported | Corrections | As Restated | Percent Misstatement |
|---|---|---|---|---|
| Net Loss | $281 million | $106 million | $175 million | 38% |
| Net Loss Per Common Share | $0.82 | -$0.31 | $0.51 | 38% |

341.  On February 1, 2018, Mattel issued an earnings release, which it also filed with the SEC on Form 8-K, as well as an investor presentation for its conference call. Each of these documents reported the same false financial results for the fourth quarter of 2017, including Mattel's reported net loss and net loss per share. Defendants have now admitted that this financial information in the earnings release, Form 8-K, and investor presentation was materially misstated when issued, as set forth in the charts above. As explained above, instead of issuing a restatement during the fourth quarter 2017 to correct the materially understated third quarter 2017 valuation allowance and net loss, as they should have done, Defendants decided to retroactively re-classify the HiT IP to avoid the required restatement.  In explaining this re-classification, the 2017 Form 10-K stated:

> In the third quarter of 2017, Mattel performed the annual impairment test for its nonamortizable intangible asset as required and determined that the nonamortizable intangible asset was not impaired as the fair value exceeded its carrying value.
>
> In the fourth quarter of 2017, Mattel determined a triggering event had occurred due to a change in brand strategy, which resulted in lower forecasted revenue attributable to the nonamortizable intangible asset. As a result, Mattel performed an interim impairment test which determined that the fair value was in excess of its carrying value, with an estimated fair value approximately 1.05x its carrying value. As such, Mattel determined that the intangible asset should no longer be designated as a nonamortizable intangible asset but should be amortized starting in the fourth quarter of 2017.

342.  This statement was materially false and misleading when made.  As Defendants

would later admit, "[a] change in accounting for an intangible asset in the fourth quarter of 2017 resulted in an effective correction of the error for the 2017 annual results." However, it was materially misleading for Defendants to assert that this "change in accounting" occurred because of a determination during the "fourth quarter of 2017" "that a triggering event had occurred due to a change in brand strategy," resulting in the asset being amortized. The decision to reclassify the HiT IP was made in January 2018 as a device to avoid a restatement as required by GAAP, and to surreptitiously compensate for the material understatement of the Company's third quarter loss without informing investors of that misstatement or disclosing material weaknesses in Mattel's internal controls.

343. Item 8 of the 2017 Form 10-K, "Financial Statements and Supplementary Data," stated that Defendants Georgiadis and Euteneuer had evaluated the effectiveness of its internal controls using COSO's "Internal Control- Integrated Framework," and concluded that Mattel's internal controls were effective as of December 31, 2017:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)). Mattel's management, including Margaret H. Georgiadis, its principal executive officer, and Joseph J. Euteneuer, its principal financial officer, evaluated the effectiveness of Mattel's internal control over financial reporting using the framework in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). ***Based on this evaluation, management concluded that Mattel's internal control over financial reporting was effective as of December 31, 2017. The effectiveness of the Company's internal control over financial reporting as of December 31, 2017 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein.***

(Emphasis added).

344. This statement was false and misleading when made. First, contrary to these statements, Defendants Georgiadis and Euteneuer had not truly "evaluated" the effectiveness of

Mattel's internal controls over financial reporting as of December 31, 2017. Specifically, Mattel executives conducted no substantive evaluation of whether internal controls were effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

345.    Second, contrary to this statement, Mattel's internal controls over financial reporting were not effective and in fact were severely deficient as of December 31, 2017. As Defendants would later admit, "there were material weaknesses in [Mattel's] internal control over financial reporting at the time of the preparation of its financial statements for the quarters ending on September 30, 2017 and December 31, 2017" related to the "control over the review of income tax valuation allowance analysis." Moreover, (1) Mattel stored vital financial information necessary for accurate financial reporting, including the back-up for Mattel's financial statements, in disorganized boxes and binders of paper, which made it extremely difficult to even locate the support for its published financial statements; (2) even when that support could be located, Mattel's financial back-up information often did not reconcile or "tie-out" with the financial statements, and senior Mattel executives would sign-off on the financial statements without adequately reconciling the financial statements with the supporting information; (3) Mattel lacked coordination between the accounting and tax departments; and (4) Mattel lacked an internal control for determining and confirming its valuation allowance on its deferred tax assets, which was a critical failure in light of the materiality of those assets.

346.    Item 9A. "Controls and Procedures" of the 2017 10-K stated that Defendants Georgiadis and Euteneuer had evaluated Mattel's disclosure controls and procedures and found them effective:

*Evaluation of Disclosure Controls and Procedures*

> *As of December 31, 2017, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective* in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms. *Based on this evaluation, Margaret H. Georgiadis, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of December 31, 2017.*

> *Changes in Internal Control Over Financial Reporting*

> There was no change in our internal control over financial reporting that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added).

347.    The statements set forth above were false and misleading when made. First, contrary to these statements, Defendants Georgiadis and Euteneuer had not truly "evaluated" the effectiveness of Mattel's disclosure controls and procedures as of December 31, 2017. Specifically, as set forth above in greater detail, Mattel executives conducted no substantive evaluation of whether disclosure controls were actually effective or even followed, and instead engaged in after-the- fact "check the box" exercises that were devoid of any meaningful review and evaluation.

348.    Second, as of December 31, 2017, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's SEC filings. As Defendants would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate

known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action." As Defendants would further admit, these "material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017." As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did not ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were "disclosed in the 2017 10-K."

349.    Further, in Exhibits 31.0 and 31.1 in the 2017 10-K, Defendants Georgiadis and Euteneuer certified, respectively, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that:

1.  I have reviewed this annual report on Form 10-K of Mattel, Inc.;

2.  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.  ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;

112

      b. ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***;

      c. ***Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation***; and

      d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

     5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Emphasis added).

350. These statements were false and misleading when made. First, contrary to the statement in paragraph 4(b) of the certification, as of December 31, 2017, Mattel's internal controls over financial reporting were severely deficient, and did not provide reasonable assurance regarding the reliability of the Company's financial statements and its compliance

with GAAP. As Defendants would later admit, "there were material weaknesses in its internal control over financial reporting at the time of the preparation of its financial statements for the quarters ending on September 30, 2017 and December 31, 2017" related to "the control over the review of income tax valuation allowance analysis." Moreover, (1) Mattel stored vital financial information necessary for accurate financial reporting, including the back-up for Mattel's financial statements, in disorganized boxes and binders of paper, which made it extremely difficult to even locate the support for its published financial statements; (2) even when that support could be located, Mattel's financial back-up information often did not reconcile or "tie-out" with the financial statements, and senior Mattel executives would sign-off on the financial statements without adequately reconciling the financial statements with the supporting information; (3) Mattel lacked coordination between the accounting and tax departments; and (4) Mattel lacked an internal control for determining and confirming its valuation allowance on its deferred tax assets, which was a critical failure in light of the materiality of those assets.

351.   Second, contrary to the statement in section 4(c) of the certification, Defendants Georgiadis and Euteneuer had not truly evaluated the effectiveness of Mattel's disclosure controls as of December 31, 2017. Specifically, as set forth above in greater detail, Mattel executives conducted no substantive evaluation of whether disclosure controls were effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

352.   Third, contrary to the statement in section 4(a) of the certification, as of December 31, 2017, Mattel's disclosure controls were severely deficient, and did not ensure that material information about Mattel was properly disclosed in the Company's SEC filings. As Defendants would later admit in the Restatement, management "failed to properly design and operate effective

monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action." As Defendants would further admit, these "material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017." As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did not ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were "disclosed in the 2017 10-K."

353.    Fourth, contrary to the statement in paragraph 3 of the certification, "the financial statements, and other financial information included in" the 2017 Form 10- K did not "fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report." Among other things, the 2017 Form 10-K reiterated Mattel's financial results for the third quarter of 2017, which Defendant Euteneuer and other senior Mattel executives knew were materially misstated. Further, the 2017 Form 10-K misleadingly described the reclassification of the HiT IP, which Defendant Euteneuer and other senior Mattel executives knew was done as a device to avoid a required restatement, and it contained results for the fourth quarter of 2017 that were also materially misstated because of this scheme.

354.    Finally, in Exhibit 32.0, Defendants Georgiadis and Euteneuer certified, pursuant to 18 U.S.C. § 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the information contained in the 2017 Form 10-K "fairly present[ed], in all material respects, the financial condition and results of operations of the Company."

355.    This statement was false and misleading when made. The information in the 2017

Form 10-K did not fairly present Mattel's financial condition and results because: (1) it contained materially misstated financial results for the quarters ending September 30, 2017 and December 31, 2017, as set forth above; (2) it failed to disclose that Mattel had determined that its financial results for the third quarter were materially misstated and then conspired with PwC to avoid a restatement of those results and the admission of material weaknesses in internal controls; and (3) it gave false reasons for why the treatment of the HiT IP asset had changed, as set forth above.

356.    Further, Defendant PwC consented to the inclusion of its audit report in the 2017 Form 10-K, and this audit report was materially false and misleading when issued. Specifically, on February 27, 2018, PwC issued an unqualified audit report included in the Company's 2017 Form 10-K for the year ended December 31, 2017. The report stated:

> We have audited the accompanying consolidated balance sheets of Mattel, Inc. and its subsidiaries as of December 31, 2017 and 2016, and the related consolidated statements of operations, comprehensive income, cash flows, and stockholders' equity for each of the three years in the period ended December 31, 2017, including the related notes and schedule of valuation and qualifying accounts and allowances for each of the three years in the period ended December 31, 2017 appearing under Item 16 (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and 2016, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2017 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control—Integrated Framework (2013)* issued by the COSO.

357.    The statements set forth above were false and misleading when made in several respects. First, it was materially false and misleading for PwC to state that it had conducted an

"audit" of Mattel and thereby determined that its financial statements were accurate, when during its 2017 audit, PwC conspired with Mattel to avoid disclosing a known material error. PwC was informed of a material misstatement issued in Mattel's third quarter financial results in January 2018, and instead of advising Mattel to issue a restatement and disclose the material weaknesses that existed at the time, PwC designed and executed a plan to avoid issuing a restatement or disclosing any known existing material weaknesses. PwC's conduct in its 2017 audit violated PCAOB standards.

358.    Second, it was materially false and misleading for PwC to state that the financial statements in the 2017 Form 10-K fairly presented the financial position of the Company as of December 31, 2017 and did so "in conformity with accounting principles generally accepted in the United States of America." Contrary to these statements, Defendants have now admitted that Mattel's results for the third and fourth quarters of 2017 were materially misstated in violation of GAAP. Moreover, it was, at minimum, misleading for PwC to represent that Mattel's financial statements were accurate in all material respects when PwC was informed of a material misstatement in Mattel's third quarter financial results in January 2018, yet designed and executed a plan to avoid issuing a restatement or disclosing any known existing material weaknesses.

359.    Third, it was materially false and misleading for PwC to state that Mattel "maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control-Integrated Framework (2013) issued by COSO." Defendants have since admitted that it was "determined that there were material weaknesses in its internal control over financial reporting at the time of the preparation of its financial statements for the quarters ending on September 30, 2017 and December 31, 2017" "related to the control over the review of income tax valuation allowance analysis" and

"monitoring control activities." Similarly, PwC also restated its audit opinion for the year ending December 31, 2018, finding that Mattel suffered a longstanding material weakness in its internal controls over financial reporting as of December 31, 2018 that resulted in the third and fourth quarter 2017 reporting errors.

360. PwC also falsely stated that it had conducted its audit in compliance with PCAOB standards and had an adequate basis for its opinions on the accuracy of Mattel's financial statements and the sufficiency of its internal controls:

*Basis of opinions:*

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. ***We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.***

***We conducted our audits in accordance with the standards of the PCAOB.*** Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal

control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

(Emphasis added).

361.    These statements were false and misleading when made. First, it was materially false and misleading for PwC to state that it had conducted an "audit" of Mattel in accordance with the standards of the PCAOB, and to describe the purportedly appropriate audit procedures it employed, when PwC conspired with the Individual Defendants during its 2017 audit to avoid disclosing a known material misstatement and material weaknesses. In fact, PwC was informed of a material misstatement issued in Mattel's third quarter financial results in January 2018, and instead of advising Mattel to issue a restatement and disclose the material weaknesses that existed at the time, PwC designed and executed a plan to avoid issuing a restatement or disclosing any material weaknesses. PwC's conduct during its 2017 audit violated a host of PCAOB standards.

362.    Further, contrary to its representation that it was "independent," PwC violated the SEC and PCAOB-mandated independence rules. As Mattel would later report, it "concluded that certain actions in specific HR-related activities by the lead audit partner of Mattel's outside auditor, namely providing recommendations on candidates for Mattel's senior finance positions, was in violation of the SEC's auditor independence rules. He also provided feedback on senior finance employees."

## D.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS CONCERNING THE FIRST QUARTER 2018

363.    On April 5, 2018, in its 2018 Proxy Statement and Notice of Annual meeting of Stockholders to be Held on May 17, 2018, PwC once again represented that Mattel's financial statements contained therein presented its financial position fairly and that Mattel maintained sufficient, effective internal controls:

> ***Mattel's consolidated financial statements present fairly, in all material respects, its financial position as of December 31, 2017*** and 2016, and its results of operations and cash flows for each of the three years in the period ended December 31, 2017 in conformity with accounting principles generally accepted in the United States of America; and ***Mattel has maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control Integrated Framework issued by COSO***.

(Emphasis added).

364. These statements were materially false and misleading when made. First, it was materially false and misleading for PwC to state that Mattel "maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control-Integrated Framework (2013) issued by COSO," when Defendants knew that Mattel did not maintain effective control over financial reporting. Second, it was materially false and misleading for PwC to state that "Mattel's consolidated financial statements present fairly, in all material respects, its financial position as of December 31, 2017." Contrary to these statements, Defendants have now admitted that Mattel's results for the third and fourth quarters of 2017 were materially misstated in violation of GAAP as referenced above. Moreover, it was, at minimum, misleading for PwC to represent that Mattel's financial statements were accurate in all material respects when PwC was informed of a material misstatement in Mattel's third quarter financial results in January 2018 yet designed and executed a plan to avoid issuing a restatement or disclosing any material weaknesses that existed at the time.

365. On April 26, 2018, Mattel filed its Form 10-Q with the SEC setting forth the Company's financial and operating results for the quarter ended March 31, 2018 (the "Q1 2018 Form 10-Q"). The Q1 2018 Form 10-Q was signed by Defendants Georgiadis and Euteneuer. Item 4. "Controls and Procedures" stated that management had evaluated Mattel's disclosure control and procedures and found them effective:

*Evaluation of Disclosure Controls and Procedures*

***As of March 31, 2018, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective*** in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. ***Based on this evaluation, Margaret H. Georgiadis, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of March 31, 2018****.*

(Emphasis added).

366. The statements set forth above were materially false and misleading when made. First, contrary to these statements, Defendants Georgiadis and Euteneuer had not truly "evaluated" the effectiveness of Mattel's disclosure controls and procedures as of March 31, 2018. Specifically, as set forth above in greater detail, Mattel executives conducted no substantive evaluation of whether disclosure controls were effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

367. Second, as of March 31, 2018, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated, and properly reported in Mattel's SEC filings. As Defendants would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action." As Defendants would further admit, these "***material weaknesses [] existed at the time of the preparation of our financial statements for the***

***third and fourth quarters of 2017.***"   As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did not ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were "disclosed in the 2017 10-K." Mattel further admitted that its "material weakness related to a deficiency in monitoring control activities" "***still existed as of December 31, 2018***."

368.    Defendants Georgiadis and Euteneuer also certified in Exhibits 31.0 and 31.1 in the 1Q 2018 10-Q, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that they: (1) designed disclosure controls and procedures to ensure that material information about Mattel was made known to them; and (2) designed internal controls over financial reporting to provide reasonable assurance that Mattel's financial statements were accurate and complied with GAAP. Specifically, Defendants Georgiadis and Euteneuer certified that:

1. I have reviewed this quarterly report on Form 10-Q of Mattel, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our***

*supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;*

b. *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;*

c. *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;* and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Emphasis added).

369.    The statements above were materially false and misleading when made. First, contrary to the statement in paragraph 4(b) of the certification, as of March 31, 2018, Mattel's internal controls over financial reporting were severely deficient, and did not provide reasonable assurance regarding the reliability of the Company's financial statements and its compliance

with GAAP. As Defendants would later admit, "there were material weaknesses in its internal control over financial reporting at the time of the preparation of its financial statements for the quarters ending on September 30, 2017 and December 31, 2017" related to "the control over the review of income tax valuation allowance analysis," and this deficiency was not remediated until December 31, 2018. Moreover, (1) Mattel stored vital financial information necessary for accurate financial reporting, including the back-up for Mattel's financial statements, in disorganized boxes and binders of paper, which made it extremely difficult to even locate the support for its published financial statements; (2) even when that support could be located, Mattel's financial back-up information often did not reconcile or "tie-out" with the financial statements, and senior Mattel executives would sign-off on the financial statements without adequately reconciling the financial statements with the supporting information; (3) Mattel lacked coordination between the accounting and tax departments; and (4) Mattel lacked an internal control for determining and confirming its valuation allowance on its deferred tax assets, which was a critical failure in light of the materiality of those assets.

370. Second, contrary to the statement in section 4(c) of the certification, Defendants Georgiadis and Euteneuer had not truly evaluated the effectiveness of Mattel's disclosure controls. Specifically, as set forth above in greater detail, Mattel executives conducted no substantive evaluation of whether disclosure controls were effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

371. Third, contrary to the statement in section 4(a) of the certification, as of March 31, 2018, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected,

communicated and properly reported in Mattel's SEC filings. As Defendants would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action." As Defendants would further admit, these "***material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017.***" As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did <u>not</u> ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were "disclosed in the 2017 10-K." Defendants further admitted that Mattel's "material weakness related to a deficiency in monitoring control activities" "***still existed as of December 31, 2018.***"

## E.     MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS CONCERNING THE SECOND QUARTER 2018

372.    On July 25, 2018, Mattel filed its second quarter 2018 Form 10-Q setting forth the Company's financial and operating results for the quarter ended June 30, 2018 (the "Q2 2018 Form 10-Q"). The Q2 2018 Form 10-Q was signed by Defendant Euteneuer. In Item 4. "Controls and Procedures," the Q2 2018 Form 10- Q stated that management had evaluated Mattel's disclosure control and procedures and found them effective:

*Evaluation of Disclosure Controls and Procedures*

***As of June 30, 2018 , Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective*** in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding

required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. ***Based on this evaluation, Ynon Kreiz, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of June 30, 2018***.

*Changes in Internal Control Over Financial Reporting*

During the quarter ended June 30, 2018, Mattel made no changes to its internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting.

(Emphasis added).

373.   The statements set forth above were materially false and misleading when made. First, contrary to these statements, Defendant Euteneuer had not truly "evaluated" the effectiveness of Mattel's disclosure controls and procedures as of June 30, 2018. Specifically, as set forth above in greater detail, Mattel executives conducted no substantive evaluation of whether disclosure controls were effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

374.   Second, as of June 30, 2018, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated, and properly reported in Mattel's SEC filings. As Defendants would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action." As Defendants would further admit, these *"material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017."* As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did <u>not</u> ensure that the material

errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were "disclosed in the 2017 10-K." Defendants further admitted that its "material weakness related to a deficiency in monitoring control activities" "*still existed as of December 31, 2018.*"

375.    Defendant Euteneuer also certified in Exhibit 31.1 in the 2Q 2018 10- Q, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that he: (1) designed disclosure controls and procedures to ensure that material information about Mattel was made known to them; and (2) designed internal controls over financial reporting to provide reasonable assurance that Mattel's financial statements were accurate and complied with GAAP.  Specifically, he certified that:

1.  I have reviewed this quarterly report on Form 10-Q of Mattel, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.  *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;*

b.  *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the*

> ***reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;***
>
> c. ***Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;*** and
>
> d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Emphasis added).

376. The statements above were materially false and misleading when made. First, contrary to the statement in paragraph 4(b) of the certification, as of June 30, 2018, Mattel's internal controls over financial reporting were severely deficient, and did not provide reasonable assurance regarding the reliability of the Company's financial statements and its compliance with GAAP. As Defendants would later admit, "there were material weaknesses in its internal control over financial reporting at the time of the preparation of its financial statements for the quarters ending on September 30, 2017 and December 31, 2017" related to "the control over the review of income tax valuation allowance analysis," and this deficiency was not remediated until

December 31, 2018. Moreover, (1) Mattel stored vital financial information necessary for accurate financial reporting, including the back-up for Mattel's financial statements, in disorganized boxes and binders of paper, which made it extremely difficult to even locate the support for its published financial statements; (2) even when that support could be located, Mattel's financial back-up information often did not reconcile or "tie-out" with the financial statements, and senior Mattel executives would sign-off on the financial statements without adequately reconciling the financial statements with the supporting information; (3) Mattel lacked coordination between the accounting and tax departments; and (4) Mattel lacked an internal control for determining and confirming its valuation allowance on its deferred tax assets, which was a critical failure in light of the materiality of those assets.

377.    Second, contrary to the statement in section 4(c) of the certification, Defendant Euteneuer had not truly evaluated the effectiveness of Mattel's disclosure controls as of June 30, 2018. Specifically, as set forth above in greater detail, Mattel executives conducted no substantive evaluation of whether disclosure controls were effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

378.    Third, contrary to the statement in section 4(a) of the certification, as of June 30, 2018, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated, and properly reported in Mattel's SEC filings. As Defendants would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action." As Defendants would further admit, these "***material weaknesses [] existed at the time of the***

*preparation of our financial statements for the third and fourth quarters of 2017."* As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did <u>not</u> ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were "disclosed in the 2017 10-K." Defendants further admitted that Mattel's "material weakness related to a deficiency in monitoring control activities" *"still existed as of December 31, 2018."*

## F. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS CONCERNING THE THIRD QUARTER 2018

379. On October 25, 2018, Mattel filed its third quarter 2018 Form 10-Q, setting forth the Company's financial and operating results for the quarter ended September 30, 2018 (the "Q3 2018 Form 10-Q"). The Q3 2018 Form 10-Q was signed by Defendant Euteneuer.

380. The 3Q 2018 Form 10-Q reiterated Mattel's previously reported false third quarter 2017 financial metrics, including the $603.2 million net loss, a $1.75 net loss per common share, a $562 million valuation allowance on its deferred tax assets, and a $664.5 million provision for income taxes. These statements were false and misleading as detailed above in the chart.

381. In Item 4. "Controls and Procedures," the 3Q 2018 Form 10-Q stated that management had evaluated Mattel's disclosure control and procedures and found them effective:

> *Evaluation of Disclosure Controls and Procedures*
>
> *As of September 30, 2018, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective* in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions

regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized, and reported within the time periods specified in Securities and Exchange Commission rules and forms. ***Based on this evaluation, Ynon Kreiz, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of September 30, 2018***.

*Changes in Internal Control Over Financial Reporting*

During the quarter ended September 30, 2018, Mattel made no changes to its internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting.

(Emphasis added).

382. The statements set forth above were materially false and misleading when made. First, contrary to these statements, Defendant Euteneuer had not truly "evaluated" the effectiveness of Mattel's disclosure controls and procedures as of September 30, 2018. Specifically, as set forth above in greater detail, Mattel executives conducted no substantive evaluation of whether disclosure controls were effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

383. Second, as of September 30, 2018, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's SEC filings. As Defendants would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action." As Defendants would further admit, these "***material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017.***" As Mattel would later specify, its disclosure controls

and procedures were materially deficient precisely because they did not ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were "disclosed in the 2017 10-K." Defendants further admitted that its "material weakness related to a deficiency in monitoring control activities" "***still existed as of December 31, 2018.***"

384.    Defendant Euteneuer also certified in Exhibit 31.1 in the 3Q 2018 10- Q, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that:

1.  I have reviewed this quarterly report on Form 10-Q of Mattel, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;***

    b.  ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;***

      c. ***Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*****;** and

      d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

     5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

      a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Emphasis added).

     385. The statements above were materially false and misleading when made. First, contrary to the statement in paragraph 4(b) of the certification, as of September 30, 2018, Mattel's internal controls over financial reporting were severely deficient, and did not provide reasonable assurance regarding the reliability of the Company's financial statements and its compliance with GAAP. As Defendants would later admit, "there were material weaknesses in its internal control over financial reporting at the time of the preparation of its financial statements for the quarters ending on September 30, 2017 and December 31, 2017" related to "the control over the review of income tax valuation allowance analysis," and this deficiency was not remediated until December 31, 2018. Moreover, (1) Mattel stored vital financial information necessary for accurate financial

reporting, including the back-up for Mattel's financial statements, in disorganized boxes and binders of paper, which made it extremely difficult to even locate the support for its published financial statements; (2) even when that support could be located, Mattel's financial back-up information often did not reconcile or "tie-out" with the financial statements, and senior Mattel executives would sign-off on the financial statements without adequately reconciling the financial statements with the supporting information; (3) Mattel lacked coordination between the accounting and tax departments; and (4) Mattel lacked an internal control for determining and confirming its valuation allowance on its deferred tax assets, which was a critical failure in light of the materiality of those assets.

386. Second, contrary to the statement in section 4(c) of the certification, Defendant Euteneuer had not truly evaluated the effectiveness of Mattel's disclosure controls as of September 30, 2018. Specifically, as set forth above in greater detail, Mattel executives conducted no substantive evaluation of whether disclosure controls were effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

387. Third, contrary to the statement in section 4(a) of the certification, as of September 30, 2018, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's SEC filings. As Defendants would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action." As Defendants would further admit, these "***material weaknesses []***

134

***existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017.***" As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did not ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were "disclosed in the 2017 10-K." Defendants further admitted that Mattel's "material weakness related to a deficiency in monitoring control activities" "***still existed as of December 31, 2018.***"

388.    Additionally, on the same day, Mattel publicly issued an earnings release, which it also filed with the SEC on Form 8-K, which reiterated and incorporated the same false third quarter 2017 financial metrics, including a $603.3 million net loss, a $1.75 net loss per common share, a $562 million valuation allowance due to deferred tax assets, and a $664.5 million provision for income taxes. Mattel also issued an investor presentation accompanying its third quarter 2018 earnings call that included the same false financial metrics from the third quarter of 2017. These statements were materially false and misleading when made, as detailed above.

## G.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS CONCERNING THE FOURTH QUARTER AND FULL YEAR 2018

389.    On February 22, 2019, Mattel filed an annual report on Form 10-K with the SEC setting forth the Company's financial and operating results for the fourth quarter and year ended December 31, 2018 (the "2018 Form 10-K"). The 2018 Form 10-K was signed by Defendants Euteneuer, Bradley, Cisneros, Dolan, Kreiz, Laursen, Lewnes, Lynch, Ng, Olian, and Prabhu.

390.    The 2018 Form 10-K reiterated and incorporated the false financial metrics from the third and fourth quarters of 2017. For the third quarter, in Note 17, the 2018 Form 10-K reported a net loss of $603.3 million, a $1.75 net loss per common share, and a $562 million

valuation allowance on Mattel's deferred tax assets. These statements were materially false and misleading, as detailed in the chart above.

391. For the fourth quarter 2017, the 2018 Form 10-K reported a $281.2 million net loss and a $0.82 net loss per common share, both of which were materially false and misleading, as detailed in the chart above.

392. Item 9A. "Controls and Procedures" of the 2018 Form 10-K stated that Defendant Euteneuer had evaluated Mattel's disclosure controls and procedures and found them effective:

*Evaluation of Disclosure Controls and Procedures*

**As of December 31, 2018, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective** in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms. **Based on this evaluation, Ynon Kreiz, Mattel's principal executive officer, and Joseph J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of December 31, 2018**.

*Changes in Internal Control Over Financial Reporting*

There was no change in our internal control over financial reporting that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added).

393. The statements set forth above were false and misleading when made. First, contrary to these statements, Defendant Euteneuer had not truly "evaluated" the effectiveness of Mattel's disclosure controls and procedures as of December 31, 2018. Specifically, as set forth above in greater detail, Mattel executives conducted no substantive evaluation of whether

disclosure controls were actually effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

394.    Second, as of December 31, 2018, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's SEC filings. As Defendants would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action." As Defendants would further admit, these *"material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017."* As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did not ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were "disclosed in the 2017 10-K." Defendants further admitted that Mattel's "material weakness related to a deficiency in monitoring control activities" "*still existed as of December 31, 2018.*"

395.    Further, in Exhibit 31.1 in the original 2018 10-K, Defendant Euteneuer certified pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that:

1. I have reviewed this annual report on Form 10-K of Mattel, Inc.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. *Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all*

*material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;*

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;*

b. *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;*

c. *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;* and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record,

process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Emphasis added).

396. The statements above were materially false and misleading when made. First, contrary to the statement in section 4(c) of the certification, Defendant Euteneuer had not truly evaluated the effectiveness of Mattel's disclosure controls as of December 31, 2018. Specifically, as set forth above in greater detail, Mattel executives conducted no substantive evaluation of whether disclosure controls were effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

397. Second, contrary to the statement in section 4(a) of the certification, as of December 31, 2018, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's SEC filings. As Defendants would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action." As Defendants would further admit, these *"**material weaknesses []** **existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017.**"* As Defendants would later specify, Mattel's disclosure controls and procedures were materially deficient precisely because they did not ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were "disclosed in the 2017 10-K." Defendants

139

further admitted that Mattel's "material weakness related to a deficiency in monitoring control activities" "***still existed as of December 31, 2018.***"

398. Third, contrary to the statement in paragraph 3, the financial information in the 2018 Form 10-K did not fairly present in all material respects Mattel's financial results for the periods presented. Defendant Euteneuer knew that the 2018 Form 10-K contained materially misstated results for Mattel's 2017 third and fourth quarters.

399. Defendant PwC consented to the inclusion of its audit report in the 2018 Form 10-K, and this audit report was materially false and misleading when issued. Specifically, on February 22, 2019, PwC issued an unqualified audit report in the Company's 2018 Form 10-K for the year ended December 31, 2018. In its report, PwC stated:

> We have audited the accompanying consolidated balance sheets of Mattel, Inc. and its subsidiaries (the "Company") as of December 31, 2018 and 2017, and the related consolidated statements of operations, comprehensive (loss) income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2018, including the related notes and schedule of valuation and qualifying accounts and allowances for each of the three years in the period ended December 31, 2018 appearing under Item 16 (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2018 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control—Integrated Framework (2013)* issued by the COSO.

400. The statements set forth were false and misleading when made. First, it was materially false and misleading for PwC to state that it had conducted an "audit" of Mattel and

thereby determined that its 2017 and 2018 financial statements were accurate, when during its 2017 audit, PwC conspired with Mattel to avoid disclosing a known material error, and PwC's audit violated PCAOB standards in numerous respects. As set forth in greater detail above, PwC was informed of a material misstatement issued in Mattel's third quarter financial results in January 2018, and instead of advising Mattel to issue a restatement and disclose the material weaknesses that existed at the time, PwC designed and executed a plan to avoid issuing a restatement or disclosing any known existing material weaknesses.

401.    Second, it was materially false and misleading for PwC to state that the financial statements in the 2018 Form 10-K fairly represented the financial position of the Company as of December 31, 2018, and did so "in conformity with accounting principles generally accepted in the United States of America." Contrary to these statements, Mattel has now admitted that its results for the third and fourth quarters of 2017 were materially misstated in violation of GAAP. Moreover, it was, at minimum, misleading for PwC to represent that Mattel's financial statements were accurate in all material respects when PwC was informed of a material misstatement in Mattel's third quarter financial results in January 2018, yet designed and executed a plan to avoid issuing a restatement or disclosing any known existing material weaknesses.

402.    Third, it was materially false and misleading for PwC to state that Mattel "maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control- Integrated Framework (2013) issued by COSO." Defendants have since admitted that Mattel "determined that there were material weaknesses in its internal control over financial reporting at the time of the preparation of its financial statements for the quarters ending on September 30, 2017 and December 31, 2017" "related to the control over the review of income tax valuation allowance analysis." Defendants

have also admitted that, as of year-end 2017 and 2018, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's SEC filings. As Defendants would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action." As Defendants would further admit, these "*material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017.*" As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did not ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were "disclosed in the 2017 10-K." Defendants further admitted that Mattel's "material weakness related to a deficiency in monitoring control activities" "*still existed as of December 31, 2018.*" Similarly, PwC also restated its audit opinion for the year ending December 31, 2018 for the same reasons.

403.    Further, PwC falsely stated that it had conducted its audit in in compliance with PCAOB standards and had an adequate basis for its opinions on the accuracy of Mattel's financial statements and the sufficiency of its internal controls:

*Basis of opinions*

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Report on Internal Control over Financial Reporting. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States)

("PCAOB") and ***are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.***

***We conducted our audits in accordance with the standards of the PCAOB.*** Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

(Emphasis added).

404.    These statements were materially false and misleading when made. First, it was materially false and misleading for PwC to state that it had conducted an "audit" of Mattel in accordance with the standards of the PCAOB, and to describe the purportedly appropriate audit procedures it employed, when PwC conspired with Mattel during its 2017 audit to avoid disclosing a known material misstatement and material weaknesses. In fact, PwC was informed of a material misstatement issued in Mattel's third quarter financial results in January 2018, and instead of advising Mattel to issue a restatement and disclose the material weaknesses that existed at the time, PwC designed and executed a plan to avoid issuing a restatement or disclosing any material weaknesses. PwC's conduct violated a host of PCAOB standards.

405.    Further, contrary to its representation that it was "independent," PwC violated the

SEC and PCAOB-mandated independence rules, as detailed above. As Mattel would later report, it "concluded that certain actions in specific HR-related activities by the lead audit partner of Mattel's outside auditor, namely providing recommendations on candidates for Mattel's senior finance positions, was in violation of the SEC's auditor independence rules. He also provided feedback on senior finance employees."

## H. MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS CONCERNING THE APRIL 4, 2019 PROXY STATEMENT

406. On April 4, 2019, the Company filed its 2019 Proxy Statement (the "2019 Proxy") with the SEC. Defendants Kreiz, Bradley, Cisneros, Dolan, Laursen, Lewnes, Lynch, Ng, Olian, and Prabhu solicited the 2019 Proxy filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions. Defendants Kreiz, Bradley, Cisneros, Dolan, Laursen, Lewnes, Lynch, Ng, Olian, and Prabhu knew or were deliberately conscious in not knowing, that the 2019 Proxy was materially false and misleading.

407. Among other things, the 2019 Proxy provided information about the director nominees up for election, Defendants Kreiz, Bradley, Cisneros, Dolan, Laursen, Lewnes, Lynch, Ng, Olian, and Prabhu. In addition, the 2019 Proxy described director responsibilities, the duties of each committee, Board risk assessment and management, and explicitly referenced the Code, which includes special ethical obligations regarding financial reporting such that all SEC filings are to be accurate

408. With respect to the Company's Code of Conduct, the 2019 Proxy stated, "[t] he Board has adopted a Code of Conduct, which is a general statement of Mattel's standards of ethical business conduct. The Code of Conduct applies to all of our employees, including our CEO and CFO. Certain provisions of the Code of Conduct also apply to members of the Board in their capacity as Mattel's directors."

409. The 2019 Proxy was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

410. Additionally, the 2019 Proxy called for shareholder approval of, among other things, ratification of PwC as the Company's independent registered public accounting firm for the year ended December 31, 2019, and a second amendment to the 2010 Long-Term Compensation Plan, which would authorize the Company to reserve an additional 14 million shares of Company stock to be issued to the Company's executive officers and directors in the form of annual equity award grants.

411. The 2019 Proxy also called for stockholders to reject a stockholder proposal regarding an amendment to stockholder proxy access provisions. Specifically, the proposal called for the Company's bylaws to be amended to provide that stockholder proxy access director candidates need not obtain a specific percentage vote in order to qualify as proxy access director candidates at any shareholder meeting.

412. The 2019 Proxy also failed to disclose, *inter alia,* that: (1) Mattel did not maintain effective internal controls over financial reporting; (2) the Company's net loss during the third fiscal quarter of 2017 was understated by $109 million; (3) the Company's senior accounting team conspired with PwC to cover up this understatement by overstating the Company's net loss during the fourth fiscal quarter of 2017 by $109 million; and (4) as a result of these misstatements, the Company's financial statements were inaccurate and were not in compliance with GAAP. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times and the Company would ultimately be forced to cancel its $250 million Notes

Offering and restate certain of its financial statements.

413.    Moreover, with regard to the "independence of PwC, the 2019 Proxy failed to disclose the material information that PwC violated the SEC and PCAOB-mandated independence rules, as detailed above. As Mattel would later report, it "concluded that certain actions in specific HR-related activities by the lead audit partner of Mattel's outside auditor, namely providing recommendations on candidates for Mattel's senior finance positions, was in violation of the SEC's auditor independence rules. He also provided feedback on senior finance employees."

As a result of the material misstatements and omissions contained in the 2019 Proxy, Company shareholders approved the ratification of PwC and the amendment to the 2010 Long-Term Compensation Plan and rejected the stockholder proposal regarding proxy access provisions.

## I.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS CONCERNING THE FIRST QUARTER 2019

414.    On April 26, 2019, Mattel filed its first quarter 2019 Form 10-Q, setting forth the Company's financial and operating results for the quarter ended March 31, 2019 (the "Q1 2019 Form 10-Q"). The Q1 2019 Form 10-Q was signed by Defendant Euteneuer. Item 4. "Controls and Procedures" of the Q1 2019 Form 10- Q stated that management had evaluated Mattel's disclosure controls and procedures and found them effective:

*Evaluation of Disclosure Controls and Procedures*

As of March 31, 2019, Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms. Based on this evaluation, Ynon Kreiz, Mattel's principal executive officer, and Joseph

J. Euteneuer, Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of March 31, 2019.

*Changes in Internal Control Over Financial Reporting*

There was no change in our internal control over financial reporting that occurred during the period of this report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. We implemented internal controls to ensure we adequately assessed the adoption impact of the new lease standard, and its related amendments, on our financial statements. There were no significant changes to our internal control over financial reporting due to the adoption of the new standard.

415.    The statements set forth above were materially false and misleading when made. First, contrary to these statements, Defendant Euteneuer had not truly "evaluated" the effectiveness of Mattel's disclosure controls and procedures as of March 31, 2019. Specifically, as set forth above in greater detail, Mattel executives conducted no substantive evaluation of whether disclosure controls were effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

416.    Second, as of March 31, 2019, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's SEC filings. As Defendants would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action." As Defendants would further admit, these "***material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017.***" As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did not ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings

and conclusions [were] documented" or that the errors were "disclosed in the 2017 10-K." Defendants further admitted that Mattel's "material weakness related to a deficiency in monitoring control activities" "***still existed as of December 31, 2018***"— and, in fact, ***still*** had not been remediated as of the time of the Company's conference call in November 2019.

417. Defendant Euteneuer also certified in Exhibit 31.1 in the 1Q 2019 Form 10-Q, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that:

1. I have reviewed this quarterly report on Form 10-Q of Mattel, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***:

b. ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***:

c. ***Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the***

*effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Emphasis added).

418.    The statements above were materially false and misleading when made. First, contrary to the statement in section 4(c) of the certification, Defendant Euteneuer had not truly evaluated the effectiveness of Mattel's disclosure controls as of March 31, 2019. Specifically, as set forth above in greater detail, Mattel executives conducted no substantive evaluation of whether disclosure controls were effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

419.    Second, contrary to the statement in section 4(a) of the certification, as of March 31, 2019, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's SEC filings. As Defendants would later admit in the Restatement, management "failed to properly design and operate effective monitoring

149

control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action."  As Defendants would further admit, these "***material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017.***"  As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did <u>not</u> ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were "disclosed in the 2017 10-K." Defendants further admitted that Mattel's "material weakness related to a deficiency in monitoring control activities" "***still existed as of December 31, 2018***"— and, in fact, ***still*** had not been remediated as of the time of the Company's conference call in November 2019.

## J.  MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS CONCERNING THE SECOND QUARTER 2019

420.    On July 26, 2019, Mattel filed its second quarter 2019 Form 10-Q, setting forth the Company's financial and operating results for the quarter ended June 30, 2019 (the "Q2 2019 Form 10-Q"). The Q2 2019 Form 10-Q was signed by Defendant Euteneuer. In Item 4. "Controls and Procedures," the Q2 2019 Form 10- Q stated that management had evaluated Mattel's disclosure control and procedures and found them effective:

> ***As of June 30, 2019 , Mattel's disclosure controls and procedures were evaluated, with the participation of Mattel's principal executive officer and principal financial officer, to assess whether they are effective*** in providing reasonable assurance that information required to be disclosed by Mattel in the reports that it files or submits under the Securities Exchange Act of 1934 is accumulated and communicated to management, including its principal executive officer and principal financial officer, as appropriate, to allow timely decisions regarding required disclosure and to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms. ***Based on this evaluation, Ynon Kreiz, Mattel's principal executive officer, and Joseph J. Euteneuer,***

***Mattel's principal financial officer, concluded that these disclosure controls and procedures were effective as of June 30, 2019.***

*Changes in Internal Control Over Financial Reporting*

During the quarter ended June 30, 2019 Mattel made no changes to its internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, its internal control over financial reporting.

(Emphasis added).

421.    The statements set forth above were materially false and misleading when made. First, contrary to these statements, Defendant Euteneuer had not truly "evaluated" the effectiveness of Mattel's disclosure controls and procedures as of June 30, 2019. Specifically, as set forth above in greater detail, Mattel executives conducted no substantive evaluation of whether disclosure controls were effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

422.    Second, as of June 30, 2019, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's SEC filings. As Defendants would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and internal control deficiencies in a timely manner to those parties responsible for taking corrective action." As Defendants would further admit, these *"material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017."* As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did not ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were "disclosed in the 2017 10-K."

Defendants further admitted that Mattel's "material weakness related to a deficiency in monitoring control activities" "*still existed as of December 31, 2018"*— and, in fact, *still* had not been remediated as of the time of the Company's conference call in November 2019.

423.   Defendant Euteneuer also certified in Exhibit 31.1 in the 2Q 2019 10- Q, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that:

1.   I have reviewed this quarterly report on Form 10-Q of Mattel, Inc.;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.   *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared*;

b.   *Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted  accounting principles*;

c.   *Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*; and

    d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

    5.   The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Emphasis added).

424.   The statements above were materially false and misleading when made. First, contrary to the statement in section 4(c) of the certification, Defendant Euteneuer had not truly evaluated the effectiveness of Mattel's disclosure controls as of June 30, 2019. Specifically, as set forth above in greater detail, Mattel executives conducted no substantive evaluation of whether disclosure controls were effective or even followed, and instead engaged in after-the-fact "check the box" exercises that were devoid of any meaningful review and evaluation.

425.   Second, contrary to the statement in section 4(a) of the certification, as of June 30, 2019, Mattel's disclosure controls were severely deficient, and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's SEC filings. As Defendants would later admit in the Restatement, management "failed to properly design and operate effective monitoring control activities to properly assess and communicate known financial statement errors and

internal control deficiencies in a timely manner to those parties responsible for taking corrective action." As Defendants would further admit, these "***material weaknesses [] existed at the time of the preparation of our financial statements for the third and fourth quarters of 2017.***" As Mattel would later specify, its disclosure controls and procedures were materially deficient precisely because they did not ensure that the material errors in its third quarter 2017 financial statements were "properly assessed" or that "findings and conclusions [were] documented" or that the errors were "disclosed in the 2017 10-K." Defendants further admitted that Mattel's "material weakness related to a deficiency in monitoring control activities" "***still existed as of December 31, 2018***"— and, in fact, ***still*** had not been remediated as of the time of the Company's conference call in November 2019.

## THE INDIVIDUAL DEFENDANTS CAUSED MATTEL TO REPURCHASE SHARES AT ARTIFICIALLY INFLATED PRICES

426. During the Relevant Period, the Individual Defendants caused the Company to repurchase its common stock at artificially inflated prices, resulting in substantial damage to the Company. In total, the Company spent in excess of $23.2 million to repurchase approximately 1.47 million shares of its own common stock at artificially inflated prices during the Relevant Period.

427. According to the 3Q17 10-Q, during August 2017, the Company purchased 289,305 shares of its common stock for approximately $5.65 million, at an average price of $19.56 per share.

428. According to the 3Q17 10-Q, during September 2017, the Company purchased 48,922 shares of its common stock for approximately $752,909, at an average price of $15.39 per share.

429. According to the 2017 10-K, during the three-month period ended December 31,

2017, the Company purchased 75,831 shares of its common stock for approximately $1.12 million, at an average price of $14.80 per share.

430.    According to the 1Q18 10-Q, during the three-month period ended March 31, 2018, the Company purchased 103,456 shares of its common stock for approximately $1.63 million, at an average price of $15.79 per share.

431.    According to the 2Q18 10-Q, during the three-month period ended June 30, 2018, the Company purchased 49,561 shares of its common stock for approximately $745,397, at an average price of $15.04 per share.

432.    According to the 3Q18 10-Q, during the three-month period ended September 30, 2018, the Company purchased 424,699 shares of its common stock for approximately $6.7 million, at an average price of $15.79 per share.

433.    According to the 2018 10-K, during October 2018, the Company purchased 7,198 shares of its common stock for approximately $97,964, at an average price of $13.61 per share.

434.    According to the 2018 10-K, during November 2018, the Company purchased 1,363 shares of its common stock for approximately $18,945, at an average price of $13.90 per share.

435.    According to the 1Q19 10-Q, during the three-month period ended March 31, 2019, the Company purchased 29,977 shares of its common stock for approximately $385,204, at an average price of $12.85 per share.

436.    According to the 2Q19 10-Q, during April 2019, the Company purchased 900 shares of its common stock for approximately $11,241, at an average price of $12.49 per share.

437.    According to Company's quarterly report on Form 10-Q filed with the SEC on November 12, 2019 (the "3Q19 10-Q"), during July 2019, the Company purchased 7,901 shares

of its common stock for approximately $113,695, at an average price of $14.39 per share.

438.    According to the 3Q19 10-Q, during August 2019, the Company purchased 440,054 shares of its common stock for approximately $5.97 million, at an average price of $13.57 per share.

439.    On the day after the truth emerged about Mattel, August 9, 2019, the Company's stock closed at $11.31 per share, a true representation of what the Company's stock was worth during the Relevant Period.

| Time Period | Number of Shares Repurchased | Average Share Price | Total Cost | Cost at $11.31/Share | Overpayment |
|---|---|---|---|---|---|
| 8/17 | 289,305 | $19.56 | $5,658,806 | $3,272,040 | $2,386,766 |
| 9/17 | 48,922 | $15.39 | $752,910 | $553,308 | $199,602 |
| 10/17-12/17 | 75,831 | $14.80 | $1,122,299 | $857,649 | $264,650 |
| 1/18-3/18 | 103,456 | $15.79 | $1,633,570 | $1,170,087 | $463,483 |
| 4/18-6/18 | 49,561 | $15.04 | $745,397 | $560,535 | $184,862 |
| 7/18-9/18 | 424,699 | $15.79 | $6,705,997 | $4,803,346 | $1,902,651 |
| 10/18 | 7,198 | $13.61 | $97,964 | $81,409 | $16,555 |
| 11/18 | 1,363 | $13.90 | $18,946 | $15,416 | $3,530 |
| 1/19-3/19 | 29,977 | $12.85 | $385,204 | $339,040 | $46,164 |
| 4/19 | 900 | $12.49 | $11,241 | $10,179 | $1,062 |
| 7/19 | 7,901 | $14.39 | $113,695 | $89,360 | $24,335 |
| 8/19 | 440,054 | $13.57 | $5,971,533 | $4,977,011 | $994,522 |
| **Totals** | **1,479,167** | | **$23,217,562** | **$16,729,380** | **$6,488,182** |

440.    During the Relevant Period, the Company, at the direction of the Individual

Defendants, overpaid for repurchases of its own stock by almost $6.5 million.

## DAMAGES TO MATTEL

441.    As a result of the Defendants' wrongful conduct, Mattel engaged in the accounting improprieties and in connection therewith disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made. The improper statements have devastated Mattel's credibility. Mattel has been, and will continue to be, severely damaged and injured by the Defendants' misconduct.

442.    Indeed, the Defendants' false and misleading statements as alleged above, have subjected Mattel to costs and expenses incurred in connection with the defense and/or settlement of the Securities Class Action. On January 26, 2021, the Court entered an order denying defendants' motions to dismiss in their entirety ("Securities Order"). The Securities Order, *inter alia,* concluded:

> In sum, Plaintiffs' comprehensive allegations and other material properly before the Court read holistically and in Plaintiffs' favor provide robust factual content to support a strong inference of the Mattel Defendants' scienter under Rule 9(b) and the PSLRA.
>
>                          * * *
>
> The severity of Mattel's control weakness as recounted above, and its persistence well after PwC's involvement, supports scienter.
>
>                          * * *
>
> After review of the pleadings and briefing on scienter, the Court has weighed Plaintiffs' allegations, the competing inferences, and innocent explanations. And construing the record properly before the Court in Plaintiffs' favor, Plaintiffs' allegations holistically infer a strong inference that PwC acted with scienter with respect to Mattel's misstatements and internal controls.

443.    As a result, the Securities Class Action is proceeding.

444.    In addition, Mattel was forced to spend time and money undertaking an internal

investigation into the allegations contained herein. Mattel's investigation determined that PwC's lead partner on the Mattel audit team violated certain independence rules. But the Company's internal investigation was not the only investigation to arise from these allegations, both the SEC and attorneys from the Southern District of New York have begun to look into the Company's investigation that resulted in plans to change its chief financial officer and restated earnings.

445.    Moreover, these actions have irreparably damaged Mattel' corporate image and goodwill. For at least the foreseeable future, Mattel will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Mattel' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS

446.    Plaintiff brings this action derivatively and for the benefit of Mattel to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Mattel.

447.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

448.    Plaintiff is an owner of Mattel common stock and was an owner of Mattel common stock at all times relevant hereto.

449.    At the time of filing of this complaint, the Board consists of the following ten individuals: Defendants Kreiz, Bradley, Cisneros, Dolan, Laursen, Lewnes, Lynch, Ng, and Olian (the "Director Defendants"), along with non-defendant Diana S. Ferguson (together with the Director Defendants, the "Directors"). Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have

been a futile and useless act.

**A.    DEMAND IS FUTILE AS TO THE DIRECTOR DEFENDANTS BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

450.    The Director Defendants all face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

451.    Moreover, the Director Defendants as directors owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

452.    Demand is futile as to the Director Defendants because they signed many of the SEC filings in question. For example, Defendants Kreiz, Dolan, Lewnes, and Ng signed the 2017 Form 10-K filed with the SEC, and all of the Director Defendants signed the 2018 Form 10-K.

453.    By reason of their positions as officers and directors of Mattel and because of their ability to control and oversee the business and corporate affairs of Mattel, it is not possible that the Director Defendants were unaware of the truth that Mattel's disclosure controls were severely deficient and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's

SEC filings. The Director Defendants' conscious and knowing making or authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability. If the Director Defendants were to bring a suit on behalf of Mattel to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do. For this reason, demand is futile as to the Director Defendants.

## B.    DEFENDANT KREIZ LACKS INDEPENDENCE

454.    As an initial matter, Mattel has conceded in its SEC filings that Kreiz is not an independent director of the Company. As noted in the Company's 2019 Proxy "Mr. Kreiz ceased being independent as of April 26, 2018 when he became our CEO."

455.    Defendant Kreiz has served as the Company's Chairman and CEO since April 26, 2018, and as a Company director since June 13, 2017. The Company provides Defendant Kreiz with his principal occupation, for which he receives substantial compensation, including $16,955,660 and $15,514,997 in 2018 and 2019, respectively. These amounts are material to him.

456.    Defendant Kreiz was ultimately responsible for all of the false and misleading statements and omissions that were made, includingthose contained in the Company's SEC filings and press releases referenced herein, many of which he either personally made or signed off on. As the Company's highest officer and as a trusted Company director, he conducted seemingly no oversight of the schemes to cause the Company to engage in improper accounting practices and to

make false and misleading statements, consciouslydisregarded his duties to monitor such controls over reporting and engagement in the schemes, andconsciously disregarded his duties to protect corporate assets.

457. Finally, Defendant Kreiz is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

## C. DEMAND IS EXCUSED AS TO DEFENDANTS BRADLEY, LYNCH, AND NG BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY

458. Defendants Bradley, Lynch, and Ng, as members of the Audit Committee during the Relevant Period, were obligated to ensure the integrity of Mattel's system of internal financial controls and to review the Company's press releases and SEC filings including Mattel's annual and quarterly reports to ensure their accuracy.

459. As noted in the Company's Audit Committee Charter, the Audit Committee members responsibilities and duties include, but are not limited to:

### Financial Statement and Disclosure Matters

1. Review and discuss with management and the independent auditor the annual audited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

2. Review and discuss with management and the independent auditor the Company's quarterly financial statements including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the results of the independent auditor's review of the quarterly financial statements, prior to the filing of its Form 10-Q.

3. Discuss with the independent auditor and management, as applicable, the matters relating to the conduct of the audit that the independent auditor must communicate to the Committee under applicable Public Company Accounting Oversight Board (the "PCAOB") standards as amended from time to time, including but not limited to: (a)

Discussing with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles. (b) Reviewing and discussing reports from the independent auditors on: i) Critical accounting policies and practices to be used. ii) Alternative treatments of financial information within generally accepted accounting principles and practices related to material items that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor. iii) Other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

4.   Discuss with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

5.   Discuss with management and the independent auditor the effect of regulatory and accounting initiatives, as appropriate, as well as off-balance sheet structures on the Company's financial statements.

6.   Oversee the Company's assessment and management of material risks (a) impacting the Company's business and (b) relating to financial reporting and accounting and compliance, and annually review and discuss with management the material risks impacting the Company and the steps management has taken to monitor and control these risks.

**Internal Controls**

7.   Review and discuss with management, the principal internal auditor and with the independent auditor, the Company's required internal controls report and the independent auditor's internal controls opinion, any special steps adopted in light of material weaknesses in internal controls and the adequacy of disclosures about changes in internal controls over financial reporting prior to the filing of the Company's Form 10-K.

8.   Discuss with the independent auditor and with management any management letter provided by the independent auditor and any other significant matters brought to the attention of the Committee by the independent auditor as a result of its annual audit. The Committee should allow management adequate time to consider any such matters raised by the independent auditor.

9.   Review disclosures made to the Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls over financial reporting or

material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls over financial reporting.

**Oversight of the Company's Relationship with the Independent Auditor**

10. Review and evaluate the lead partner of the independent auditor team.

11. Obtain and review a report from the independent auditor at least annually regarding (a) the independent auditor's internal quality-control procedures, (b) any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm, (c) any steps taken to deal with any such issues, and (d) all relationships between the independent auditor and the Company, consistent with PCAOB Rule 3526.

12. Actively engage in a dialogue with the independent auditor with respect to any disclosed relationships or services that may impact the objectivity and independence of the independent auditor, and take, or recommend that the Board take, appropriate action to oversee the independence of the independent auditor.

13. Evaluate the qualifications, performance and independence of the independent auditor, including considering whether the auditor's quality controls are adequate and the provision of permitted non-audit services is compatible with maintaining the auditor's independence, and taking into account the opinions of management and internal auditors. The Committee shall present its conclusions with respect to the independent auditor to the Board.

14. Ensure the rotation of the audit partner as required by law.

15. Set policies for the Company's hiring of employees or former employees of the independent auditor who participated in any capacity in the audit of the Company.

16. Discuss with the independent auditor issues on which the national office of the independent auditor was consulted by the Company's audit team, to the extent such issues were deemed to be material by the independent auditor.

17. Meet with the independent auditor prior to the audit to discuss the planning and staffing of the audit.

460. In conscious disregard of their duties and responsibilities, Defendants Bradley, Lynch, and Ng failed to monitor Mattel's information and reporting systems for compliance relating to the Company's products and product development. In conscious disregard of their duties and responsibilities, Defendants Bradley, Lynch, and Ng approved management's false and

misleading statements, as described herein.

461.    Defendants Bradley, Lynch, and Ng, as members of the Audit Committee failed to ensure the integrity of the Company's financial statements and financial reporting process, and the Company's systems of internal accounting and financial controls provided by the Company, as required by the Audit Committee Charter. For this reason, demand is futile as to Defendants Bradley, Lynch, and Ng.

**D.     THE Director Defendants Improperly Approved Mattel's Stock repurchases**

462.    Each of the Director Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $6.48 million for its own common stock during the Relevant Period. The Director Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases, particularly Defendants Lynch, Ng, and Laursen, who, as members of the Finance Committee oversaw the Company's repurchase programs. Thus, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

**FIRST CLAIM**

**AGAINST DEFENDANTS KREIZ, BRADLEY, CISNEROS, DOLAN, LAURSEN, LEWNES, LYNCH, NG, OLIAN, AND PRABHU FOR VIOLATIONS OF SECTION 14(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

463.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

464.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

465.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

466.    Under the direction and watch of Defendants Kreiz, Bradley, Cisneros, Dolan, Laursen, Lewnes, Lynch, Ng, Olian, and Prabhu, the 2019 Proxy failed to disclose that: (1) Mattel did not maintain effective internal controls over financial reporting; (2) the Company's net loss during the third fiscal quarter of 2017 was understated by $109 million; (3) the Company's senior accounting team conspired with PwC to cover up this understatement by overstating the Company's net loss during the fourth fiscal quarter of 2017 by $109 million; and (4) as a result of these misstatements, the Company's financial statements were inaccurate and were not in compliance with GAAP. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times and the Company would ultimately be forced to cancel its $250 million Notes Offering and restate certain of its financial statements.

467.    Moreover, the 2019 Proxy was false and misleading when discussing the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their causing the

Company to issue false and misleading statements and/or omissions of material fact.

468. In the exercise of reasonable care, Defendants Kreiz, Bradley, Cisneros, Dolan, Laursen, Lewnes, Lynch, Ng, Olian, and Prabhu should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to voting on the matters set forth for shareholder determination in the 2019 Proxy, including but not limited to, election of directors, advisory approval of executive compensation, ratification of PwC as the Company's independent auditor, approval of a stockholder proposal regarding an amendment to stockholder proxy access provisions, and approval of amendments to the 2010 Long-Term Compensation Plan.

469. Moreover, with regard to the "independence of PwC, the 2019 Proxy failed to disclose the material information that PwC violated the SEC and PCAOB-mandated independence rules, as detailed above. As Mattel would later report, it "concluded that certain actions in specific HR-related activities by the lead audit partner of Mattel's outside auditor, namely providing recommendations on candidates for Mattel's senior finance positions, was in violation of the SEC's auditor independence rules. He also provided feedback on senior finance employees."

470. The false and misleading elements of the 2019 Proxy led to the approval of the ratification of PwC as the Company's auditor, amendments to the 2010 Long-Term Compensation Plan and to the re-election of Defendants Kreiz, Georgiadis, Bradley, Cisneros, Dolan, Edwards, Laursen, Lewnes, Lynch, Ng, Olian, and Prabhu, which allowed them to continue breaching their fiduciary duties to Mattel.

471. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2019 Proxy.

472. Plaintiff on behalf of Mattel has no adequate remedy at law.

## SECOND CLAIM
### AGAINST INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF
### SECTION 10(b) AND RULE 10b-5 OF THE SECURITIES EXCHANGE ACT OF 1934

473. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

474. In connection with Mattel's repurchase of shares, the Individual Defendants disseminated and/or approved false and/or misleading statements about Mattel specified herein which they knew, or recklessly disregarded, were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and the Individual Defendants' course of conduct were designed to artificially-inflate the price of the Company's common stock.

475. At the same time that Mattel's stock price was inflated due to the Individual Defendants' false or misleading statements, the Individual Defendants caused the Company to repurchase millions of shares of common stock. The Individual Defendants engaged in a scheme to defraud Mattel by causing the Company to spend over $23 million repurchasing shares of Mattel stock at artificially-inflated prices.

476. The Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Mattel in connection with the Company's purchases of Mattel stock.

477. The Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or the United States mails, engaged

and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Mattel stock, which were intended to, and did, (i) deceive Mattel regarding, among other things, that the Company's disclosure controls were severely deficient and did not provide reasonable assurance that the information required to be disclosed by Mattel in its SEC filings was collected, communicated and properly reported in Mattel's SEC filings; (ii) artificially inflate and maintain the market price of Mattel stock; and (iii) cause Mattel to purchase the Company's stock at artificially-inflated prices, and suffer losses when the true facts became known.

478.    The Individual Defendants were executives and/or the directors of the Company, and were, therefore, directly responsible, and are liable for all materially false or misleading statements alleged above.

479.    The misstatements and omissions of material facts set forth herein were either known to Individual Defendants or were so obvious that Individual Defendants should have been aware of them. The Individual Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

480.    The Individual Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock by the Company itself.

481.    As a result of Individual Defendants' misconduct, Mattel has and will suffer damages in that it paid artificially inflated prices when purchasing Mattel common stock and

suffered losses when the previously undisclosed facts relating to the deficiency of the Company's disclosure controls and the need to file a restatement were disclosed. Mattel would not have purchased these securities at the prices it paid, but for the artificial inflation in the Company's stock price caused by Individual Defendants' false or misleading statements.

482.    As a direct and proximate result of Individual Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of Mattel stock. By reason of such conduct, Individual Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

483.    Plaintiff brought this claim within two years of its discovery of the facts constituting the violation and within five years of the violation.

**THIRD CLAIM**
**AGAINST PwC FOR VIOLATIONS OF SECTION 10(b)**
**AND RULE 10B-5 OF THE SECURITIES EXCHANGE ACT OF 1934**

484.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

485.    PwC participated in a scheme to defraud with the purpose and effect of defrauding Mattel. Not only is Mattel now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Mattel by PwC.

486.    During the Relevant Period, PwC, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's periodic and current reports filed with the SEC.

487.    PwC employed devices, schemes and artifices to defraud while in possession of

adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Mattel not misleading.

488.    PwC is liable as a direct participant in the wrongs complained of herein. Through its position as the Company's independent registered accounting firm, PwC was able to and did control the conduct complained of herein and the content of the "clean" audit reports contained in the financial statements disseminated by Mattel.

489.    PwC acted with scienter during the Relevant Period, in that PwC either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that PwC failed to ascertain and to disclose the true facts, even though such facts were available to PwC. PwC worked with the top executives of the Company, and received direct briefings from them, and was therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

490.    By virtue of the foregoing, PwC has violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

491.    Plaintiff brought this claim within two years of its discovery of the facts constituting the violation and within five years of the violation.

## FOURTH CLAIM
### VIOLATIONS OF SECTION 29(b) OF THE EXCHANGE ACT
### (AGAINST THE INDIVIDUAL DEFENDANTS)

492.    The Individual Defendants each received incentive pay, compensation, and fees, including stock awards and options, while engaging in conduct that violates Section 10(b) of the

Exchange Act. The Individual Defendants' incentive compensation and fees should be rescinded under Section 29 of the Exchange Act because the Individual Defendants violated Section 10(b) by making untrue statements of material facts or omitting material facts necessary in order to make the statements made, in light of the circumstances, not misleading as described in this Complaint. All of the payments the Individual Defendants received are therefore voidable by Mattel under Section 29(b) of the Exchange Act.

493.    Mattel is in privity with each of the Individual Defendants with respect to the incentive compensation and fees provided by Mattel to the Individual Defendants. The Individual Defendants have engaged in prohibited conduct in violation of the securities laws as alleged herein.

494.    Mattel has been severely injured by the misconduct of the Individual Defendants. Accordingly, Mattel is entitled to damages, such as rescission of the incentives, compensation, and fees granted to the Individual Defendants.

## FIFTH CLAIM
### AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATIONS OF
### SECTION 20(a)OF THE SECURITIES EXCHANGE ACT OF 1934

495.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

496.    The Individual Defendants, by virtue of their positions with Mattel and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Mattel and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Mattel to engage in the illegal conduct and practices complained of herein.

497.  Plaintiff on behalf of Mattel has no adequate remedy at law.

## SIXTH CLAIM
### AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES

498.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

499.  Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Mattel's business and affairs.

500.  Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

501.  The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Mattel.

502.  In breach of their fiduciary duties owed to Mattel, the Individual Defendants willfully or recklessly caused the Company to engage in improper accounting practices, and made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) Mattel did not maintain effective internal controls over financial reporting; (2) the Company's net loss during the third fiscal quarter of 2017 was understated by $109 million; (3) the Company's senior accounting team conspired with PwC to cover up this understatement by overstating the Company's net loss during the fourth fiscal quarter of 2017 by $109 million; and (4) as a result of these misstatements, the Company's financial statements were inaccurate and were not in compliance with GAAP. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times and the Company would ultimately be forced to cancel its $250 million Notes Offering and restate

certain of its financial statements.

503.     The Individual Defendants consciously caused or allowed Mattel to lack requisite internal controls, and, as a result, the Company regularly made false and misleading statements regarding its accounting practices.

504.     The Individual Defendants consciously disregarded their oversight and monitoring responsibilities involving the Company.

505.     The Individual Defendants' actions and failures to act were breaches of their fiduciary duties to Mattel and its shareholders and could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

506.     The Individual Defendants' actions and failures to act have subjected Mattel to material enterprise risk from liability, damages, penalties and fines in the Securities Class Action; investigations by regulators and government bodies; and legal, consulting, investigative, and other fees and expenses.

507.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**SEVENTH CLAIM**
**AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS**

508.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

509.     The Individual Defendants caused the Company to engage in improper accounting practices, to repurchase its own stock at artificially inflated prices, and to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

510.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Mattel to waste

valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

511.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

## EIGHTH CLAIM
### AGAINST PwC FOR AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY AND THE INDIVIDUAL DEFENDANTS' OTHER VIOLATIONS OF LAW

512.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

513.     PwC aided and abetted the Individual Defendants who breached their fiduciary duties to Mattel, abused their control, grossly mismanaged the Company, wasted corporate assets, violated the Exchange Act, and were unjustly enriched thereby.

514.     PwC's misconduct resulted in continuous, connected, and ongoing harm to the Company.

515.     Specifically, PwC aided and abetted the Individual Defendants in making false and misleading statements about the Company's internal controls and the adequacy of the Company's financial statements, allowing the artificial inflation of the price of Company stock.

516.     PwC is jointly and severally liable to the same extent as any other Individual Defendant is liable for breaches of fiduciary duty as set forth herein or violations of any other laws, including for any unjust enrichment PwC received from Mattel while it violated the Exchange Act and aided and abetted the Individual Defendants' violations of law.

517.     As a direct and proximate result of PwC's aiding and abetting of Mattel's directors' and officers' breaches of duty and other misconduct alleged herein, Mattel has sustained and will

continue to sustain substantial damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests the following relief:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of Mattel and that Plaintiff is a proper and adequate representative of the Company;

B.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, violations of securities laws, and waste of corporate assets;

C.     Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law, including, but not limited to the institution of appropriate corporate governance measures;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, and costs and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Lead Plaintiffs demand a trial by jury of all issues so triable.

Dated: June 22, 2021

**OF COUNSEL:**

**HYNES & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116
Email: mhynes@hh-lawfirm.com
          lhernandez@hh-lawfirm.com

**LONG LAW, LLC**

By:   */s/ Brian D. Long*
        Brian D. Long (#4347)
        3828 Kennett Pike, Suite 208
        Wilmington, DE 19807
        Telephone: (302) 729-9100
        Email: bdlong@longlawde.com

        *Attorneys for Plaintiff*